# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

JOSEPH ANTHONY BARRETT,

Defendant and Appellant.

S124131

Imperial County Superior Court

CF5733

June 23, 2025

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Jenkins, and Evans concurred.

PEOPLE v. BARRETT

S124131

Opinion of the Court by Groban, J.

A jury convicted defendant Joseph Anthony Barrett of first degree murder (Pen. Code,[1] § 187), aggravated assault by a life prisoner (§ 4500), and two counts of possession of a deadly weapon by a prisoner (§ 4502). It found true special circumstances for a prior murder (§ 190.2, subds. (a)(2)) and an intentional killing while lying in wait (§ 190.2, subd. (a)(15)). At the penalty phase, the jury returned death verdicts for the special-circumstance murder and the aggravated assault by a life prisoner counts. The court denied defendant's automatic motion to modify the verdict (§ 190.4, subd. (e)), as well as a motion for a new trial, imposed the death sentence for the murder, and stayed the remaining terms. This appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND[2]

In the early morning hours of April 9, 1996, Thomas Richmond was found nonresponsive in the cell he shared with defendant at Calipatria State Prison (Calipatria). Richmond had suffered multiple stab wounds. Defendant admitted

---

[1]     All further undesignated statutory references are to the Penal Code.

[2]     Further factual and procedural background is provided throughout the opinion as relevant to particular claims.

1

stabbing Richmond but asserted that he did so in self-defense. In July 1998, defendant was indicted for first degree premeditated murder, aggravated assault by a life prisoner, and two counts of deadly weapon possession, with special circumstances for a prior murder and lying-in-wait murder. On December 1, 2003, the prosecution began presenting its guilt phase case-in-chief. The prosecution theorized that defendant killed Richmond, not in self-defense, but because he knew Richmond was an informant or "snitch" working with prison staff. In January 2004, the jury found defendant guilty as charged and found both special circumstance allegations to be true. The penalty phase began on February 3, 2004. On March 10, 2004, the jury returned death verdicts for the special-circumstance murder and aggravated assault by a life prisoner convictions. The trial court imposed a death sentence for the murder and imposed and stayed a death sentence for the aggravated assault. The trial court also imposed and stayed determinate upper terms of eight years for each of the weapon possession counts.

## A. Guilt Phase

### 1. Prosecution Evidence

In February 1996, Richmond was an inmate housed in the general population at Calipatria. On February 29, 1996, Richmond told Correctional Officer Jason Longcor that "he was holding weapons" in his cell. Longcor advised Richmond to return to his cell. Longcor did not immediately search Richmond's cell because he did not want other inmates to suspect Richmond of being a "snitch." Later, Longcor and Correctional Sergeant Timothy Borem removed Richmond and his cellmate from their cell and put them in separate showers.

The officers searched Richmond and confiscated two inmate manufactured plexiglass knives that Richmond had hidden in his clothing. No weapons were recovered from Richmond's cell.

In a subsequent interview with Borem, Richmond explained that an unidentified inmate told him there were weapons hidden in Richmond's mattress and instructed Richmond to hold onto them. Richmond told prison officials about the weapons because he did not want to be caught with them; he said he had been " 'threatened by a few people about holding' " the weapons.

Longcor filled out a rules violation report, or "115," on Richmond, but did not include in his report that Richmond voluntarily gave up the weapons since such information could put Richmond at risk of being assaulted by other inmates. Thereafter, Richmond was sent to the prison's Administrative Segregation Unit, or "Ad Seg," where a general population inmate is placed for either a rules violation, i.e., a "management case," or for protective purposes. Correctional Lieutenant Glenn Trujillo was in charge of the Ad Seg unit at the time. He processed Richmond as a management case; no one told Trujillo that Richmond had voluntarily given up weapons, a fact that would have made Trujillo consider Richmond for protective placement.

On April 9, 1996, Richmond was housed with defendant in cell 146 of Calipatria's Ad Seg. At around 2:00 a.m., as Correctional Officer Jeffrey Wysocki conducted his second count of inmates, he looked into cell 146 and observed Richmond on the top bunk bed and defendant on the lower bunk. Wysocki did not hear anyone "screaming for help" or see anything unusual thereafter. When Wysocki and Correctional Officer Robert Avila

did their third count at approximately 4:45 a.m., the light was on in cell 146 and defendant was standing at the door of the cell in his boxer shorts. The officers then observed Richmond sitting on the lower bunk; he was "slumped over" and had visible stab wounds to his chest. From Wysocki's viewpoint at the cell door, the cell "looked ordinary and neat." He had never seen a cell look "as ordinary as Cell 146 did on April the 9th of 1996" after a cell fight. Wysocki addressed defendant, " 'Your celly doesn't look too fucking good.' " Defendant replied, " 'Well, he's not.' " To Wysocki, defendant seemed to be acting normally. Neither Wysocki nor Avila observed any scratches on defendant. Wysocki and Avila left to advise Correctional Sergeant Fred Hazel, who was in the control booth, of the situation.

Wysocki, Avila, and Hazel thereafter returned to cell 146, where they found defendant eating an apple. Defendant was removed from cell 146 and placed in a holding cell. As Avila escorted defendant to the holding cell, an inmate yelled out to him, " 'what is wrong with your celly?' " Defendant "didn't say nothing. He just smiled and kept walking." Defendant did not show any indications of having recently been in a struggle nor was there any sign of a struggle in the cell.

In cell 146, Hazel observed Richmond "leaning" on the lower bunk bed with his head on the desk. Hazel observed four wounds to the right side of Richmond's chest; his feet were in "a pool of what appeared to be coagulated blood." Hazel could not find a camera to take pictures of the cell but testified that cell 146 did not look "trashed," as would be expected after a cell fight.

After defendant was escorted out of cell 146, Wysocki, Hazel and a medical technical assistant, Michael Greene, entered the cell to check on Richmond. Greene placed Richmond

on the floor.  Greene checked Richmond's vital signs; he had no pulse, was cold to the touch, and exhibited no signs of life. Greene administered cardiopulmonary resuscitation (CPR), but Richmond was unresponsive.  Greene observed that rigor mortis was setting in.  After Greene unsuccessfully administered CPR, an ambulance arrived to transport Richmond to the prison emergency room.  Greene recorded that Richmond had six chest wounds, puncture wounds to his abdomen and shoulder, and a wound on the left side of his face.

Joann Huelsen, a registered nurse, was working in the prison emergency room on the morning of April 9, 1996.  She testified that Richmond showed no signs of life upon his arrival to the emergency room at around 5:15 a.m., but "there was an unstated rule that no one died on grounds."  Richmond was transported by ambulance at about 5:50 a.m. to Pioneers Memorial Hospital.  He was pronounced dead while in route to the hospital.

On the morning of April 9, 1996, Ralph Smith, an investigator with the Coroner's Division of the Imperial County Sheriff's Office, was called to Pioneers Memorial Hospital to investigate Richmond's death.  Upon his arrival at the hospital at 7:19 a.m., he preliminarily examined Richmond's body. Richmond was five feet, nine inches tall, and weighed 160 pounds.  He had visible stab wounds to his face, neck, chest, and left hip.  Based on rigor mortis to Richmond's neck and shoulders and some lividity, Smith opined he had been dead for at least a couple of hours, but no more than three hours.

In the meantime, while defendant was in the holding cell, Correctional Officers Raymond Leon and William Brumbaugh observed him squatting down and looking around, which raised

their suspicions. The officers decided defendant should be x-rayed for contraband. Brumbaugh asked defendant how his cellmate was doing, and defendant said he had " 'steel poisoning.' "

Marco Pineda was working as an x-ray technologist at Calipatria on April 9, 1996 when defendant was brought to the infirmary for an x-ray. Pineda took an x-ray of defendant's pelvis and abdomen. Based on his training and experience with x-rays, Pineda suspected defendant was hiding contraband in his body. Defendant was then placed on "contraband watch." Correctional Officer William Wright oversaw defendant while he was on contraband watch. Defendant called Wright over to his cell in the infirmary and said, " 'Here is the weapon' " and slid a razor blade with some tape for a handle under the cell door.

At about 8:50 a.m. on April 9, 1996, Katrina Sweet, a medical technical assistant working in Ad Seg at Calipatria, was called to perform an examination of defendant. Defendant refused to allow her to examine him because he preferred to be examined by a male. Sweet did not see any wounds on defendant. Defendant subsequently refused to allow a male medical technical assistant, Roberto Victa, to examine him. Victa observed some open blister-like sores on defendant's hands, but his hands were not swollen or bruised. Victa did not observe any defensive wounds on defendant.

Robert Swetich, a correctional officer with the Calipatria Security and Investigations Unit, also met with defendant on the morning of April 9, 1996. He did not recall seeing any defensive wounds on defendant. According to Swetich, defendant appeared calm and acted arrogantly, joking about

Swetich's wife. Richmond's death was the first homicide Swetich had investigated. He recorded a video of cell 146 and its contents on the day of Richmond's death, which was played for the jury. There appeared to be blood on the floor, underneath the desk, and on the chair, and blood spatter on the wall. Both mattresses and the bed linens were on the lower bunk; there was blood on the sheets and pillowcases. Swetich did not find any weapons or contraband. The cell looked neater than was typical after a cell fight. Swetich testified that he did not interview any inmates housed in nearby cells.

At around 8:45 a.m. on April 9, 1996, Samuel Tozer, a plumber at Calipatria, arrived at the Ad Seg building and was directed to cell 146 to retrieve an item from the toilet. He pulled a piece of metal with white cloth on it from the toilet in cell 146; it could not have come from any other cell.

At around 9:15 a.m. on April 9, 1996, Correctional Officer Raymond Leon arrived in Ad Seg to pick up the item retrieved by Tozer. Leon photographed the item and described it as being a piece of flat metal stock measuring about eight and one-half inches long, three quarters of an inch wide, and one-inch thick at its thickest point. The metal was sharpened to a point on one end, with a "handle" on the other end consisting of "material wrapped around one end to use so that a person won't injure their hand[.]" Leon photographed the steel desk in cell 146, which had a missing piece of metal that was consistent in size with "the inmate-manufactured weapon" that Leon retrieved from Tozer. Leon testified that inmates can sharpen weapons on the concrete floor, ceiling, and walls of their cells.

Dr. Christopher Swalwell, a deputy medical examiner, performed an autopsy of Richmond's body on April 9, 1996.

Richmond had a stab wound on the left side of his cheek, as well as one on the back of his head that went through the scalp. He also had four stab wounds on the right side of his chest, a stab wound on his left arm near his shoulder, a couple of wounds on the left side of his back, two wounds on the left side of his chest, and a wound on his left hip. He had two cuts on his hands. Dr. Swalwell testified that Richmond's cause of death was "the multiple stab wounds." Six of Richmond's stab wounds were potentially fatal. Dr. Swalwell could not determine where Richmond was in the cell when he received his wounds. Richmond's wounds were consistent with having been inflicted during a struggle. Based on a hypothetical describing a weapon consistent with that retrieved by Tozer from the toilet in cell 146, Swalwell opined that such a weapon could have been used to inflict Richmond's wounds.

Ray Vialpando, a correctional case records analyst assigned to Calipatria, testified that defendant was serving an indeterminate 26-year-to-life sentence for a 1987 conviction at the time of Richmond's death.

### 2. Defense Evidence

Vialpando was recalled by the defense. He testified that Richmond had been convicted of three counts of second degree robbery and one count of burglary, for which he was sentenced to 13 years in prison. These serious felony convictions could qualify as strikes.

Defendant testified on his own behalf. He explained how prisoners generally "segregate themselves according to race or gang affiliation." Defendant had never been in a gang. He could be said to be a "wood," or a White inmate in good standing with other White inmates. "Snitching" on a cellmate would probably

be a violation of acceptable behavior within any prison community.

Defendant met Richmond when they became cellmates in Ad Seg in March of 1996. The men exchanged "114s," which are "just basically institutional paperwork with a summary of why you're being placed in ad seg." Defendant explained to Richmond how Ad Seg worked and "[l]et him know who's here as far as our people [other White inmates] were concerned and who was all right." Richmond told defendant he was in Ad Seg because he claimed responsibility for knives found in his cell, even though the knives did not belong to him. Defendant and Richmond got along well and committed rules violations together, including a joint attempt to bring weapons to the yard. Following a "flooding" incident, defendant and Richmond were separated and defendant was moved to cell 146. During the time they were separated from each other, defendant witnessed Richmond get extracted from his newly assigned cell; Richmond told defendant he was extracted for possessing weapons. Defendant also became aware that Richmond "gass[ed] a couple of officers," though he did not personally witness the gassing. Defendant defined "gassing" as "[t]hrowing any liquid substance on someone. It could be any combination of substances, some of them foul."

Defendant started making a knife from the steel desk in cell 146 when Richmond was not housed with him. Richmond was later rehoused with defendant in cell 146 and defendant "enjoyed his company." Defendant could not hide the fact that he was making a weapon and Richmond assisted defendant in sharpening the knife. Defendant had Richmond stop sharpening the knife when he became suspicious of Richmond receiving "kites," or inmate written notes, that Richmond did

not share with him. It was "courtesy" to share kites with your cellmate. Richmond offered no explanation for his behavior. Richmond also began acting "uptight" and "tense," as though "something was on his mind." Defendant did not inquire with Richmond about his behavior because such an inquiry could be viewed as disrespectful. Defendant did not like "what was going on," but gave Richmond "the benefit of the doubt."

Defendant testified that, on April 8, 1996, Richmond received an unwrapped knife with a handle through the side of their cell door. An unwrapped knife is intended for immediate use and defendant considered stabbing Richmond right then. Defendant "thought for sure it was a setup for [Richmond] to use the knife." Richmond told defendant he was asked to hold the knife for another inmate. Defendant speculated that Richmond did not immediately attack him because defendant had his own knife in his hand at the time. Defendant did not stab Richmond at that point because he was not sure what Richmond's intentions were and he could think of no reason why Richmond would want to attack him. Defendant eventually got on the bottom bunk and put his own knife under his pillow. He did not get under the covers as that would put him "in a more vulnerable position." Richmond got in the top bunk with his knife.

After the first count of inmates, "something very unusual happened." Richmond "slid his legs over the top bunk by my desk . . . [a]nd he stepped down onto the desk," which was an uncommon way to exit the bunk. "There was no doubt in [defendant's] mind that" he "was going to come after me." Defendant grabbed his knife and jumped up. He saw Richmond had a knife in his left hand. Defendant, who was afraid and thinking Richmond was going to attack him, stabbed Richmond.

Defendant stabbed Richmond "several times" until Richmond climbed back onto the top bunk. Defendant continued to stab Richmond "while he was on the top bunk." Richmond grabbed the mattress off the top bunk and tried to block defendant as he came down off the top bunk to the desk again. Richmond still had his knife. Richmond and defendant struggled over the mattress and defendant continued to try to strike Richmond. Richmond ended up "either falling or sitting to the edge of the bunk." They were both breathing heavily. They stared at each other for about a minute and Richmond started to get up. Defendant struck Richmond in the chest as he was trying to get up. Neither Richmond nor defendant called for help, as that is "not done." Richmond fell backwards, and defendant struck him several more times. Defendant was "afraid of what he may do." Defendant stopped when Richmond stopped moving.

After it was apparent Richmond was not breathing, defendant looked to see if he had been wounded. Defendant had not. Defendant then washed the blood off himself and flushed his clothes down the toilet. Defendant did not touch Richmond. He found Richmond's knife under the bunk; he "snapped it in half and flushed it down the toilet." Defendant then broke the handle off his knife and flushed it, followed by the blade, down the toilet. Defendant did not want correctional officers finding any weapons. He explained, "if you can keep them from getting it, you don't let them get it." Defendant straightened up the cell and looked for other contraband to hide. The officers came by the cell for second count, but did not stop. Defendant "was flabbergasted." He did not know why they did not stop. He thought "[m]aybe they had something to do with it" and "got paranoid." Defendant then turned on the cell light and stood by the door for third count. He did not recall what words he

exchanged with Officer Wysocki. Defendant eats when he is nervous, so he began eating an apple. Defendant "absolutely" did not tell anyone Richmond died from "steel poisoning." He initially refused to undergo a physical examination without a lawyer and due to modesty, but he eventually complied.

On cross-examination, defendant admitted killing Richmond. Defendant also admitted several prior acts of misconduct while incarcerated. In February 1995, he approached an inmate from behind and "stabbed, I think it was a child abuser several times in the back while he was reading Bible Scriptures on the yard." In May 1995, he was caught with a piece of metal in his "anal cavity." In August 1995, defendant "slashed" another inmate. In September 1995, defendant was found in possession of a weapon. In February 1996, defendant assaulted another inmate in the yard. In February 1999, defendant was found in possession of weapons. In January 2000, a weapon was found in defendant's cell wall. In February 2000, defendant possessed razorblades. In March 2002, defendant "assaulted an inmate with a weapon on the yard." He could not recall specifically but testified that the weapon was "[p]robably a slashing instrument." Defendant denied that the razorblades he possessed on two other occasions were weapons.

Returning to the circumstances of Richmond's killing, defendant testified that, on April 9, 1996, he continued attacking Richmond as Richmond retreated to the top bunk because Richmond still had his knife. Defendant could not remember if he continued striking Richmond while he was on the top bunk, but he "may have." The whole struggle lasted "[a] brief time." Defendant did not call for help. He sat in the cell with Richmond for "several hours," and cleaned up while Richmond was dead. Defendant destroyed Richmond's weapon.

Defendant testified that it was a "fair statement," that he destroyed the "one piece of evidence that may have exonerated" him. Defendant acknowledged the plumber only retrieved his weapon from the toilet in cell 146.

On redirect, defendant testified that, before Richmond's death, he had received no negative information about Richmond. Richmond won defendant's trust by going to the yard with him with a weapon. Richmond's other acts of weapon possession and "gassing" officers showed defendant that "[h]e was trying to ingratiate himself to the people around him." These acts were inconsistent with "snitching on white inmates or giving up voluntary weapons." Defendant "keistered" a weapon away from the scene after Richmond's killing because he felt his life might be in continued danger.

Lisa DiMeo, a forensic specialist, testified as a defense expert. She underwent specialized training in bloodstain analysis and crime scene reconstruction. She described what it meant to "secure a crime scene" and "protect the integrity of the evidence that's within that crime scene." She reviewed documents in defendant's case, as well as photographs and a video of the scene. She opined that the processing of the crime scene "was less than perfect. It was adequate for what I needed to do, but there — there should have been more done. It would have answered more questions." According to DiMeo, "[m]ore attention should have been given to the integrity of the evidence, the construction of the mattress, the construction of the bedding and their position. The bloodstain evidence was not photographed properly with proper equipment." Not all of the bedding and clothing was preserved, some blankets were improperly labeled, and some blood stains were not properly documented. Based on her review of the evidence, "all the blood

evidence at the scene and the evidence of, you know, items strewn all over the place, it's obvious that there was a fight." DiMeo opined that "the cuts on the [bed]sheet" evidenced that Richmond had a weapon. If the weapon were caught in the sheet, that would account for defendant's lack of injuries.

On cross-examination, DiMeo said she spoke briefly to defendant, but not about her analysis in the case. DiMeo did "[n]ot for a fact" know that Richmond had a weapon.

Christopher Poore, a former Calipatria inmate who was on death row at San Quentin State Prison at the time of defendant's trial, testified that he knew defendant and Richmond when he was in Ad Seg at Calipatria from 1995 through 1997. Richmond communicated with Poore through kites that he wanted a weapon and wanted to cell up with defendant so he could kill him. Poore saw a weapon being transferred to Richmond "on the line." On the "night of April 8th, April 9th," Poore "woke up to the sound of the struggle." During cross-examination, Poore testified that he never told defendant that Richmond wanted to kill him. Poore saw a couple unpackaged knives moving around the night of Richmond's death, "the smaller one" went to cell 146.

### 3. Prosecution Rebuttal

In rebuttal, the prosecution called three inmates to testify. Robert Wilson was housed in Ad Seg at Calipatria at the time of Richmond's death and shared a cell with Poore. Wilson did not see any weapons go across the floor on the evening of April 8, 1996. Wilson testified that he and Poore received a few kites from defendant prior to April 9, 1996. The kites indicated that defendant thought Richmond was a "rat" and was going to "deal

with him." Richmond never sent a kite into Wilson's cell asking for a weapon.

Inmate Michael Hill testified that he was in Ad Seg at Calipatria in April 1996; his cell was connected by air vents to the cell defendant shared with Richmond. Hill talked to defendant through the vents. He did not have any direct conversations with defendant about why he killed Richmond. Hill had information that defendant was "going to hit" Richmond because Richmond got himself sent to Ad Seg by turning over "two knives" to the "cops" to avoid paying a debt on "C yard." Hill and defendant argued over whether defendant had enough proof to kill Richmond. Hill suggested defendant send Richmond out to "hit" someone on the yard as a "heart check." Defendant instead told Hill he would kill Richmond.[3] On the morning of April 9, 1996, Hill woke up to Richmond "yelling 'why?' " He also heard defendant call out his (Hill's) name because he wanted help removing the knife from his cell.

Inmate James Magee testified that he met defendant at Calipatria in 1993 and then reunited with him at Pelican Bay Prison in 1997. Defendant moved into the cell next to Magee's cell at Pelican Bay. Magee was an "affiliate" of the Aryan Brotherhood, "the primary white prison gang in California." Magee "ran that particular [cell] block" where he and defendant were housed, so defendant would talk to him. Defendant was not in the Aryan Brotherhood, but the Aryan Brotherhood gang

---

[3] The Attorney General concedes that Hill's testimony "was contradictory at times." For instance, "Hill testified that he and [defendant] argued through the vents about the killing of Richmond, [but] he also denied having such conversations with [defendant]."

controlled White inmates "in maximum security prisons where they have a presence." Defendant "had got[ten]wind" that the Aryan Brotherhood was questioning the validity of "his murder" and whether he "conduct[ed] a thorough enough investigation before he committed his murder." Defendant wanted to "explain his case" to Magee so that a murder contract would not be put out on his life. The Aryan Brotherhood has "standing orders to kill all rats," but an inmate who commits a killing that was not "sanctioned" by the Aryan Brotherhood, like Richmond's killing, would have to "justify his murder." Magee testified that defendant told him he murdered Richmond because he had information that Richmond was "a rat." Defendant never mentioned self-defense or there being two weapons. He told Magee that he had cut a knife from a desk and stabbed Richmond in the heart and liver. Defendant thought the guards' reactions to seeing Richmond's dead body were "rather amusing."

Elissa Mayo, a crime scene reconstructionist and senior criminalist with the Department of Justice testified that, on her review of the evidence, there was no indication more than one weapon was used during the events in cell 146. Mayo explained, "[t]he evidence was not taken or collected in a manner one would normally expect if a scene was processed properly," so she could "make only a few determinations from the evidence."

Vialpando, the case records analyst at Calipatria, was recalled by the prosecution. He testified that Richmond had no documented in-prison misbehavior until he entered Ad Seg in February of 1996.

### 4. *Defense Surrebuttal*

On surrebuttal, defendant denied making the statements that Hill, Wilson, and Magee attributed to him. Defendant knew Hill and Magee to be well-acquainted with each other; they were "homeboys from Sacramento." Defendant "had no idea" he and Richmond would be in "a mortal conflict" until April 9, 1996.

Inmate Edward Vargas, who was housed next door to Richmond and defendant in Ad Seg at Calipatria in April 1996, did not remember having a conversation with an officer about Richmond's death. He did not remember telling an officer shortly after the incident that he knew "everything about it." He did not recall telling an officer that " '[t]he knife came from an inmate upstairs by the name of Shorty.' "

Michael Capeci, a sworn peace officer working as an investigator for the District Attorney's Office, testified that he had contacted Vargas at the time of Richmond's death. Vargas told Capeci he was "apprehensive on testifying," but explained to Capeci that there was a hole in the wall separating his cell from cell 146. Vargas looked through the hole at one point and saw Richmond sharpening a "sharp instrument." Vargas said he knew the knife that killed Richmond came from an "inmate upstairs by the name of Shorty[.]" During cross-examination by the prosecutor, Capeci testified that Vargas told him that he heard Richmond plead for his life on the night of the assault, saying " 'Stop. Why are you doing that?' " According to Vargas, there were 10 to 15 minute periods of quiet before the assault would resume. Capeci understood Vargas to be saying that he saw Richmond sharpening a weapon on the night of his death. Vargas also heard Richmond pounding on the cell door and

yelling, " 'Get me out of here[.]' " Vargas said he heard defendant call Richmond "[a] little bitch."

The prosecution then called Capeci as its own witness. Capeci testified that Vargas only described one weapon to him; he never said that both defendant and Richmond had weapons. Vargas described "Mr. Richmond as a harmless person." Vargas wanted to get help for Richmond during the assault, "but he just didn't do it." On cross-examination, Capeci testified that, according to the transcript of his interview with Vargas, Vargas said he saw "a knife going into [cell] 146 from above." Apart from Vargas's statement, Capeci did not know if there was any evidence to support that "Richmond was banging on the cell door during the alleged assault."

## B. Prior Murder Special Circumstance

During a bifurcated proceeding, the parties stipulated that, in 1987, defendant was convicted of first degree murder in San Francisco County Superior Court.

## C. Penalty Phase

### 1. Prosecution Evidence

#### a. Juvenile Crimes

Kenneth Condencia testified that, on April 19, 1982, at around 3:00 p.m., defendant, armed with a knife, and another individual robbed him as he was getting off a bus in San Francisco. Defendant ordered Condencia, who was 14 years old at the time, to give him all of his money. Condencia complied, giving defendant all he had, which was less than a dollar. Defendant and his cohort then ordered Condencia to remove his clothes, which he did, except for his pants. Defendant and his companion then left. On cross-examination, Condencia said

defendant did not attempt to harm him. He also said defendant appeared to be his age (defendant was 12 years old at the time).

Andrew Dimitrou testified that, at approximately 3:15 p.m. on the same day Condencia was robbed (April 19, 1982), he and his friend Ebenezer were robbed by defendant and his cohort "Mr. LaMar" in San Francisco's Marina District. Dimitrou was 11 years old at the time. Defendant and Mr. LaMar confronted Dimitrou and Ebenezer with a brick and a knife and demanded their money. Dimitrou and Ebenezer complied, handing over approximately $7. Defendant and Mr. LaMar also took Ebenezer's jacket and backpack. During cross-examination, Dimitrou said he was not harmed aside from "losing a dollar."

Christopher Spychala testified that, at about 8:00 p.m. on October 11, 1986, defendant approached him and his female friend, who apparently knew defendant, as they walked down Market Street in San Francisco. The three continued to walk and encountered "some African Americans on the street." Defendant confronted them, "calling them [n-words]"[4] as he held a knife behind his back. Spychala and his female friend "didn't want to be involved in what was going on" and "walked off." Defendant caught up with them and asked Spychala's friend to buy him beer. She told defendant to buy his own beer and defendant said, " 'Well, fuck you. What's your boyfriend going to do?' " Defendant then attacked Spychala, who had said nothing, with his knife. Spychala threw up his hand and defendant's knife cut the left side of Spychala's neck and shoulder area. Spychala was able to escape down the street.

---

[4]     Epithet redacted.

On cross-examination, Spychala admitted he had been convicted of several drug offenses.

Frank McCoy, a retired San Francisco police detective, testified that he responded to the scene of James (Jim) Jackson's homicide on October 5, 1986.  Jackson was killed with a 10-pound dumbbell in his apartment.  Defendant's fingerprints were found on the dumbbell.  McCoy came into contact with defendant on October 11, 1986, after defendant was apprehended for Spychala's assault.  On that date, McCoy interrogated defendant, who confessed in detail to killing Jackson (see more, *post*, at pp. 147–151).  An audiotape of defendant's confession was played for the jury, accompanied by a transcript of the interrogation.

### b. *In-Prison Misconduct*

The prosecution called several correctional officers to testify about instances of in-prison misconduct by defendant that occurred between 1991 and 2003.  On nine different occasions, defendant was found in possession of weapons or "weapon stock."  On six different occasions, defendant assaulted fellow inmates, including a February 1995 incident during which he stabbed another inmate in the back in the yard.  On four different occasions, defendant assaulted correctional officers, including punching a correctional officer in the face in February 1997.

### c. *Victim Impact Testimony*

The prosecutor presented victim impact testimony from Richmond's mother and sisters.  Richmond's mother, Carlyn Ann Cox, "just crumbled" when she found out her son had died.  Since her son's death, she had been "under a doctor's care for my nerves and my whole body is just — I have a heart problem

now." Cox testified, "My family is not the same anymore. I'm not the same. [¶] I mean, he took my heart. Tommy was my heart. He took that."

Richmond's older sister, Kimberly Ann Colangelo, "broke" when she found out about her brother's death. Richmond was the "only male left in the family" that her children could look up to and he kept the family together. After her brother's death, her "mom mentally broke." When her brother died, the family was unable to emotionally reconnect; "[h]e was everything to us."

Richmond's younger sister, Christina Nicole Richmond, testified that she felt "alone" after her brother's passing; "when I lost my brother I lost my mom, too. And I need her, too." The family had once been "so close and strong," but was now "so far apart."

### 2. *Defense Evidence*

Charles Rand, defendant's former juvenile probation officer, testified about the challenges defendant faced growing up and how defendant came to be assigned to him. (See more, *post*, at pp. 160–162.) Rand was able to meet with defendant the day of his testimony and believed defendant had shown some positive growth.

James Esten, a retired correctional consultant with the California Department of Corrections and Rehabilitation, testified about the secure housing conditions at Pelican Bay in which defendant would likely live if sentenced to life without the possibility of parole.

Defendant testified on his own behalf. He took "sole responsibility for where I'm at" and did not want his mom and sister coming in and pleading for his life. Defendant did not

believe in the legal system. Defendant hoped that his experience could be of "benefit in some way." Defendant had never been a gang member. Defendant detailed some aspects of his childhood, including moves to different homes. Defendant spoke about his crimes as a juvenile and the realities of prison life. He read a statement in allocution to the jury, in which he said, "I pose no danger to anyone who is not a threat to me in some way." The assaults he committed in the prison yard were "mutual situations." During the prosecutor's cross-examination, Barrett admitted to assaulting an elderly man and beating him with his own cane around the same time as defendant's other juvenile crimes.

## II.  DISCUSSION

### A.  Jury Selection Issues

#### 1.  Motion to Exclude All Correctional Department Employees from the Jury Pool

Defendant contends the trial court's refusal to excuse all employees of the California Department of Corrections and Rehabilitation (CDCR) as prospective jurors deprived him of his right to an impartial jury. According to defendant, "the average person employed by the CDC[R] would be economically, socially, and emotionally identified with the Department" and therefore incapable of being impartial in his in-prison murder case.

#### a.  Background

In August 2003, during a hearing on pretrial motions, defense counsel first raised the possibility of excluding all CDCR employees from the prospective jury pool. At that hearing, the trial court observed that, because of the location of the trial, there would be a "fair amount" of CDCR employees called for jury duty. Defense counsel pointed out that, in his experience,

the parties often stipulate to excluding CDCR employees as jurors. The trial court responded that it could not "exclude a group of people like that on speculation. I'm not going to do it." The court further noted that "[y]ou can't decide which way these people will go. They all have their own mind." The court explained that "we routinely, as long as the prisons have been here in this county, have corrections officers and other [CDCR] personnel sit as jurors in criminal cases." The trial court told defense counsel that "unless somebody can find some specific law that says correctional officers or any other [CDCR] employee can't sit on a criminal case, I'm going to allow them on the jury panel." It would "allow maybe a little leeway on voir dire."

Thereafter, on October 2, 2003, defense counsel asked the court to remove all CDCR personnel as prospective jurors, emphasizing that several witnesses would be correctional officers. The trial court denied the request, stating it was not "legally required" to exclude CDCR personnel and would instead examine prospective jurors "one at a time" rather than "exclude any cognizable segment of the population of Imperial County. I want to talk to them, see what they say."

During *Hovey*[5] voir dire, which began on October 9, 2003, the trial court excused for cause several CDCR employees whom it concluded could not be impartial. After *Hovey* voir dire concluded, there remained at least 17 CDCR employees in the prospective jury pool.

Before general voir dire, defendant filed a written motion to exclude all remaining CDCR personnel. He asserted that

---

[5] See *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 (*Hovey*).

"[p]ermitting employees of CDC[R], especially correction officers, to sit as jurors in this case will violate the accused['s] rights to a fair and impartial jury. It would be equivalent to letting inmates sit as jurors . . . ." Defendant underscored how CDCR personnel would be implicitly biased as a result of their interests in the case — they "investigated the incident, gathered and processed evidence, secured it, and referred the matter to the prosecuting authorities. They comprise a very substantial number of the prosecution's guilt and penalty phase witnesses, including experts." Moreover, CDCR employees would presumably be aware of "security procedures in the court room that are hidden from other jurors," and are at greater risk of exposure to outside information. According to defendant, CDCR personnel "likely have predisposed belie[fs] that CDC[R] is a dangerous place to work, as well as entrenched opinions regarding prisoner assaults on staff or on each other," "may be familiar with prison codes," "may have submitted information concerning an inmate's alleged gang activities," "could possibly end up working on death row," and "are likely to be biased."

The trial court heard and denied the motion. The trial court noted that "every other small county in the state that has a state prison . . . [treats an employee of CDCR] just like any other prospective juror" and that it had already excused a large number of CDCR employees during *Hovey* voir dire "because of the number of witnesses that they have known or because of the evidence, they're biased." Defense counsel repeated his contention to the court that, in his experience, the parties usually stipulate to excusing all correctional officers from the jury panel in prosecutions involving in-prison offenses. The trial court reiterated that "there is no case that says you can't do this. And to the extent they answer the questions correctly, I can't

treat them like a separate part of society and say, 'You can't be on a jury.'" Defense counsel responded in part, "Well, I think that common sense applies to the analysis of C.O.'s, especially from Calipatria, that are sitting as potential jurors. I mean, they're going to make credibility findings against officers conceivably. These are the same people they might need for backup emergency situations. And make that in favor of inmates?" The trial court understood counsel's "concern [a]nd I can see potentially that maybe this would become an issue for the appellate court, but it hasn't yet at any other part of the state." The trial court had "to assume people, when they answer questions under oath, they're being honest."

At the close of jury selection, one CDCR employee, a correctional officer from Centinela who had been employed by the CDCR for 10 years, was seated on defendant's jury as Juror No. 12.

### b. Failure to Remove CDCR Personnel from the Jury Pool

Under the particular circumstances of his case, defendant argues that the trial court was compelled to find all prospective jurors who were CDCR personnel were impliedly biased as a matter of law. The Attorney General contends defendant has not preserved his claim that the trial court erred in denying his blanket for-cause challenge to CDCR personnel because he did not exhaust his remaining six peremptory challenges before his jury was sworn in, nor did he express dissatisfaction with the jury as constituted. As an initial matter, we agree that defendant has forfeited his claim.

We have repeatedly held that, "[t]o preserve a contention that the court erred in denying a challenge for cause to a

prospective juror, the defendant must (1) exercise a peremptory challenge to remove that prospective juror, (2) exhaust all peremptory challenges or somehow justify the failure to do so, and (3) express dissatisfaction with the jury that is ultimately selected." (*People v. Rices* (2017) 4 Cal.5th 49, 75, citing *People v. Souza* (2012) 54 Cal.4th 90, 130; *People v. Mills* (2010) 48 Cal.4th 158, 186–187 & fn. 8.) Defendant acknowledges our precedent in this regard, but he asserts that it is misconceived and his failure to exhaust his peremptory challenges should be excused because the trial court's refusal to excuse all CDCR employees precluded him from "intelligently exercis[ing] his peremptory challenges." Defendant's arguments are unavailing.

After the trial court denied defendant's blanket challenge to *all* CDCR personnel on the ground that challenges were better pursued on an individual basis (see more below), defendant used only 14 of his 20 peremptory challenges. During general voir dire, he exercised seven peremptory challenges to excuse CDCR employees from the jury pool and one CDCR employee was excused for cause.[6] However, defendant did not challenge Juror No. 12 individually for cause and he did not use a peremptory challenge to remove her. Nor did defendant express dissatisfaction with the jury as ultimately constituted. In other words, apart from the blanket challenge to *all* CDCR personnel, the trial court was never asked by defense counsel to remove Juror No. 12 and counsel never voiced dissatisfaction

---

[6] This prospective juror was a fire captain at CDCR who supervised inmates at Centinela; he was excused for cause after acknowledging that he would immediately assume "officers" were being truthful.

with Juror No. 12 being seated on the jury. On this record, defendant cannot now claim the trial court erred by retaining Juror No. 12 on his jury.

Defendant asserts that, given the sheer number of CDCR personnel in the jury pool, trial counsel was faced with the impossible "choice of whether to preserve the strength of whatever tactical decisions he had been able to make during selection, knowing that one biased juror would remain on the jury, or to strike Juror No. 12, and risk running out of peremptory challenges while an even more biased CDCR employee juror remained in the jury box, alongside other undesirable prospective jurors who counsel would have also excused if he had peremptory challenges remaining." In defendant's view, "[t]hese circumstances justify counsel's difficult decision not to use the remaining six peremptory challenges and should not result in the forfeiture of [his] right to an impartial jury." More specifically, defendant argues that, at the time defense counsel accepted the jury, "six CDC[R] employees lurking in the jury pool were far worse," as they expressed, inter alia, views in favor of the death penalty and one prospective juror knew defendant. He admits, "it is conceivable that some of these remaining CDC[R] employees might have been removed for cause, [but] the actual likelihood was very low." He continues, "other remaining jurors who were not CDC[R] employees could have also potentially been removed for cause, increasing the probability that the six CDC[R] employees would be seated. And while the jury pool contained about 50 more jurors, the prosecution had 11 peremptory challenges remaining, allowing the state to excuse other non-CDC[R] employees, further increasing the chances that CDC[R] employees would be seated."

We are unpersuaded by defendant's argument that, after he used seven peremptory challenges to remove CDCR employees, he was not reasonably able to challenge Juror No. 12, the only seated CDCR employee, due to the large number of CDCR employees remaining in the jury pool. Defendant elected to deplete a substantial number of his peremptory challenges against a purportedly biased class, which he broadly identified to include all CDCR employees. As explained below, the trial court acted well within its discretion to deny a blanket challenge to *all* CDCR employees, and to insist that the defendant individually challenge *particular* CDCR employees, whom he believed were properly subject to a challenge for cause for additional reasons. If the defendant wished to preserve a challenge on some narrower basis, for instance, due to prospective jurors' status as a correctional officer in a nearby prison, or their familiarity with prosecution witnesses or the facts of the case (or some combination thereof), he was obliged to subsequently challenge jurors for cause on such a ground. With respect to Juror No. 12 — and for that matter all the other CDCR employees excluded via defense peremptory challenge — he chose not to do so.

For these reasons, defendant's arguments, by their very terms, are speculative. It is unclear from the record that the trial court would have rejected a cause challenge against Juror No. 12, had defendant attempted to raise one, or how many peremptory challenges defendant would have expended had he raised (potentially successful) additional cause challenges based on prospective jurors' individual characteristics. We have rejected similar efforts to justify, on speculation, trial counsel's failure to comply with the exhaustion requirement, and the record here necessitates the same. (See, e.g., *People v.*

*Manibusan* (2013) 58 Cal.4th 40, 61; *People v. Hoyos* (2007) 41 Cal.4th 872, 905; see also *People v. Mills* (2010) 48 Cal.4th 158, 186 ["acceptance of this excuse would swallow the [exhaustion] rule entirely, for a defense attorney might in every case wish to hold challenges in reserve for strategic reasons"].) Thus, defendant's contentions of erroneous jury inclusion are forfeited. However, as described below, even if we were to reach the merits, defendant cannot show error, let alone any prejudice, because the trial court reasonably denied his blanket challenge to CDCR personnel.

From the outset, it is important to underscore that, as a general matter, there is no authority establishing that CDCR personnel cannot sit as jurors in criminal cases. (Cf. *People v. Ledesma* (2006) 39 Cal.4th 641, 670, fn. 4 (*Ledesma*) [explaining that custodial officers are not statutorily excluded from jury service in California, even though some law enforcement officials are, citing former section 219, subdivision (a) of the Code of Civil Procedure].) Instead, defendant's claim "is one of implied bias" under the particular circumstances of his case. Defendant relies on four subdivisions of Code of Civil Procedure section 229 to argue that *all* CDCR employees in his jury pool were impliedly biased: "(1) where a prospective juror has an employment relationship with a party (§ 229, subd. (b)); (2) where a prospective juror has a direct interest in the outcome of the litigation (§ 229, subd. (d)); (3) where a prospective juror has a pre-existing unqualified opinion as to the merits of the case based on knowledge of the material facts (§ 229, subd. (e)); and (4) where a prospective juror harbors enmity or bias toward a party (§ 229, subd. (f))." He asserts that subdivision (b) offers "the most straightforward grounds for finding implied bias." As relevant to defendant's argument, subdivision (b) of Code of

Civil Procedure provides in part that a challenge for implied bias may be taken when a prospective juror stands "in the relation of, or being the . . . employer and clerk . . . to either party." Defendant asserts that CDCR was "a party" within the meaning of subdivision (b), rendering all employees thereof impliedly biased. To support his position, defendant relies heavily on the reasoning in *People v. Terry* (1994) 30 Cal.App.4th 97 (*Terry*).

In *Terry*, the defendant challenged for cause, pursuant to Code of Civil Procedure section 229, subdivision (b)'s provision for implied bias where a prospective juror stands in "relation of attorney and client with either party or with the attorney for either party," a juror who was a deputy district attorney in the same district attorney's office representing the prosecution in the case. The trial judge denied the challenge because the juror's answers on voir dire showed he could be impartial and because " 'the People are a party, the district attorney is not a party.' " (*Terry*, *supra*, 30 Cal.App.4th at p. 100.) The Court of Appeal in *Terry* interpreted section 229 differently. In its view, subdivision (b) could be read to support a finding of implied bias where "the juror has had an attorney-client relationship with one of the *attorneys*." (*Id*. at p. 102.) By logical extension, this would apply to attorneys at the same firm or public office because "the relationship among attorneys of the same firm or office is of a fiduciary and confidential nature essentially the same as that of attorney-client." (*Ibid*.) *Terry* reasoned that "the thrust and purpose of section 229, if not perhaps its specific wording, requires that an attorney who is a member of the firm of counsel trying a case should not be permitted, over objection, to serve on the jury." (*Id*. at p. 103.) Nonetheless, the *Terry* Court of Appeal concluded that the defendant waived any claim of prejudice from the trial court's error because he had used a

peremptory challenge to dismiss the deputy district attorney in question and he did not express dissatisfaction with the jury as empaneled. (*Id.* at pp. 103–104.)

Defendant relies on *Terry* to argue that CDCR was necessarily "a party" because "[t]he charged offenses occurred in a CDC[R] prison. CDC[R] was the investigating agency; a correctional officer was the chief investigator who documented the scene using videotape, photographs, and drawings, and then created a 'reenactment' video to 'document' what responding correctional officers saw when they first approached the cell where the alleged victim's body was found, and CDC[R] employees gathered the evidence against [defendant]. Apparently concluding that [defendant] did not act in self-defense as he claimed, CDC[R] directly referred the matter to the district attorney." Several of these cited circumstances arose by simple virtue of the fact that the killing occurred in a cell at Calipatria; they would not appear to convert CDCR into a "party," just as the police department would not be considered a party to a criminal prosecution for a crime committed outside of a prison. (See *People v. Punzalan* (2003) 112 Cal.App.4th 1307, 1310 ["In criminal matters, the parties are the defendant and the People of California. The arresting law enforcement agency is not a party"]; cf. *U.S. v. Caldwell* (D.C. Cir. 1974) 543 F.2d 1333, 1347 ["In several jurisdictions, the law is established that '[t]he mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial' "]; *U.S. v. Morales* (2d Cir. 1999) 185 F.3d 74, 84 ["despite the fact that some of the charges against the defendants related to the felony-murder and attempted murders of police officers, the challenged jurors' connections to law enforcement in this case do not, standing alone, suffice to

establish implied bias or ' "bias conclusively presumed as a matter of law" ' "].) *Terry* is very different from the instant case: the challenged juror in *Terry* was deemed a party in the truest sense — he worked for the entity prosecuting the case and had a confidential relationship, akin to an attorney-client relationship, with the attorney who was presenting the case to the jury. (See *Terry*, at p. 102.) The prosecuting attorney and the juror were actual colleagues in the same office. By contrast, defendant's motion before the trial court was far-reaching, "urg[ing] the court to excuse correctional officers, administrative staff, and independent contractors in favor of drawing jurors from a less likely contaminated jury pool." There is nothing in section 229 that suggests such a far reaching rule that would find implied bias for any employee of CDCR, no matter how far attenuated (e.g., administrative staff and independent contractors) their employment is from working as a correctional officer. Based upon defendant's reasoning, even a CDCR accountant or janitor would have to be removed because, inter alia, they "may be familiar with prison codes" and are "likely to be biased." That cannot be. *Terry* addressed an individual for-cause challenge to a juror who was an attorney in the same district attorney's office as that prosecuting the defendant; it does not support the blanket use of Code of Civil Procedure section 229, subdivision (b) to disqualify a whole class of prospective jurors, irrespective of their positions, exposure to information about the defendant's alleged offense, and geographic locations.

For similar reasons, defendant's passing reference to subdivisions (e) and (f) of Code of Civil Procedure section 229 in his written motion to exclude CDCR personnel from the jury pool (subdivision (d) was not referenced in the motion) did not

compel the trial court to accept the argument that *all* CDCR employees had to be *automatically* removed from the jury pool for implied bias. Those subdivisions, by their terms, would seem better suited to an individualized assessment of implied bias. Subdivision (e) of section 229 speaks to a prospective juror "having an unqualified opinion or belief as to the merits of the action *founded upon knowledge of its material facts.*" (Italics added.) As stated *ante,* the roles and locations of CDCR personnel who remained in the jury pool at the time of defendant's motion varied. For instance, the jury pool included CDCR employees who worked in accounting offices and at a prison other than Calipatria. As such, one would expect the jurors' respective knowledge of the "material facts" of defendant's case to evade broad generalizations, as would their "state[s] of mind" (Code Civ. Proc., § 229, subd. (f)) and their "[i]nterest . . . in the event of the action" (*id.*, subd. (d)). In sum, defendant fails to persuade that the trial court was required, pursuant to Code of Civil Procedure section 229, to find all CDCR employees impliedly biased on the record before it.

We rejected a similar claim of error from a trial court's denial of a blanket challenge to all CDCR personnel in the jury pool in *People v. Ramirez* (2022) 13 Cal.5th 997, a capital case arising out of three carjacking incidents. There, the defendant asserted without "independent proof" that "all correctional officers in the jury pool were unfit to serve because the case was 'a chief subject of concern and speculation in the numerous correctional institutions of Kern County, and . . . falsities, presumptions of guilt, and poisonous rumors were part of daily talk in public areas of these institutions.'" (*Ramirez*, at p. 1046.) We concluded the trial court acted within its discretion in denying the defendant's blanket challenge. First, we noted

that, in *Ledesma, supra,* 39 Cal.4th at page 670, we rejected the argument that a prospective juror's "employment as a corrections officer in the county jail system where defendant was housed" made him impliedly biased under Code of Civil Procedure section 229. (*Ramirez,* at p. 1047.) The *Ramirez* court concluded, "[t]he same is true here" where the "[d]efendant's assertion about panelists' exposure to case information among correctional officers was explored on a case-by-case basis" and the "voir dire record disproves defendant's expansive claim that 'falsities, presumptions of guilt, and poisonous rumors' about the case were so prevalent in the correctional institutions of Kern County that anyone who worked there was *automatically* disqualified from service." (*Ibid.*)

Likewise here, the trial court reasonably concluded defendant's claim of implied bias amongst CDCR personnel was better assessed on a "case-by-case basis." (Cf. *People v. Rhoades* (2019) 8 Cal.5th 393, 440 [the trial court's ruling on a challenge for cause will be upheld on appeal " ' "if it is fairly supported by the record" ' "].)

### 2. *Denial of* Batson/Wheeler *Motion*

Defendant contends the prosecutor improperly exercised a peremptory challenge against the only African American prospective juror, Lisa B., on the basis of race. (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).)

### a. *Background*

The juror questionnaire provided to prospective jurors asked various questions about their feelings towards the death penalty, as well as jury service in general and its attendant

responsibilities. Question 11 asked, "If we were to get to the penalty phase, would you as a juror be able to listen to all the evidence, as well as the judge's instructions of law, and give honest consideration to both death and life without parole, before reaching a decision?" Lisa B. checked "Yes." Question 12 queried, "What types of crimes, if any, do you think generally warrant the death penalty?" Lisa B. wrote in response, "I would think murder w/ the intent to kill. Not just one individual in a lifetime. An individual that shows no emotion/remorse [and] can kill again w/out provocation." Question 59 asked, "How do you feel about being on jury service?" Lisa B. responded, "Jury service imposes the right of one person to pass judgment on another person. I would not like the responsibility to have to do that to another person. I have never had to serve on a jury before so this is my unbiased opinion as I see it now." Question 68 asked, "Do you have any religious or moral feeling that would make it difficult or impossible for you to sit in judgment of another person?" Lisa B. wrote, "Not quite sure. Have not been able to define my own thoughts regarding being able to pass judgment. I know I wouldn't like to be responsible in that position." Question 87 inquired, "Is there any reason why you would prefer not to serve as a juror in this case?" Lisa B. checked "Yes," and explained that she "wouldn't like to be the one to have to judge another person. Not based on any other reason, but because that would be too much power for 1 person."

During *Hovey* voir dire, the court asked Lisa B. a series of questions regarding whether she had "any religious or conscientious beliefs against the infliction of the death penalty that would prevent or interfere with [her] ability to vote to impose the death penalty without regard to the evidence." She repeatedly said "No." The prosecutor thereafter asked Lisa B.

what she meant when she stated in her questionnaire that the "death penalty does not serve any purpose." Lisa B. explained that her response was "not a religious or conscientious belief," but rather in reference to "what we actually know. There are so many people sitting on death row that are still sitting there. So it doesn't serve a purpose, in general." She assured the prosecutor that she would not automatically vote for life without parole, and she would base a verdict on the "full circumstances" of the case.

Lisa B. was ordered to return for general voir dire. During the end of his allotted time for questioning, the prosecutor questioned Lisa B. The prosecutor initially confused Lisa B. with another prospective juror who had the same last name, but the trial court thereafter gave the prosecutor "another minute" to look at Lisa B.'s questionnaire and conclude his questioning. The prosecutor then asked Lisa B. about her response on the written questionnaire relating to her views on self-defense: "The question was, 'Do you have any problem with the concept that [the] right of self-defense exists only as long as real or apparent danger — threatened danger . . . continues to exist. And when danger ceases to appear to exist the right to self-defense ends.' [¶] You responded first 'Yes,' and then you responded 'No.' Do you recall that?" Lisa B. responded, "Yes." The prosecutor continued: "Then you went on to write a really good response, 'Once a person is not in any danger any longer and the assailant cannot continue to threaten you you are no longer trying to defend yourself against them.' [¶] . . . [¶] Why did you cross it out?" Lisa B. did not remember why she crossed it out but assured the prosecutor that the answer expressed her true views, "Yes, once you are no longer in danger." The prosecutor responded, "So we are on the same track. Thank you

very much." Defense counsel, who had also confused Lisa B. with another juror, declined the court's invitation to question Lisa B.

While the parties were exercising peremptory challenges, Lisa B. was called into the jury box and the prosecutor exercised a peremptory challenge. Defense counsel made a *Wheeler* motion, "There's only one Black American in the jury panel, and she was kicked seemingly with no cause. There's nothing to distinguish that juror from other jurors and, I think, to exclude that juror would deprive my client of a fair defense." The trial court then asked the prosecutor to "articulate for the record the reason why you excused Lisa B[.]" The prosecutor recited to the court Lisa B.'s response to question 59 regarding her reluctance to pass judgment on another person. He explained, "I didn't get to that question. I have her marked down as I was going to challenge her for cause. I didn't get to that question because I was running out of time. All I got to ask her was one question." The prosecutor also quoted Lisa B.'s written response to Question 68 for the court, expressing uncertainty over whether she had any religious or moral beliefs that would make it difficult to pass judgment on another. Lisa B. had written in part, "I know that I wouldn't like to be responsible in that position."

Defense counsel pointed out that the prosecutor "passed for cause on *Hovey*. Now we are talking about a *Hovey* challenge here." The trial court responded, "No, that's not death penalty, just passing judgment in general," which the prosecutor confirmed. The trial court concluded, "I think that's a valid, non-racial reason. So I'll deny the *Wheeler*." The prosecutor then stated, "For the record, it had nothing to do with the color of her skin. It had to do with the answer to her questions period." The

trial court responded, "That's what I'm assuming by the way you responded. So let's bring the people back in."

### b. *Analysis*

Defendant argues the prosecutor's stated reason for dismissing Lisa B. was pretextual. He underscores that the prosecutor did not question Lisa B. about the responses he later cited as cause for concern, which, to defendant's mind, "strongly suggests that [the prosecutor's] reason for dismissing her was not race-neutral."

" 'Peremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender.' [Citations.] 'Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal.' [Citation.] When a party opposing a peremptory strike makes a prima facie case that the strike was motivated by impermissible discrimination (step 1), the proponent of the strike must offer a nondiscriminatory reason for that challenge (step 2). [Citation.] The question then becomes (step 3) whether the opponent of the peremptory challenge has shown it ' "more likely than not that the challenge was improperly motivated." ' [Citations.]" (*People v. Baker* (2021) 10 Cal.5th 1044, 1071 (*Baker*).) The parties agree that "only the third step of the *Wheeler* motion is at issue."

"At the third stage of the *Wheeler*/*Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " (*People v. Lenix* (2008)

44 Cal.4th 602, 613.) "Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*Id.* at pp. 613–614.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings." (*People v. Silva* (2001) 25 Cal.4th 345, 385.)

The prosecutor's stated reason for dismissing Lisa B., i.e., her discomfort with passing judgment on another person, is both plausible and supported by Lisa B.'s responses to Questions 59 and 68 in the questionnaire, which the prosecutor quoted for the trial court. Nor does the prosecutor's failure to further question Lisa B. about her responses in this regard support a finding of pretext, as defendant alleges. As in *People v. Smith* (2018) 4 Cal.5th 1134, 1152 (*Smith*), "the prosecutor's stated concerns [in this case] arose from . . . questionnaire responses that spoke for themselves; no additional clarification was needed to ascertain [Lisa B.'s] meaning. [Citations.] . . . Whatever inference may arise from the prosecutor's lack of questioning is not so strong as to undermine the trial court's determination that [Lisa B.'s discomfort with passing judgment on others] did, in fact, matter to the prosecutor."

Defendant asserts that the prosecutor had "ample opportunity" to question Lisa B. about her "allegedly concerning" answers to Questions 59 and 68 during *Hovey* voir dire, and his failure to do so demonstrates that his explanation for striking Lisa B. on the basis of her answers to those questions was pretextual. To bolster this argument, defendant points out that the prosecutor questioned other jurors during *Hovey* voir dire about their "reticence to sit in judgment of others." For example, the prosecutor questioned Erika G. about her response to Question 59 regarding how she felt about being on jury service; in response to that question, she had written, "I do think that my past experience with my dad's murder would partially influence my decision in this case." Upon further questioning, she explained that her dad was murdered by a drug addict and that "may influence" her ability to serve on the jury; Erika G. was excused for cause. Defendant explains, "[i]n short, if the [prosecutor] had genuinely believed that [Lisa B.] might be excused for cause based on her questionnaire responses, he would have asked about her views during *Hovey* voir dire."

We read the record differently. The fact that other prospective jurors were excused for cause for voicing opinions similar to Lisa B.'s during *Hovey* voir dire actually supports the genuineness of the prosecutor's assertion that he considered challenging Lisa B. for cause, but did not do so because he ran out of time. Moreover, as the record reflects, the prosecutor was under significant time pressure during Lisa B.'s questioning during general voir dire.[7] Under these circumstances,

---

[7] We caution that the imposition of time limits on voir dire can serve the cause of efficiency. However, their use should not

substantial evidence supports the trial court's conclusion that the strike was not motivated by racial discrimination.

Defendant further argues that a comparative juror analysis compels a different conclusion. "When a court undertakes comparative juror analysis, it engages in a comparison between . . . a challenged panelist, and . . . similarly situated but unchallenged panelists who are not members of the challenged panelist's protected group. [Citation.] In this case, a comparative analysis would ask whether the prosecutor's justification for striking one [African American] individual applies just as well to an otherwise similarly situated non-[African American] individual who is permitted to serve on the jury. The high court has held that comparative analysis may be probative of purposeful discrimination at *Batson*'s third stage. [Citation.]" (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1173.) When, as here, "a defendant asks for comparative juror analysis for the first time on appeal, we have held that 'such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent.' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 976.) Furthermore, when we engage in a comparative juror analysis for the first time on appeal, we focus our review on the jurors discussed in the defendant's briefing and " ' "need not consider responses by stricken panelists or seated jurors other than those identified by the defendant." ' " (*Baker, supra,* 10 Cal.5th at p. 1083.)

Defendant argues that "the prosecutor's proffered reason for striking [Lisa] B. applied to similar non-black jurors he did not peremptorily excuse," namely, Juror Nos. 8 and 12.

_____

impede the creation a record that facilitates appellate review, particularly in this significant context.

Defendant asserts that "[t]here was no significant difference between Lisa B. and Jurors [*sic*] Nos. 8 and 12," as all three were female, each had children, none had previously served on a jury, Lisa B. and Juror No. 8 had family members who worked for the CDCR, and Juror No. 12 was a correctional officer herself. However, Lisa B. was the only one of the three prospective jurors to explain that she would not like to be responsible for judging another person.[8] In fact, in response to question 59 asking how she felt about jury service, Juror No. 8 wrote, "I feel it's my duty and obligation as a citizen." She checked "No," in response to question 68 regarding whether she had "any religious or moral feeling that would make it difficult or impossible" to judge another individual. During *Hovey* voir dire, although Juror No. 8 initially indicated that she might "have a problem with actually considering the death penalty," she subsequently assured the court that she did not think she "would have a

---

[8] In a footnote, defendant also compares Lisa B. to Alternate Juror No. 4, arguing that "Alternate Juror No. 4 was a *less* desirable juror for the state, by virtue of her general opposition to the death penalty." However, despite expressing opposition to the death penalty in general, elsewhere in her questionnaire and during questioning by the prosecutor, Alternate Juror No. 4 indicated she would be able to listen to all of the evidence and honestly consider the death penalty; she also listed crimes she considered to be worthy of the death penalty. Furthermore, like Juror Nos. 8 and 12, and unlike Lisa B., Alternate Juror No. 4 did not express any difficulty passing judgment on others. In response to question 59 on the jury questionnaire addressing her feelings towards jury service, Alternate Juror No. 4 answered "I feel [it] is my civic responsibility to serve as a juror." In response to question 68 regarding whether she had any moral or religious feelings making it difficult to judge another, she checked "No."

problem" with imposing the death penalty if the evidence so justified. She repeatedly stated that her decision would be based on the evidence. Juror No. 12, similar to Juror No. 8, responded to question 59 by explaining that she believed it was her "civic duty" to serve on a jury. She likewise checked "No," in response to question 68. During *Hovey* voir dire, Juror No. 12 confirmed that she was "neutral" on the death penalty and "would be fair and impartial to both sides and wait to hear the evidence from both sides before making a decision." During general voir dire, Juror No. 12 stated, "I have a job to do, a job to listen to all the evidence before I make a judgment on this." On this record, a comparative juror analysis does not change our conclusion that substantial evidence supports the trial court's ruling.[9]

## B. Pre-Trial and Guilt Phase Issues

### 1. *The Trial Court Properly Denied Defendant's Motion to Dismiss for Pre-charging Delay*

Defendant contends the trial court erroneously denied his motion to dismiss the charges for prejudicial pre-charging delay. We disagree.

#### a. *Background*

Before trial, defendant moved to dismiss the case because of the 27-month delay in bringing the charges against him. In

---

[9] Defendant unpersuasively highlights that several other prospective and seated jurors "expressed a desire not to serve," but were retained by the prosecutor. But defendant points to jurors who expressed a desire not to serve for more general reasons, like feelings of nervousness or worries over being inconvenienced by a long trial. By contrast, Lisa B. expressed a specific reluctance to pass judgment on another person.

his motion, he contended that two critical defense witnesses died during that timeframe and the District Attorney proffered no justification for defendant's delayed indictment. In a declaration attached to the motion, defendant specifically averred that inmates Cruz and Hogan,[10] who were at Calipatria State Prison the night of Richmond's death, would have corroborated his version of events: "Inmate Cruz would have provided testimony that inmate Richmond was in fact the aggressor in this case, that Richmond was given an order to kill me, and that I was the victim of an imminent violent attack on the night in question. . . . [¶] Inmate Hogan, like inmate Cruz, would have also testified that my cellmate, inmate Richmond, was given an order to kill me. Mr. Hogan would have testified that he had personal knowledge that Mr. Richmond planned to kill me and that Mr. Richmond was armed on the night in question." Defendant further averred that the delay had compromised his recollection of the names of other "witnesses/inmates who knew Richmond was armed on the night of the incident." Defense counsel also attached a newspaper article to the dismissal motion, in which a former deputy district attorney was quoted as saying with respect to defendant's case, " 'The reason we were so deliberate in this case is we had the time given the uniqueness of this case. By that, I mean he is an inmate who is not going anywhere.' " Defendant argued that the prosecution's "intentional delay" based on his status as a prison inmate violated his right to due process and was an insufficient justification to overcome the prejudice defendant suffered from the delay.

---

[10]     No first names are provided for inmates Cruz and Hogan.

In their response, the People asserted that defendant did not meet his burden of showing actual prejudice — his "mere conclusory statements in the form of affidavits" did not suffice.

With the agreement of the parties, the trial court deferred ruling on the dismissal motion until after the guilt phase evidence was presented. After the guilt phase concluded, defense counsel requested a ruling, reiterating the arguments made in his written motion. He underscored that the now deceased inmates, Cruz and Hogan, would have given critical testimony in support of defendant's self-defense testimony. With respect to the claim that they would have testified a knife was sent into defendant's cell on the evening of Richmond's death, defense counsel acknowledged, "Now, I realize that [defendant] flushed that weapon down the toilet and in a sense created some of the problems himself." But defense counsel asserted that defendant made a prima facie showing of prejudice from the pre-charging delay and that the delay resulted from defendant's status as a "known life inmate," not from any good cause. The prosecutor submitted without argument.

The trial court denied the motion, explaining "Well, I wish it [the motion] had been filed sooner. But under the circumstances, I'm going to deny the motion. So it's all done within the statute of limitations. There is no statute of limitations for this offense. It's not that uncommon to see them brought to trial years after the event." Defense counsel reminded the court that the parties and the court agreed to defer a decision on the motion until after the close of the guilt phase evidence. The trial court further opined that "[s]ome of the things you're alleging that Mr. Cruz would have said would have been cumulative even if that were true." Defense counsel questioned how it could be "cumulative," and the trial court said,

"We had other testimony of the same effect as I recall." Defense counsel asserted that if the court found a prima facie showing, then the prosecution had to justify the delay. The prosecutor explained that all he knew was that "it went by way of an indictment. And it took them approximately two years to get him indicted. That's all I know." The prosecutor, in his almost five years of experience, had "never seen a murder case come to trial within two years."

At the end of trial, defendant filed a motion for a new trial, in which he renewed his claim that the pre-charging delay violated his due process rights. Defense counsel asserted that, "[b]y [his] unrebutted declaration," defendant had established a prima facie case of prejudice, shifting the burden to the prosecution to justify the delay. The People referred the trial court back to their opposition to defendant's unsuccessful "motion to dismiss on this issue." The trial court denied the motion without any discussion of the issue.

### b. *Analysis*

" 'The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging.' [Citation.] A defendant seeking to dismiss a charge on this ground must first demonstrate prejudice arising from the delay, 'such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time.' (*People v. Abel* (2012) 53 Cal.4th 891, 908.) ' "The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against

the justification for the delay." ' (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250, quoting *People v. Catlin* (2001) 26 Cal.5th 81, 107.) However, '[i]f the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 406 (*Mataele*).) " ' "In the balancing process, the defendant has the *initial* burden of showing some prejudice before the prosecution is required to offer any reason for the delay [citations]. The showing of prejudice requires some evidence and cannot be presumed. [Citations.]" ' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 874.) " '[W]hether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' [Citation.] 'The justification for the delay is strong when there is "investigative delay, [and] nothing else." ' [Citation.] 'A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges.' " (*Mataele, supra*, 13 Cal.5th at p. 406.) We review a trial court's ruling on a motion to dismiss for pre-charging delay for abuse of discretion and defer to any factual findings supported by substantial evidence. (See *id.* at p. 407.) "Because the trial court deferred ruling on defendant's motion to dismiss until after the [guilt phase evidence had been presented], we will consider all evidence that was before the court up to that time." (*Ibid.*)

The trial court did not abuse its discretion by denying defendant's motion to dismiss. Defendant fails to demonstrate

that the 27-month interval between Richmond's death and the filing of the indictment against him resulted in actual prejudice. While he asserts that inmates Cruz and Hogan would have provided exonerating information, defendant does not explain how he had any knowledge of what Cruz and Hogan would have said; in his declaration, he does not assert he knew them, spoke with them, or interacted with them. Absent any facts as to the basis of defendant's personal knowledge, defendant's conclusory declaration, made only "to the best of [his] knowledge, information and belief," that inmates Cruz and Hogan would have testified in accordance with his defense is, alone, inadequate to establish actual prejudice. (See *People v. Manzo* (2023) 96 Cal.App.5th 538, 541 ["[t]he showing of actual prejudice must be made on competent evidence and 'must be supported by particular facts and not . . . by bare conclusionary statements' "]; cf. *Bowden v. Robinson* (1977) 67 Cal.App.3d 705, 719–720 ["The phrase '[t]o the best of my knowledge' " did not establish the declarant's personal knowledge and "implies that the declarant's statement is based on something similar to information and belief" — statements within the declaration were "not admissible evidence of which declarant had personal knowledge"].) Nor does defendant persuade that he was prejudiced from his own fading memory resulting from the charging delay. Defendant was able to testify in great detail about events leading up to, and on, the night of Richmond's death and his vague assertion that the delay had compromised his recollection of the names of other "witnesses/inmates who knew Richmond was armed on the night of the incident" is inadequate to establish prejudice. (See *Abel*, *supra*, 53 Cal.4th at p. 909 [rejecting the defendant's similar claim that a pre-charging delay prejudicially affected his memory where the

record reflected that he "had detailed recall of events occurring on or near" the date the alleged offense took place].) We therefore do not need to consider whether the prosecution's pre-charging delay was justified. (See *Mataele, supra*, 13 Cal.5th at p. 406.) While we conclude the trial court did not abuse its discretion, because the court's remarks did not address the issue of prejudice, we take this opportunity to emphasize that trial courts should make a clear record of their rulings in this context so as to aid appellate review.

### 2. *Prosecutorial Misconduct: Communications with Defendant*

Defendant contends the prosecutor's communications with defendant, outside the presence of defense counsel, constituted prejudicial misconduct requiring the trial court to grant both his motion for acquittal and his motion for a new trial.

### a. *Background*

Prior to trial, the trial court sealed the transcripts of the grand jury proceedings in defendant's case. In doing so, the trial court noted the rarity of capital cases in Imperial County, the small jury pool, and the desire to guard against widespread and "inflammatory" pretrial publicity. The parties also stipulated to a "gag order" upon the trial court's suggestion. That order prohibited, inter alia, the parties, witnesses, and attorneys from "releas[ing] for public dissemination any statement of defendant or witnesses, documents or exhibits, or any evidence admissible or inadmissible about this case, nor express for public dissemination any weight, value or effect of such evidence."

On November 20, 2003, before opening statements in the guilt phase of defendant's trial, the trial court instructed jurors not to "read or listen to any accounts or discussions of the case

reported by the newspapers or other news media including radio, television, the internet, or any other electronic source." On December 2, 2003, the trial court again admonished jurors "not to read, listen to, or view any media accounts of the proceedings in this trial."

On December 4, 2003, outside the presence of the jury, defense counsel called the court's attention to an article about defendant's case printed the previous day in the *Imperial Valley Press*. The article was lodged in evidence. It described "an interchange between" defendant and the prosecutor occurring on December 2nd in the absence of defense counsel. The article, by reporter Mike Salorio, described defendant's case and summarized trial testimony from Correctional Officers Wysocki and Avila. It then described an interaction between defendant and the prosecutor as follows, "Barrett exchanged remarks during a break in the proceedings with Imperial County Deputy District Attorney Wayne Robinson, who is prosecuting the case. Barrett asked Robinson if he was attempting to get a death penalty conviction so he could run for political office. [¶] 'Do you have any political aspirations?' asked Barrett. [¶] 'No comment,' said Robinson. [¶] Barrett then criticized the DA's Office for taking nearly eight years before finally bringing a trial against him. [¶] 'Hey, how long did it take the Board of Supervisors to realize the state would give them money for this murder trial?' asked Barrett. [¶] Barrett then criticized the DA's Office for not being able to get a first-degree murder conviction in the recent trial of Pedro Archuleta for the murder of 15-year-old Jovita Becerra. [¶] 'How is that justice?' asked Barrett. [¶] 'You're forgetting about your past, Mr. Barrett. You were a 17 year old who killed someone with a dumbbell,' said Robinson. [¶] 'I don't dispute that,' responded Barrett. [¶] At the break's end, Barrett

asked Robinson to stir up the proceedings. [¶] 'Maybe you can agitate one of the witnesses, Mr. Robinson, and liven things up a little bit,' said Barrett."

Since the exchange involved defendant's prior murder conviction, evidence of which was not admissible during the guilt phase of defendant's trial, defense counsel asked the trial court to find that the prosecutor committed prejudicial misconduct. As a remedy, defense counsel asked the trial court to dismiss the case or strike the special circumstance allegation. Defense counsel did not ask for a mistrial since the court indicated it would not "do a hovey [*sic*] voir dire again" and "[w]e feel we got, probably, the finest jury selection in this case on both sides any counsel could get." Defense counsel asked the court to poll jurors "individually as to whether or not they saw the article" and "whether anybody talked to them about the article or asked them questions about it." Further, defense counsel asked "that the jury be admonished not to read specifically the *Imperial Valley Press* or look at it for the rest of this trial." The trial court deferred ruling on the alleged misconduct but proceeded to question the jurors about the article.

When the jurors returned to the courtroom, the trial court explained, "As you recall, on numerous occasions throughout the trial and jury selection, and specifically in the last couple of days I advised everybody not to read, listen to or view any media or news accounts of this case. [¶] Now, last night in the *Imperial Valley Press* the case was the headline item, and I'm going to have to ask each one of you individually." The trial court asked each juror individually whether they had read the article, and each replied in the negative. The trial court then ordered jurors not to read the *Imperial Valley Press* for the duration of defendant's trial. The trial judge explained, "I can't have jurors

reading the newspaper reporter's interpretation of what goes on," and then thanked jurors for following his prior instruction not to read media sources. When collectively asked whether anyone tried to discuss the article with them, no juror answered affirmatively. Juror No. 6 then stated that her husband told her "there was an article," but the couple "didn't discuss it." The trial court thanked jurors again, and then had the prosecutor call his next witness.

On December 16, 2003, after the prosecution presented its case-in chief, defense counsel reraised his previously unresolved allegation of prosecutorial misconduct as part of his motion for acquittal pursuant to section 1118.1. Defense counsel cited California Rules of Professional Conduct former Rule 2-100,[11] prohibiting a lawyer representing a client in a matter from communicating with a party represented by a different attorney in the matter absent the attorney's consent. Defense counsel asked the trial court to impose sanctions for the prosecutor's "ex parte communication" with defendant in front of the reporter. In terms of appropriate sanctions, the defense proposed the trial court could dismiss the case, strike the death penalty and prior murder enhancements, cite the prosecutor, and/or disqualify him and the entire District Attorney's Office.

The trial court heard the motion the same day. At the outset, the trial court "want[ed] the record to be clear here for any reviewing court that this was — all happened out of the presence of the jurors." The trial court could not find "a single case" of prosecutorial misconduct occurring outside the presence

---

[11] Those rules were revised and renumbered effective November 1, 2018. The substance of former Rule 2-100 relied upon here became Rule 4.2(a) of the revised Rules.

of the trier of fact. Defense counsel referred to civil cases and emphasized, among the other requested sanctions, the need to remove the prosecutor from the case in the interest of defendant's constitutional rights since his conversation with defendant concerned a special circumstance and potential penalty phase evidence.

The prosecutor, Mr. Robinson, responded that there could be no constitutional violation since he did not ask defendant a single question; he only responded to defendant's questions. Robinson underscored that the jurors all denied reading the article.

The trial court found there was no actual harm because all jurors, under oath, indicated they had not read the article. The court noted that it had openly observed "friendly banter" on occasion between defendant and the bailiff, the transportation officers, and even Robinson, with defense counsel present at times. The trial court remarked, "Maybe I should have said something then," and acknowledged "these kinds of mistakes can happen if we're not very diligent." Ultimately, because the trial court could "find absolutely no harm that has occurred because of this and because the initial conversation was instituted by Mr. Barrett, I'm not going to propose any sanctions except to admonish Mr. Robinson. [¶] For God's sake, don't do that again. All right?"

While accepting the admonishment, Robinson pointed out that defendant was talking to the reporter throughout the break, only towards the end of which he directed questions towards Robinson about his political aspirations. Robinson said he was initially nonresponsive but responded after defendant persisted. The trial court reminded Robinson that defendant "is

53

not an officer of the court. He's not held to knowledge of the ethical canons about communication. You are. [¶] So that's why I'm going to go ahead and just make this an admonishment. Don't do it again." The trial court explained that everyone was going to have to be very careful going forward about what they say and who may hear it.

Prior to the start of the penalty phase, defendant renewed his request to exclude "any evidence of the underlying circumstances of the prior conviction" as a sanction for the prosecutor's misconduct, but evidence of Jackson's murder was admitted. After the jury returned its death verdict, defendant unsuccessfully moved for a new trial on several grounds, including prosecutorial misconduct.

### b. *Defendant Fails to Show Prejudice*

Defendant contends the prosecutor's communication with defendant, outside of defense counsel's presence, was misconduct in violation of defendant's constitutional rights to counsel, due process, an impartial jury, a reliable death judgment, and the right against self-incrimination, as well as a violation of the ethical rules applicable to attorneys. He asserts that the trial court's failure to impose any sanction for the misconduct was prejudicial error requiring reversal of his convictions or, at the very least, his death sentence.

" 'To constitute a violation of the federal Constitution, prosecutorial misconduct must " ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade

either the court or the jury.' " ' (*People v. Benavides* (2005) 35 Cal.4th 69, 108.)" (*People v. Camacho* (2022) 14 Cal.5th 77, 126, italics added (*Camacho*).)

Here, where the alleged prosecutorial misconduct occurred outside the presence of the jury and the jurors expressly denied reading the article in question, the trial court soundly concluded the fairness of defendant's trial proceedings was not compromised. Therefore, defendant has not demonstrated prosecutorial misconduct under the federal standard. However, similar to the trial court, we will assume that the prosecutor's conversation with defendant in front of a reporter was misconduct under state law.[12] Nevertheless, defendant is not entitled to any relief. "In order to be entitled to relief under state law, defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict." (*People v. Blacksher* (2011) 52 Cal.4th 769, 828, fn. 35 (*Blacksher*).) Defendant unpersuasively contends the trial court should not have credited jurors' representations that they did not read any articles about the case because the case received widespread publicity. But, "[a]bsent a contrary indication in the record, it must be assumed the jury followed its instruction to avoid all publicity in the case." (*People v. Pride* (1992) 3 Cal.4th 195, 226.) Here, we need not just assume the jurors avoided publicity about the trial. Prior to the publication of the article at issue, the trial court twice admonished jurors not to read any newspaper accounts of the case and the record contains

---

[12] The trial court also reminded the prosecutor that he had a duty to uphold the "ethical canons about communication." Former Rule 2-100 (now Rule 4.2) prohibits ex parte communications with represented parties "about the subject of the representation" absent the consent of the parties' lawyer.

affirmative assurances from jurors that they did not read the article in question nor discuss it with anyone. Defendant further argues that the prosecutor's conduct could have had "a chilling effect on counsels' efforts to vigorously represent their client," as defense counsel may have been hesitant to have "frank conversations with their client in the courthouse" or may have prepared less effectively during breaks for fear of leaving defendant unaccompanied. These speculative claims are unpersuasive. In sum, defendant fails to show that the prosecutor's misconduct affected the jury's verdict.

### 3. *The Trial Court Properly Admitted Evidence Under Evidence Code Section 1103*

Defendant argues that the trial court misinterpreted Evidence Code section 1103, and violated his constitutional rights, when it permitted the prosecution to introduce evidence of defendant's violent character during the guilt phase of trial, after defendant testified about Richmond's prison rules violations. Defendant asserts that his testimony about Richmond's in-prison weapons possession and gassing of a correctional officer should not have opened the door for admission of evidence of his violent character under section 1103 because his testimony was not meant to characterize Richmond as a violent person. (See Evid. Code, § 1103, subds. (a)(2), (b).) Furthermore, defendant asserts the error in admitting evidence of his prior violent acts was compounded by the trial court's inadequate prejudice analysis thereof under Evidence Code section 352 and its instructions to the jury.

### a. *Background*

On December 18, 2003, prior to putting on the defense case, defense counsel explained his intent to introduce evidence

of Richmond's commitment crimes and defendant's knowledge of Richmond's prior in-prison bad acts to counter the prosecution's theory "that Mr. Richmond was . . . somebody that the other people in his particular gang or culture would want to have taken out." In other words, Richmond had proven himself to be trustworthy to other White inmates by engaging in prison misconduct and there was no reason to kill him. The prosecutor responded that, if the defense attacked Richmond's character, then "under 1103 I should be able to attack Mr. Barrett's character through 115s." Defense counsel underscored, "we're not introducing the evidence to show he's a bad character in the sense that he acted in conformity with his bad character. We're just showing that in the prison environment that he was a respected person . . . ." The trial court decided "to wait and see what happens," and deferred ruling on the admissibility of Richmond's and defendant's uncharged misconduct and crimes.

In his opening statement, defense counsel said: "Mr. Richmond has been taken to another cell and has another cellie. During the time he's with that cellie he gets caught with weapons, gets drunk, and he gases a CO. And I'm not saying it's anything to imply that that's unusual but that — or to imply that he's a villain, but only to put in balance that he's not an innocent either."

Later that day, defense counsel called Vialpando, the case records analyst at Calipatria, as his first witness. Vialpando testified that Richmond was convicted of four prior "strike" offenses, including three convictions for second degree robbery and one conviction for burglary. Regarding Richmond's robbery convictions, defense counsel asked Vialpando, "robbery, even second degree, is by force or fear of violence; is that correct?" When Vialpando replied that second degree robbery is a serious

felony, but not a violent offense, counsel replied, "it's threat-related, but it's taking from the presence of somebody or the person of somebody; is that correct?" Vialpando replied, "Correct sir."

The defense subsequently called defendant to the stand. Defendant testified that Richmond told him he was in Ad Seg because an officer found knives in his pants during a cell search. Defendant said that he and Richmond discussed bringing weapons to the yard for protection. The prosecutor objected on hearsay grounds, and the trial court sustained the objection. Defense counsel argued in response that he was not introducing the conversation between defendant and Richmond for its truth, "but to explain why [defendant] had respect for this." The trial court observed, "It isn't really used for the truth in a lot of ways. But when you get a whole bunch of stuff out there that you're not using it for the truth, it's hard to unring the bell. The jury is going to remember that." Defense counsel queried how the jury would otherwise learn that defendant trusted Richmond. The trial court suggested more direct inquiries, like " 'How did you feel about him?' " Defense counsel continued with questions about defendant and Richmond trying to bring a weapon to the yard.

Defendant later explained that he and Richmond were both cited for a rule violation for "flooding the cell." Richmond and defendant were thereafter placed in separate cells. Defense counsel inquired whether Richmond partook in any noteworthy activities while he was apart from defendant. Defendant responded, "Cell extraction, gassing a couple of correctional officers, got caught with a weapon during cell extraction." The trial court struck the cell extraction and weapon possession testimony upon the prosecutor's motion because defendant did

not witness these incidents. Defense counsel then asked defendant whether Richmond admitted these transgressions to him, and defendant confirmed he did; the trial court thereafter permitted the jury to consider the testimony about Richmond's weapon possession as "an admission against interest." Defendant later testified more generally about how he and Richmond "got along pretty good." Richmond assisted defendant in making his weapon from the desk in the cell. At some point, defendant had Richmond "stop sharpening [the knife] because [he] became suspicious of [Richmond's] activities" when Richmond started receiving kites and not showing them to him. Defendant then started detailing how Richmond received an unwrapped knife in their shared cell shortly before his death.

During a break in defendant's testimony, the trial court turned back to the Evidence Code section 1103 question. The judge advised defense counsel, "you've gotten into a situation now, I believe, where [the prosecutor] can introduce evidence of [defendant's] violent past activities, including the murder in San Francisco." Defense counsel underscored that the only "assaultive behavior that was talked about was the gassing . . . [¶] . . . [¶] I don't know that that establishes character." The trial court recognized the importance of the issue to defendant's trial and recessed early so that the parties could brief the issue.

The following day, the parties submitted their written briefs. In support of the admission of the Evidence Code section 1103 evidence against defendant, the People argued that defendant testified that Richmond "has been involved in acts of violence, which includes possessing weapon [*sic*], gassing officers, and a forced cell extraction" and "the prosecution should now be allowed to introduce character evidence of defendant's violent propensities." The People quoted our decision in *People*

*v. Ramos* (1997) 15 Cal.4th 1133, 1173 for the proposition that weapon possession in a prison environment " 'would reasonably implicate a violent character whether defendant intended to use the[m] offensively or defensively.' "

In their[13] brief, defense counsel explained that "[t]he defense has never 'offered' the evidence of Richmond's bad acts to show his propensity for violence against [defendant]." Rather, these acts had "special relevancy" to negate the prosecution's theory of motive and demonstrate, consistent with defendant's testimony, that defendant would have had no reason to suspect that "Richmond was a 'snitch' cooperating with the authorities by telling on other inmates." Defense counsel asserted, "[a]t most, the prosecution would be entitled [to] an instruction that evidence of Richmond's 'misconduct' is limited to supporting an inference that [defendant] would have no knowledge or reason to believe Richmond gave up weapons or was a snitch[.]" Finally, defense counsel objected on Evidence Code section 352 grounds that there was "great danger of undue prejudice in admitting evidence under 1103(b)."

The trial court also heard argument from the parties. Defense counsel asked the court to read Evidence Code section 1103 again and reiterated that there was "no offer to prove" Richmond's character for violence. The court responded, "Well, it certainly wasn't limited in any way when it came in." The prosecutor asserted, "Your Honor, it's clear that the defense has brought in the evidence against Mr. Richmond's past for a

---

[13] Defendant was represented by two attorneys at trial, one who acted as the lead attorney and the other as second chair. Defense counsel will be referred to in the singular unless otherwise necessary for clarity.

multiple number of reasons. And so it is being offered — I don't care what they say. It is being offered to attack Mr. Richmond's character. There is no other interpretation the jury is going to get from that . . . . [¶] So now it's my turn to be able to go after [defendant]." The prosecutor explained that he did not intend to bring in defendant's prior murder conviction but wished to introduce his other uncharged acts of violence. The court agreed, "This evidence comes in for multiple purposes. You can't sanitize it. You just can't do it, not this type of evidence. [¶] . . . I'm going to let everything in but the murder under 352."

Defense counsel repeated that Richmond's misconduct was never offered to prove his bad character. The trial court replied, "Well, look. I'm going to say it appears to me that that evidence was offered for multiple purposes . . . . It certainly is going to have the effect on the jury that they're going to think [defendant] reasonably feared for his life because of Mr. Richmond's alleged violent character of gassing people, carrying inmate manufactured weapons. It's just too clear in that regard. I can't avoid section 1103-B." The trial court continued, "The jury is going to understand that [defendant] is now faced with a violent Mr. Richmond who is receiving mysterious notes and some sort of weapon. It's just there." The judge, however, postponed his final ruling to think about the issue more.

When the parties and the trial court revisited the issue, defense counsel again argued against the admission of any of defendant's uncharged violent acts and submitted that the court could otherwise strike defendant's testimony or provide a limiting instruction. The trial court ruled that the prosecution could introduce evidence of defendant's prior violent acts, "this is a tough call, and I don't like to do it. The evidence wasn't limited when it went in. It would be too late to do it now."

When the jury returned to the courtroom, the trial court gave an instruction addressing the anticipated evidence against defendant: "At this time, [the prosecutor] is going to be seeking to elicit testimony with — that can only be used by you pursuant to the Evidence Code to show whether or not [defendant] has a character for violence or a trait of character for violence. It cannot be used to show he has a propensity to commit violent crimes." The trial court refused defense counsel's request to instruct the jury that defendant's testimony "of the conduct of Mr. Richmond in connection with holding weapons, going to the yard with weapons, and gassing [correctional officers] was for the limited purpose of showing that [defendant] had no knowledge that he had [snitched]."

During his cross-examination of defendant, and over defense counsel's continuing objections, the prosecutor elicited evidence of several violent acts (spanning from 1995 to 2003) committed by defendant, including multiple assaults upon other inmates and various weapon possession incidents (see *ante*, at p. 12). The trial court cut the prosecutor off at the point at which the evidence was becoming "cumulative."

### b. *Analysis*

Evidence of a person's character is generally inadmissible "to prove his or her conduct on a specified occasion" (Evid. Code, § 1101, subd. (a)), but it is admissible to prove some other fact, such as opportunity or intent. (Evid. Code, § 1101, subd. (b).) However, an exception to this general rule is that a criminal defendant may offer evidence of the victim's "character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)" in order "to prove conduct of the victim in conformity with the character or trait of

character."[14]    (Evid. Code, § 1103, subd. (a)(1).)    But if a defendant chooses to introduce such evidence about the victim, then the prosecution may rebut such evidence with evidence of the defendant's own character.  (Evid. Code, § 1103, subd. (a)(2).)  Specific to violent character evidence, pursuant to Evidence Code section 1103, subdivision (b), if "a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that . . . the defendant was a violent person, from which the jury might infer it was the defendant who acted violently."    (*People v. Fuiava* (2012) 53 Cal.4th 622, 696 (*Fuiava*).)  Even if evidence of a defendant's character is made admissible under Evidence Code section 1103, a trial court may still exclude it under Evidence Code section 352 if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 808 (*Gutierrez I*).) We review the trial court's ruling admitting evidence under Evidence Code sections 1103 and 352 for abuse of discretion. (*People v. Cox* (2003) 30 Cal.4th 916, 955.)

Here, defendant contends the trial court misinterpreted Evidence Code section 1103 and did so in a manner that violated his constitutional rights.  Defendant repeats his argument before the trial court that he never offered "evidence of Richmond's misconduct to show that he had a violent character

---

[14]    Except as limited in sex offense cases.  (See Evid. Code, § 1103, subd. (c)(1).)

and therefore was the aggressor on the night he died." The evidence was merely meant to show defendant's "state of mind and to counter the prosecution's theory of murder." In other words, defendant insists he never "opened the door" for the prosecution to present evidence of his violent character.

On the record before it, the trial court could reasonably conclude that defense counsel presented evidence of Richmond's misconduct to show he was a violent person. As noted, during his opening statement, defense counsel said: "Mr. Richmond has been taken to another cell and has another cellie. During the time he's with that cellie he gets caught with weapons, gets drunk, and he gases a CO. And I'm not saying it's anything to imply that that's unusual but that — or to imply that he's a villain, but only to put in balance that he's not an innocent either." While questioning Vialpando about Richmond's robbery conviction, defense counsel asked, "robbery, even second degree, is by force or fear of violence; is that correct?" When Vialpando replied that second degree robbery is a serious felony, but not a violent offense, counsel replied, "it's threat-related, but it's taking from the presence of somebody or the person of somebody; is that correct?" Vialpando replied, "Correct sir." These arguments and inquiries seem aimed at portraying Richmond as violent. On this record, the trial court did not have to accept defense counsel's representation that the evidence of Richmond's misconduct was admitted solely for purposes of establishing defendant's state of mind. The defense's theory was that defendant acted in self-defense after Richmond received an unwrapped knife and attacked him, and the jury had evidence before it that Richmond previously possessed a weapon and gassed an officer, i.e., evidence showing that Richmond might have acted in conformity with his prior violent behavior on the

night of his death and been the aggressor. As defense counsel argued, Richmond was "not an innocent." Thus, the trial court reasonably concluded the evidence of Richmond's misconduct served "multiple purposes" and it would have been improper to give a limiting instruction to prevent jurors from considering it as evidence of Richmond's violent character. Moreover, the trial court advised defense counsel, prior to the start of the defense case, that it was going to wait to rule on whether evidence of Richmond's misconduct would open the door to rebuttal evidence of defendant's misconduct, but defense counsel proceeded to elicit information about Richmond's violent character without waiting for a ruling. Under these circumstances, the trial court did not abuse its discretion by allowing the prosecutor to rebut such evidence with evidence of defendant's own violent character.[15]

---

[15]    In his second supplemental brief, defendant claims for the first time that he received ineffective assistance of counsel as an alternative claim to his argument that the trial court erred when it permitted the prosecution to admit evidence of his prior violent acts under Evidence Code section 1103, subdivision (b). However, as the record reflects, defense counsel's purpose for eliciting evidence of Richmond's prior violent conduct was to contradict the prosecution's motive theory. In doing so, defense counsel risked opening the door to evidence of defendant's prior violent conduct. Defendant asserts the trial court induced defense counsel's ineffective choice by changing its ruling on the Evidence Code section 1103 issue, but the record shows the court did not definitively rule that it would not let in rebuttal evidence if defense counsel presented evidence of Richmond's violent acts and defense counsel presented the evidence without waiting for a ruling. On the present record, defendant's belated claim of court-induced ineffectiveness does not merit our consideration. (See *People v. Carrasco* (2014) 59 Cal.4th 924, 990 [new theory of ineffective assistance raised for first time at oral argument and in subsequent supplemental reply brief is forfeited].)

Nor did the trial court abuse its discretion under Evidence Code section 352 by admitting this evidence, which defendant contends was "marginally probative and highly prejudicial." "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and *which has very little effect on the issues*. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d. 612, 638, italics added.) Defendant's own violent character in this self-defense case was made highly relevant after the defense's presentation of evidence that Richmond possessed a weapon and gassed a guard. Moreover, the trial court cabined the evidence of defendant's violent character, excluding evidence of his prior murder conviction and cutting off the prosecution's presentation of evidence at the point it risked becoming cumulative. Nor did the evidence "necessitate undue consumption of time" (Evid. Code, § 352), as it was efficiently presented through defendant's own testimony. On this record, defendant fails to show the trial court exercised its discretion " ' " 'in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 480 (*Mora and Rangel*).)

For the same reasons, defendant fails to persuade that the trial court's application of Evidence Code section 1103 deprived him of "his federal and state constitutional rights to due process

and a fundamentally fair trial, to exercise his privilege against self-incrimination, to fair notice, and to a reliable capital proceeding." "[T]he operation of [Evidence Code] section 1103(b) is dependent upon a choice made by the defendant, in much the same way that other strategic choices made by the defense during a trial will make admissible evidence that otherwise would have been excluded. [Citation.] It is not fundamentally unfair to require the defendant to make that choice." (*Fuiava*, *supra*, 53 Cal.4th at p. 698; see also *id.* at p. 700 [Evidence Code section 1103, subdivision (b) does not violate "any fundamental constitutional principle of fairness and justice"].) Having chosen to present evidence of Richmond's violent misconduct, defendant's claims of constitutional error fail.

### 4. *The Trial Court's Instructions Addressing the Evidence Code Section 1103, Subdivision (b) Evidence Accurately Explained the Law*

Defendant asserts the trial court's jury instructions addressing the violent character evidence (see Evid. Code, § 1103, subd. (b)) were erroneous in various respects. We conclude there either was no error in the instructions, or any error was harmless.

#### a. *Background*

As previously noted, before permitting the prosecutor to question defendant about his prior acts of violence, the trial court instructed the jurors that the evidence "can only be used by you pursuant to the Evidence Code to show whether or not [defendant] has a character for violence or a trait of character for violence. It cannot be used to show he has a propensity to

commit violent crimes."[16]    Before the jury's guilt phase deliberations, and following extended discussions with the parties, the trial court instructed the jury on the prior crimes evidence with CALJIC Nos. 2.09, 2.50.2, and a modified version of 2.50.

As modified, CALJIC No. 2.50 (Evidence of Other Crimes) read: "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. [¶] Except as you will otherwise be instructed, this evidence, if believed, may be considered by you for the limited purpose of determining if it tends to show: [¶] The existence of the intent which is a necessary element of the crime charged; [¶] The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged; [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose."

CALJIC No. 2.09 (Evidence Limited As To Purpose) read, "Certain evidence was admitted for a limited purpose. [¶] At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. [¶] Do not consider

---

[16]    At the time of defendant's trial, and "[t]o appellant's knowledge, neither CALJIC nor CALCRIM include[d] standard jury instructions relating to Evidence Code section 1103." In March 2023, CALCRIM No. 352 (Character of Victim and of Defendant) was added to the California Criminal Jury Instructions; it addresses character evidence admitted under Evidence Code section 1103.

this evidence for any purpose except the limited purpose for which it was admitted."

CALJIC No. 2.50.2 (Definition Of Preponderance Of The Evidence) read: " 'Preponderance of the evidence' means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it. [¶] You should consider all of the evidence bearing upon every issue regardless of who produced it."

The trial court did not instruct the jury with CALJIC No. 2.50.1, which would have told jurors that the prosecution must prove a defendant committed other crimes for which he or she is not on trial by a preponderance of the evidence. Nor did the trial court give any of the special instructions related to Evidence Code section 1103, subdivision (b) requested by defense counsel. Defense counsel had proposed, inter alia, a special instruction that would have told jurors: "It is not sufficient to sustain a conviction on a particular charge to prove that the defendant is guilty of some other charge or of generally bad and criminal conduct. But the proof must establish his guilt of the particular charge in the indictment."

### b. Analysis

First, defendant alleges the trial court's instructions "unfairly permitted the jury to consider other crimes evidence in determining whether [defendant] — but not Richmond — had a violent character."

"A defendant is entitled to a pinpoint instruction, upon request, only when appropriate. [Citation.] 'Such instructions relate particular facts to a legal issue in the case or "pinpoint"

the crux of a defendant's case . . . . [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' " (*Gutierrez I*, *supra*, 45 Cal.4th at p. 824.) "

Defendant does not contend that he specifically requested a pinpoint instruction to the effect that Richmond's prior violence could be considered as relevant to the question of whether he acted in conformity therewith on the night of his death. In the absence of a request, defendant was not entitled to a pinpoint instruction regarding Richmond's violent character, and he cannot complain that the jury instructions were unfairly lopsided in that regard.[17]

---

[17] During the parties' subsequent discussions about how to instruct the jury, the only special instruction requested by defense counsel pertaining to the prior crime evidence spoke to it being insufficient to "establish his guilt of the particular charge in the indictment." The trial court refused a requested special instruction titled " 'Other Crimes, Risk of Prejudice,' " deeming it "argumentative," but told defense counsel he could "certainly argue that." Defendant points out that the record on appeal does not include a complete set of all the special jury instructions offered by the parties. For purposes of establishing the record on appeal, the parties signed a "Stipulated Settled Statement Re Jury Instructions." In the statement, the parties explain that defense counsel submitted a second and third packet of proposed jury instructions, "[o]n January 5, 2004" and "[o]n January 8, 2004" respectively, that could not be located. The parties did not recall the content of these proposed instructions. Both packets were before the trial court when, on January 8, 2004, it ultimately refused defense counsel's proposed " 'Other Crimes, Risk of Prejudice' " instruction as argumentative and there is no suggestion in the record that counsel requested a pinpoint instruction to the effect that Richmond's prior violent misconduct could be considered to demonstrate his character for violence.

Second, defendant contends the modified CALJIC No. 2.50 instruction was inapplicable to his case because the trial court did not admit his prison misconduct under section 1101 to show his intent or knowledge in stabbing Richmond, but instead only to show his character for violence under section 1103. In his view, the court's instructions, by permitting jurors to consider his prior misconduct for the dual purposes of demonstrating his intent and knowledge (see Evid. Code, § 1101, subd. (b)) *and* his character for violence (*id*., § 1103, subd. (b)), gave him "the worst of both worlds." The People argue that the trial court "implicitly" admitted the evidence of defendant's prior misconduct under Evidence Code section 1101, subdivision (b).

When initially discussing the CALJIC No. 2.50 instruction with the trial court, including defense counsel's assertion that "1101-B was thrown out," the prosecutor posited, "I don't believe, your Honor, that you did eliminate me from bringing in 1101-B evidence. In fact, before we selected the jury, we went through that. And you were inclined to let it in. And you were holding off to see how it all panned out during the course of the trial. [¶] So I just saw another opening under 1103. And that's how I proceeded. But 1101-B did not specifically exclude the evidence." The court responded, "I think you're right." Later, when revisiting its discussion of the CALJIC No. 2.50 instruction, defense counsel said, "I'm not sure it was admitted on the intent stuff, but we'll reserve the right to consider that further because I think it was admitted solely on the issue of violent character traits." The court responded, "I think so." Defense counsel continued, "Not on the intent or knowledge. I think you had ruled that out under 1101(b) except on the issue of possession of weapons." The court said, "No, if it's admissible under those sections, then, use it the way it is."

The trial court's initial tentative ruling, at least as to defendant's prior possession and manufacturing of weapons, was that the prior misconduct evidence was not admissible under Evidence Code section 1101, subdivision (b) "unless [Barrett] claims that [the weapons he possessed] were Richmond's weapons; that he didn't have any weapons." As such, we will assume the trial court erred by instructing the jury with CALJIC No. 2.50. Nevertheless, any error was harmless. As previously explained, the evidence of defendant's prior acts of violence was properly introduced under Evidence Code section 1103 to prove defendant acted in conformity with his violent character on the night of Richmond's death. In conjunction with admitting the evidence, the trial court instructed in part that it "can only be used by you pursuant to the Evidence Code to show whether or not [defendant] has a character for violence or a trait of character for violence." Thus, the trial court's subsequent instruction under a modified version of CALJIC No. 2.50, which told jurors they could consider the evidence of defendant's uncharged acts for a purpose narrower than showing his character for violence, i.e., "for the limited purpose of determining if it tends to show" his intent or knowledge and for no "other purpose," could not have prejudiced defendant.

Third, defendant complains the trial court erred by failing to instruct jurors under CALJIC No. 2.50.1. CALJIC No. 2.50.1 would have told jurors that "the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed crimes other than those for which he is on trial" and the evidence may not be considered "for any purpose" unless so proved. The instruction also "remind[s] [jurors] that before a defendant can be found guilty of any crime charged in this trial, the evidence as a whole must persuade you beyond a reasonable

doubt that the defendant is guilty of that crime." Relatedly, defendant asserts the trial court should have given a special instruction at his request that "would have remedied some of [the] prejudice caused by the absence of 2.50.1" by telling "the jury that other crimes evidence was insufficient to sustain a conviction of the charged offenses." Under the trial court's instructions as a whole, the failure to instruct under CALJIC No. 2.50.1 was harmless. After reading the instruction defining "preponderance of the evidence" (CALJIC No. 2.50.2), the trial court stated, "I don't want to confuse you with this too much. But the main burden here is beyond a reasonable doubt, not preponderance. There's one issue that has to be proved by a preponderance. And at this moment it escapes me." Defense counsel asserted, "Other crimes." The trial court then advised the jury that "[t]he other crimes that were alleged that you heard about that these people may have committed. Those only have to be proved by a preponderance, which is the definition used in civil cases. More likely than not. 51/49 is a preponderance. [¶] The issue of guilt here and the finding of special circumstances is governed by the reasonable doubt standard, not by — beyond a reasonable doubt, not by preponderance of the evidence."

Defendant asserts the trial court's "improvised oral instructions" were an inadequate substitute for CALJIC No. 2.50.1, but the jury was told to consider the instructions as a whole and additionally instructed that the People had the burden of proving the charged crimes beyond a reasonable doubt (CALJIC Nos. 2.01, 2.90). Taken together, these instructions correctly advised the jury of the relevant law and compensated for any alleged deficiency in the trial court's deviation from the standard instructions under CALJIC No. 2.50.1. Nonetheless,

even though we find no prejudice on the instructional record here, we take this opportunity to remind trial courts that, when the standard instructions are complete, it is "often risky" for the court to stray from them. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

In sum, with respect to each claim, defendant either fails to demonstrate error or prejudice, and there was no risk of cumulative prejudice. (See *People v. Rogers* (2006) 39 Cal.4th 826, 890 (*Rogers*) [where the issue posed by one incorrect instruction was resolved against the defendant under other instructions, it "did not result in any prejudice . . . that could cumulate" and the other error, "standing alone did not render the trial fundamentally unfair"].)

### 5. *The Trial Court Properly Admitted Evidence that Richmond Turned in Weapons*

Defendant contends the trial court erred when it refused to strike the testimony from Correctional Officers Longcor and Borem that Richmond had voluntarily turned over weapons he had received from another inmate. Defendant asserts this testimony was inadmissible absent the "critical foundational fact" that defendant knew Richmond had done so. Absent such a showing, defendant argues that the testimony was irrelevant because it could have no bearing on the prosecution's theory that defendant killed Richmond because he knew Richmond was "a rat" working with prison officials.

### a. *Background*

Before trial, the prosecution explained in its "Trial Brief and In Limine Motions" that "[t]he evidence will show that defendant Barrett decided to murder Mr. Richmond for voluntarily turning in two inmate manufactured weapons to a

correctional officer." The prosecution was prepared to present evidence to establish that, during their time sharing a cell, defendant became suspicious of Richmond and started inquiring about him with other inmates. "After defendant's inquiries about the victim, inmate Keith Barnard . . . sent a 'kite' back to defendant Barrett," informing him "that Richmond had turned in two weapons he had been instructed to hold for another inmate, to a Correctional Officer, and gave defendant Barrett the 'green light' to assault the victim for giving up weapons." Barnard was on the prosecution's witness list for trial.

After Longcor and Borem testified, the People called Barnard to the stand, but he refused to testify even though he was granted immunity; the trial court instituted contempt proceedings against him. The expected letter or "kite" from Barnard, informing defendant that Richmond had turned over two weapons, was excluded from evidence for lack of foundation; there was no evidence defendant actually received the kite.

During the defense case, when defendant's cross-examination by the prosecutor was interrupted to discuss the admissibility of defendant's prior misconduct under Evidence Code section 1103, defense counsel moved to strike the evidence that Richmond had given up weapons as irrelevant. Defense counsel argued the evidence was irrelevant because the prosecutor failed to prove that defendant knew Richmond had given up weapons; counsel pointed out that the trial court excluded Barnard's letter on that basis. Defense counsel also argued that, by extension, any evidence of defendant's bad acts should be excluded because Richmond's violent acts of gassing an officer and possessing a weapon were only mentioned to rebut the prosecution's unsupported theory of motive. The trial court said the issue could be argued to the jury. The trial court then

permitted the prosecution to question defendant about his prior acts of violence. After the defense presented the remainder of its case in chief, defense counsel "renew[ed] [his] motion to strike the testimony of the two officers" that Richmond had given up weapons as irrelevant because "there's never been a tie-up of that — those events or any evidence — any credible evidence, any competent evidence to show that [defendant] had knowledge of those things." The trial court observed that the motion "might be premature," and declined to rule until all the evidence was in. Defense counsel highlighted for the court that only rebuttal witnesses remained; the court deferred a ruling "to wait and see what they say."

During the prosecution's rebuttal, inmates Wilson, Hill and Magee testified, inter alia, to the effect that defendant thought Richmond was a "rat." (See opn., *ante,* at pp. 14–16.) Hill testified more specifically that defendant told him that Richmond "had two knives" and Richmond "used those knives to get at the cops and tell them he had knives," so he could be sent to Ad Seg and avoid "a debt on 'C' yard to another inmate."

### b. *Analysis*

When "[t]he relevance of the proffered evidence depends on the existence of [a] preliminary fact," the proponent of the evidence bears the burden of producing evidence in support of that preliminary fact. (Evid. Code, § 403, subd. (a)(1).) "We have explained that the trial court's role with regard to preliminary fact questions under Evidence Code section 403, subdivision (a), ' " 'is merely to determine whether there is evidence sufficient to permit a jury to decide the question.' ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 47.) " 'The court should exclude the proffered evidence only if the "showing of

preliminary facts is too weak to support a favorable determination by the jury." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 956, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 466.) "The determination regarding the sufficiency of the foundational evidence is a matter left to the court's discretion. [Citation.] Such determinations will not be disturbed on appeal unless an abuse of discretion is shown." (*Brooks*, at p. 47.)

Here, the prosecution explained before trial that it would produce evidence to establish that defendant knew Richmond turned over two weapons to prison officials, namely, the testimony and letter of fellow inmate Barnard. At that point, defense counsel did not make any claim that the prosecution's anticipated foundational evidence would be insufficient to permit the jury to determine the relevance of Richmond turning over weapons. However, after Longcor and Borem testified, Barnard was called by the prosecution to testify but ultimately, and presumably unforeseeably, refused to do so despite a court order. Defense counsel did not move to strike the officers' testimony at that point in time. Instead, defense counsel waited until after the prosecution's case in chief had concluded to move to strike the testimony. The trial court first said the question could be argued to the jury. Defense counsel thereafter renewed his motion to strike prior to the prosecution's presentation of rebuttal witnesses (i.e., after the defense and prosecution's cases in chief had concluded), and the trial court then deferred its ruling until after the rebuttal testimony.

Defendant asserts the trial court erred by deferring its ruling on his motion to strike the officers' testimony until hearing from the prosecution's rebuttal witnesses, though he admits he cannot find any case law prohibiting such a deferred ruling. More specifically, defendant contends that permitting a

court to defer a ruling in this manner "would be illogical" in light of the longstanding rule that rebuttal evidence may " 'not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime.' (*People v. Carter* (1957) 48 Cal.2d 737, 753 (*Carter*).)"

Where the trial court was first presented with a motion to strike from defendant after the prosecution's case in chief had concluded, its ultimate conclusion that the rebuttal witnesses could furnish the requisite foundational fact (that defendant knew Richmond handed over weapons) was procedurally logical. (See *People v. Cox* (1991) 53 Cal.3d 618, 700 ["[a] trial court has inherent as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice"]; § 1044 ["It shall be the duty of the judge to control all proceedings during the trial . . . with a view to the expeditious and effective ascertainment of the truth regarding the matters involved"].) Had defense counsel moved to strike the officers' testimony during the prosecution's case-in-chief, after Barnard refused to testify, then the prosecution could have been called upon to remedy any alleged foundational deficiency during its case-in-chief, with witness testimony like that ultimately provided by Wilson, Magee, and Hill. (See *People v. Viray* (2005) 134 Cal.App.4th 1186, 1208–1209 ["Ordinarily a court cannot commit error in the admission of evidence unless it is called upon to *rule* on an *objection* by a party. (See Evid. Code, § 353, subd. (a).) . . . For a court to take the initiative in enforcing such rules would tend to interfere with the prerogatives of counsel"].) The rebuttal testimony from Wilson, Magee and Hill that defendant communicated to them that he thought Richmond was a "rat," and Hill's specific testimony that defendant

mentioned Richmond giving up two weapons "to get at the cops," was more than sufficient for the jury to infer that defendant knew Richmond handed over weapons to prison officials — thereby lending relevance to the officers' testimony about Richmond handing over weapons. On this record, the trial court did not abuse its discretion by denying defendant's motions to strike the officers' testimony.[18] For the same reasons, defendant fails to demonstrate any constitutional error. (Cf. *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 ["As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense' "].)

### 6. *The Trial Court Properly Denied Defendant's Motion for Judgment of Acquittal*

Defendant contends the trial court erred by denying his motion for acquittal (§ 1118.1).

#### a. *Background*

On December 16, 2003, after the prosecution presented its guilt phase case-in-chief, defendant, pursuant to section 1118.1, filed a written motion for "acquittal on the first degree murder

---

[18]     Defendant also argues that the trial court erred in denying his first motion to strike the officers' testimony about Richmond giving up weapons. He argues that there was insufficient foundation when the first motion was made, and the evidence should have been excluded at that time. He therefore contends that the trial court erred in concluding that the evidence could be admitted, and that defense counsel could simply argue to the jury that there was no evidence defendant knew Richmond turned over weapons. However, as explained above, the trial court subsequently and reasonably permitted the rebuttal witnesses to provide the requisite foundational testimony.

charge and the special circumstance of lying-in-wait[.]"[19] As for the first degree murder charge, defendant claimed the prosecution did not introduce "substantial evidence that the killing was a premeditated, willful, deliberated murder" and the prosecution theory "that Richmond was killed because he was an informant cannot be sustained." According to defendant, "[w]ithout the evidence of so called motive, the record is naked concerning the question what prompted the violence." Defendant further challenged the sufficiency of the evidence of the lying-in-wait special circumstance charge, claiming that the prosecution did not prove "any substantial waiting period before the confrontation began."

The trial court heard argument on the motion the same day. Defense counsel argued, "The position of defense is that the first degree [premeditated] murder has not been established since there was no evidence other than there was an eruption of violence that is unaccounted for." Defense counsel further asserted the evidence was inadequate to show the killing was accomplished by lying in wait since there was insufficient evidence "establishing what occurred prior to the eruption of violence."

In response, the prosecutor emphasized that Officer Wysocki saw both men lying in their bunks during second count, and then Richmond was dead on the third count. "That's definitely an indication that any reasonable juror could come to and reach an inference that that — that they were, in fact,

---

[19] Defendant also moved for acquittal on the weapon possession charge "for his secreting of the razor blade." Defendant does not challenge the trial court's denial of his motion as to that count and we need not discuss it.

sleeping or resting at the time [defendant] attacked Mr. Richmond. That is clearly lying in wait." Considering this same evidence, the jury could decide whether defendant committed first degree premeditated murder.

The court denied the motion, explaining that, if the jury accepted the prosecution's "interpretation of the facts, they could find that [defendant] was lying in wait." With respect to first degree murder, the trial court observed, "I think on this record, the jury could conclude that the killing was premeditated based on the fact that it certainly took time to cut that prisoner manufactured weapon, the shank, out of the desk. That didn't happen quickly. [. . .] [¶] And the jury could, based on that, find that this murder was premeditated."

### b. *Analysis*

"We review the denial of a Penal Code section 1118.1 motion using the same standard 'employed in reviewing the sufficiency of the evidence to support a conviction.' [Citation.] We thus examine ' "the entire record in the light most favorable to the judgment" ' to determine whether it discloses substantial evidence — ' "evidence that is reasonable, credible, and of solid value" ' — ' "from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.] Our review ' " 'presume[s] in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " [Citation.] Even where . . . the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might " ' "be reasonably reconciled with the defendant's innocence." ' " ' [Citation.] Instead, we ask whether there is ' " 'substantial evidence of the existence of each element

of the offense charged' " ' such that any rational jury may have convicted defendant." (*People v. Veamatahau* (2020) 9 Cal.5th 16, 35–36 (*Veamatahau*).)

### i. *First- Degree Murder*

Defendant contends the evidence was insufficient to show Richmond's murder was deliberate and premeditated so as to constitute murder in the first degree. (See § 189, subd. (a).)

" ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' [Citation.]" (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.) In *People v. Anderson* (1968) 70 Cal.2d 15, 26 (*Anderson*), we identified "three basic categories" of evidence that may be probative of premeditation and deliberation: 1) planning activity, 2) motive, and 3) manner of killing. However, " '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.' [Citation.] 'The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way.' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)

Focusing on the *Anderson* categories, defendant argues that "the prosecution's case-in-chief failed to present substantial evidence of planning activity, motive, or manner of killing from which the jury could have reasonably inferred that appellant killed Richmond with premeditation and deliberation." We disagree.

As for planning activity, the People presented evidence that a weapon was cut from the desk in the cell defendant shared with Richmond. As the trial court observed, making a weapon of this sort would take time. That weapon was the only weapon found in defendant's cell after Richmond's killing. Further, the manner of killing also supports a finding of premeditation and deliberation. The prosecution's medical examiner, Dr. Swalwell, testified that Richmond's cause of death was multiple stab wounds. Richmond suffered 12 stab wounds, including wounds to his head, chest, and back, consistent with having been inflicted by the weapon found in defendant's cell. By contrast, defendant did not suffer any stab wounds and had no defensive wounds, and the cell looked more orderly than it would have had there been a fight, all of which suggests that defendant killed Richmond in a surprise attack (see more *post*). Based on this evidence from the prosecution's case-in-chief, the jury could have inferred that defendant had "a 'preconceived design' to take his victim's life in a particular way . . . ." (*Anderson, supra,* 70 Cal.2d at p. 27; see also *People v. Sandoval* (2015) 62 Cal.4th 394, 416 (*Sandoval*) [" 'Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill.' [Citation.] Proof of lying in wait ' "distinguish[es] those cases in which a defendant acts insidiously from those in which he acts out of rash impulse" ' "].)

Defendant underscores that there was no evidence of *who* made the weapon from the desk in cell 146 and, even if we assume he made it, there is no evidence he intended to kill Richmond with it. He highlights that the prosecution's theory of motive, i.e., that defendant killed Richmond for being a "rat," was not established in the prosecution's case-in-chief. Finally, defendant asserts that Dr. Swalwell's testimony suggested only

an explosion of violence, but not a killing resulting from careful thought and deliberation.

However, the fact that the evidence might also be reconciled with a contrary conclusion as to premeditation and deliberation does not render it insufficient to overcome a motion for acquittal. (See *Veamatahau, supra*, 9 Cal.5th at p. 36.) Moreover, motive "evidence is not indispensable to proving premeditation when the manner-of-killing evidence is so compelling." (*People v. Hawkins* (1995) 10 Cal.4th 920, 957.) Thus, any alleged insufficiency in the motive evidence at the time of defendant's motion is not determinative. In sum, the evidence was sufficient to support a jury finding that Richmond's murder was premeditated and deliberate.

### ii. Lying-in-Wait

Defendant contends the prosecution presented insufficient evidence to support a jury finding that he killed Richmond while lying in wait. (Pen. Code, § 190.2, former subd. (a)(15).) We disagree.

"We analyze a sufficiency-of-the-evidence challenge to a special circumstance finding under the same standard applied to a conviction: 'Reviewed in the light most favorable to the judgment, the record must contain reasonable and credible evidence of solid value, "such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.]" (*Mataele, supra*, 13 Cal.5th at pp. 420–421.)

At the time of Richmond's killing, the lying-in-wait special circumstance required that the murder be committed "*while lying in wait.*" (§ 190.2., former subd. (a)(15).) This meant " 'the elements of the lying-in-wait special circumstance required an intentional killing, committed under circumstances that

included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1183 (*Hajek*).) To satisfy the concealment element, it must be shown " ' " 'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' [Citation.]" (*People v. Carpenter* (1997) 15 Cal.4th 312, 388.)

Here, Officer Wysocki testified that between 2:00 and 2:15 a.m. on April 9, 1996, he observed defendant lying in the lower bunk of cell 146 and Richmond lying in the upper bunk. When he next checked after 4:45 a.m., defendant was standing at the cell door and Richmond was slumped over on the lower bunk with stab wounds to his chest. As stated *ante*, the evidence further showed that only one weapon was recovered from the cell and Richmond suffered multiple stab wounds, while defendant suffered no stab wounds nor defensive injuries. Moreover, the cell was more orderly than would be expected had there been a fight. From this evidence, a rational jury could infer that defendant concealed himself and his weapon while lying on the bottom bunk out of Richmond's view and waited underneath Richmond until Richmond was asleep or otherwise unsuspecting to launch his fatal attack. Defendant argues that, even assuming there was evidence of concealment, watchful waiting, and a surprise attack, the evidence did not show " 'an uninterrupted attack commencing no later than the moment concealment ends.' " (See *People v. Lewis* (2008) 43 Cal.4th 415, 512 (*Lewis*).) But the lack of injuries to defendant suggests a continuous flow of lethal events. (See *People v. Cage* (2015)

62 Cal.4th 256, 279–280 (*Cage*) [the evidence was sufficient to support a lying-in-wait special circumstance where the defendant went to the victim's front door with a shotgun hidden in a laundry basket and conversed with the victim before taking out the gun and shooting her; "the jury could reasonably determine that defendant's actions met the requirement of an immediate [and continuous] surprise attack on unsuspecting victims from a position of advantage"].) The evidence sufficed to support a lying-in-wait special circumstance finding.

Defendant additionally claims the "erroneous denial of his section 1118.1 motion violated his federal due process rights" and prejudiced him. However, since we conclude the motion was properly denied, defendant does not demonstrate any constitutional violation nor prejudice.

### 7. *Defendant's Failure to Object Forfeited His Claim that the Trial Court Improperly Admitted Testimony from the Prosecution's Rebuttal Witnesses*

Defendant contends the prosecution's rebuttal evidence improperly exceeded the permissible scope of such evidence.

Rebuttal testimony is authorized by statute. (§ 1093, subd. (d).) Pursuant to section 1093, subdivision (d), after each party has presented evidence to support its case (§ 1093, subd. (c)), they "may then respectively offer rebutting testimony only, unless the court, for good reason, in furtherance of justice, permit them to offer evidence upon their original case." However, "[i]t is improper for a prosecutor to withhold 'crucial evidence properly belonging in the case-in-chief' [citations] and to present it in rebuttal to take unfair advantage of a defendant." (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 30 (*Nunez and Satele*).) "A defendant's reiterated denial of guilt

and the principal facts that purportedly establish it does not justify the prosecution's introduction of new evidence to establish that which defendant would clearly have denied from the start." (*People v. Carter* (1957) 48 Cal.2d 737, 754 (*Carter*).) "Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt." (*Id.* at pp. 753–754.)

### a. Background

Months before defendant's trial commenced, defense counsel filed a "Motion to Limit and Exclude Rebuttal Evidence by the Prosecution." In the motion, relying in part on our decision in *Carter*, *supra*, 48 Cal.2d at page 737, defense counsel submitted "that the People should not be allowed to introduce into evidence during the rebuttal phase of their case evidence of the Defendant's guilt that could certainly have been introduced during the prosecution's case in chief." The trial court never ruled on this motion. As previously detailed (see *ante*, at pp. 14–16), in rebuttal, the prosecution called inmates Hill, Wilson, and Magee to testify. They testified that defendant either told them he intended to kill Richmond or confessed after the killing to having murdered Richmond. Each said defendant was motivated by his belief that Richmond was a "rat" or "snitch." Defense counsel did not object to the rebuttal testimony.

### b. Analysis

An in limine motion like the one made by defendant here may serve to "register" an evidentiary objection, but only " ' "when it satisfies the basic requirement of Evidence Code

section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context.” ’ ” (*People v. Pineda* (2022) 13 Cal.5th 186, 246.) However, as defendant himself acknowledges, he did not secure a ruling on his in limine motion. Moreover, his motion only generally objected to improper rebuttal testimony without specifically identifying any “body of evidence.” Defendant did not object on the grounds set forth in his briefing here when the prosecution called Hill, Wilson, and Magee to testify. On this record, defendant’s claim that the rebuttal testimony was improperly admitted is forfeited. (See *Pineda*, at pp. 246–247 [despite the defendant’s in limine motion objecting to some aggravating evidence, “[h]aving failed to raise a sufficiently specific objection to [particular] evidence and there being no reasonable basis for us to conclude that an objection would have been futile, it is plain that defendant forfeited any challenge to the admission of this testimony”]; *Nunez and Satele, supra*, 57 Cal.4th at p. 30 [failure to object to witness’s testimony at trial forfeited claim on appeal that it constituted improper rebuttal testimony].)

Alternatively, defendant contends trial counsel rendered ineffective assistance by failing to preserve his claim. Defendant contends that the testimony from Hill, Magee, and Wilson about defendant’s admissions was clearly central to the prosecution’s theory of first degree murder and thus should have been presented in its case-in-chief. By extension, he argues that counsel could therefore have had no tactical reason for failing to object to this material and damaging rebuttal testimony.

"The two-prong standard governing claims of ineffective assistance of counsel is well settled. ' " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.]' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653; *Strickland v. Washington* (1984) 466 U.S. 668, 688–692 (*Strickland*).) "We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

On the record here, we cannot say there is no reasonable explanation for counsel's conduct. (See *People v. Gurule* (2002) 28 Cal.4th 557, 609–610 (*Gurule*) [" ' "[A]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." [Citation.]' "].) Defendant's claim is better raised in a habeas corpus proceeding. (See *Mendoza Tello*, at pp. 266–267.)

### 8. *The Trial Court Properly Ruled on Defendant's Evidentiary Objections to the Rebuttal Testimony*

Defendant further argues the testimony from Hill, Magee, and Wilson violated the "Secondary Evidence Rule" and constituted inadmissible hearsay. Moreover, he asserts that the trial court compounded its errors in admitting their testimony

by inappropriately limiting the cross-examination of Wilson and Magee.

### a. Background

As previously detailed, Wilson testified that he and his cellmate, Poore, received kites from defendant prior to April 9, 1996. When the prosecutor asked Wilson what those kites said, defense counsel objected on "double hearsay" grounds and asked "under the Secondary Evidence Rule that the kite be produced." The prosecutor claimed that the kites were "going to be a declaration against interest, I guarantee you," and "also an admission." The trial judge overruled defense counsel's objections but said he would "have to strike this if it doesn't fall within one of the exceptions." Wilson testified defendant sent at least "[a] few" kites, which indicated that defendant thought Richmond "was a rat" and "was going to deal with him," meaning "hurt" him. Wilson threw the kites "in the toilet and flush[ed] them."

Michael Hill testified that when he was in Ad Seg at Calipatria in April 1996, air vents connected his cell with the cell defendant and Richmond shared. Hill said he received kites from defendant, but they were not in reference to Richmond's killing. When the prosecutor later asked if Hill knew why defendant killed Richmond, Hill testified about Richmond "lock[ing] up" to avoid paying a debt on "C yard." Hill continued, "And what I mean by locked up, it means that you did something against the rules that the prison — we, they — conduct for ourselves." Defense counsel asked that Hill's testimony in this regard be stricken, as it was "obviously hearsay." Hill interjected that "It's on the kites" from defendant. The trial

court allowed the testimony under the "admission against interest exception to the hearsay rule."

Magee testified that defendant told him he killed Richmond because he had information that Richmond was a "rat." In 1997, defendant was housed near Magee at Pelican Bay. Magee was an Aryan Brotherhood member who "ran that particular [cell] block," so defendant would talk to him. Defendant had "gotten wind" that the Aryan Brotherhood was questioning the validity of "his murder" and whether he "conduct[ed] a thorough enough investigation before he committed his murder." Defendant wanted to "explain his case" to Magee so that a murder contract would not be put out on him.

### b. *Admission of Testimony About The Kites*

Defendant asserts the testimony from Hill and Wilson concerning statements made in kites that were never physically recovered should have been excluded because the kites were not properly authenticated, and the testimony was improperly received as secondary evidence of the kites' existence.

Defendant did not raise an objection to the authentication of the destroyed kites and has therefore forfeited his claim that they were inadequately authenticated. As detailed, with regard to witness Wilson, defense counsel only made a "hearsay" objection and "ask[ed] under the Secondary Evidence Rule that the kite be produced." Neither comment challenged the kites' *authenticity* (or for that matter, Wilson's personal knowledge as to whether defendant wrote them). As to witness Hill, after he first testified he received kites from defendant but "they were not" in reference to Richmond's killing, the prosecutor asked what they were "in reference to" and defense counsel made a "relevance" objection (which the trial court sustained). Later, while defense counsel was

asking the trial court to strike as "hearsay" Hill's testimony about why defendant killed Richmond, Hill interjected, "It's on kites." Defense counsel made no other objection and the trial court "allow[ed]" the testimony based on the "admission against interest exception to the hearsay rule." On this record, defendant forfeited any authentication claim. (See *People v. Williams* (1976) 16 Cal.3d 663, 667, fn. 4 (*Williams*) ["It is the general rule, of course, that questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection at trial on the ground sought to be urged on appeal"].)

In a related argument, defendant claims the oral testimony of Wilson and Hill to prove the contents of the destroyed kites was not sufficient to meet the "Secondary Evidence Rule." (Evid. Code, § 1521, subd. (d).) "Once the proponent of the evidence establishes its authenticity, section 1521 requires exclusion of secondary evidence only if the court determines (1) '[a] genuine dispute exists concerning material terms of the writing *and* justice requires the exclusion' or (2) '[a]dmission of the secondary evidence would be unfair.' ([Evid. Code,] § 1521, subd. (a)(1) & (2).)" (*People v. Skiles* (2011) 51 Cal.4th 1178, 1188, italics added.) Oral testimony is admissible to prove the content of a writing "if the proponent does not have possession or control of a copy of the writing and the original is lost or has been destroyed without fraudulent intent on the part of the proponent of the evidence." (Evid. Code, § 1523, subd. (b).)

Defense counsel did not make any objection to Hill's testimony under the Secondary Evidence Rule. Defense counsel, although making a "hearsay" objection to Hill's testimony, did not further object when, during discussion of the hearsay objection, Hill interjected, "It's on kites." He has therefore forfeited his

Secondary Evidence claim as to Hill. (See *Williams*, *supra*, 16 Cal.3d at p. 667, fn. 4.) Wilson testified that he "flushed" the kites to avoid adverse consequences from his cellmate. Thus, there was no evidence the kites were destroyed because of any "fraudulent intent" on the prosecution's part, and the trial court did not abuse its discretion by concluding oral testimony about the kites' contents was admissible. (See Evid. Code, § 1523, subd. (b).) Defendant, on the basis of testimony from Wilson's cellmate Christopher Poore, asserts there was "a genuine dispute" about the contents of the destroyed kites that Wilson testified to receiving, as well as over whether the kites existed at all. However, the fact that Poore testified for the defense that he did not share the kites he received with Wilson did not create a dispute as to the "material terms" of the kites Wilson testified to receiving from defendant. If anything, Poore's testimony created a broader credibility question for the jury to decide about who was more believable, Poore or Wilson. As stated, under Evidence Code section 1521, a "court shall exclude secondary evidence of the content of a writing if the court determines . . . a genuine dispute exists concerning material terms . . . *and justice requires the exclusion*," or, alternatively, that admitting "the secondary evidence would be unfair." (Italics added.) On this record, the trial court could reasonably conclude that neither fairness nor justice required the exclusion of Wilson's rebuttal testimony as secondary evidence of the contents of the kites he received from defendant. (Cf. Evid. Code, § 1521, subd. (a)(1) & (2).)[20]

---

[20] The People argue that Evidence Code section 1523 alone governs the admissibility of oral testimony as secondary evidence, whereas defendant asserts that Evidence Code section

Finally, defendant asserts that the testimony from Hill, Wilson, and Magee about defendant's admissions was inadmissible hearsay. The trial court overruled defense counsel's hearsay objections to the testimony from Hill and Wilson, finding that defendant's statements fell under the hearsay exception for statements against penal interest.[21] (See Evid. Code, § 1230.) However, the parties agree that this hearsay exception could not apply because it requires the declarant, in this case defendant, be "unavailable as a witness" (*ibid.*), which was certainly not the case here given defendant testified in his own defense.[22] Nevertheless, the Attorney General argues the statements were admissible as defendant's prior inconsistent statements. We agree.

"When a trial court erroneously relies on one hearsay exception to admit evidence that otherwise would have been

1521 controls the analysis. Since we conclude that Wilson's testimony was admissible under both sections, we find it unnecessary to resolve any statutory ambiguity in this regard.

[21] Respondent asserts that defendant forfeited his claim of error as to Magee for failing to object to his testimony on hearsay grounds. However, defendant makes the persuasive argument that "[t]here is no reason to believe the trial court would have sustained such an objection after denying the same objection to the testimony of Hill and Wilson." (See *People v. Gomez* (2018) 6 Cal.5th 243, 286–287 [" 'Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile . . . .' "].)

[22] Since we agree with the parties that defendant's statements were improperly admitted under Evidence Code section 1230 because defendant was available to testify, it is not necessary to address defendant's secondary claim that the statements did not satisfy section 1230's threshold trustworthiness requirement for admission. (See *People v. Geier* (2007) 41 Cal.4th 555, 583.)

admissible under a different exception, it cannot be said that the evidence was admitted in error. [Citation.] 'It is axiomatic that we review the trial court's rulings and not its reasoning. [Citations.]' (*People v. Mason* (1991) 52 Cal.3d 909, 944.)" (*People v. Martinez* (2003) 113 Cal.App.4th 400, 408.)

Evidence Code section 1235 provides, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his [or her] testimony at the hearing and is offered in compliance with [Evidence Code] Section 770." "Evidence Code section 770 requires that before an inconsistent statement is admitted, the witness must be given 'an opportunity to explain or to deny the statement,' or must be subject to being recalled as a witness." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 414, fn. 35.) " 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . .' " (*People v. Fiero* (1991) 1 Cal.4th 173, 221.) "Prior inconsistent statements are admissible under [Evidence Code section 1235] to prove their substance as well as to impeach the declarant." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1144.)

Here, defendant's testimony at trial that he killed Richmond in self-defense was inconsistent with his prior statements as testified to by Wilson, Hill and Magee. Wilson testified that defendant wrote in his kites that he was going to "deal" with Richmond and that it was funny Richmond was making the knife defendant would stab him with. Hill testified that defendant told him in a kite that he was going to "hit" Richmond. And Magee testified that defendant told him he killed Richmond because he was informed Richmond was "a rat." In surrebuttal, defendant was recalled as a defense witness and

had the "opportunity to explain or to deny the statement[s]." (Evid. Code, § 770.) Defendant denied making any incriminating statements to Magee and Hill, and he testified that he did not send a kite to Poore (Wilson's cellmate) discussing "anything like what was testified to." Under these circumstances, defendant's statements were admissible as prior inconsistent statements and properly placed before the jury.

### c. Limitation of Defense Counsel's Cross-Examination of Wilson and Magee

Relatedly, defendant contends the trial court improperly limited defense counsel's cross-examination of Wilson and Magee, thereby hindering the jury's ability to judge their credibility in violation of his Sixth Amendment right to confrontation.

"[A]part from matters affecting credibility, cross-examination of a witness is limited to the scope of the direct examination. (Evid. Code, § 773.)" (*People v. James* (1976) 56 Cal.App.3d 876, 887.) " ' "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " [Citation.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1251 (*Virgil*).)

During defense counsel's cross-examination, Wilson conceded that he had used violence in the past and was in Ad Seg because he stabbed someone. When defense counsel tried to ask how badly hurt the victim of that stabbing was, the trial court sustained the prosecutor's objection as "beyond the scope of direct examination."

Defendant asserts that details of Wilson's stabbing of an individual would have convinced the jury that Wilson's asserted current dislike of violence was insincere and thus undermined his credibility. However, the jury heard from Wilson himself that he had previously used violence "a lot," including the stabbing in question, and any specific details related to that stabbing were therefore of "marginal relevance" to an assessment of his credibility. (See *Virgil*, *supra*, 51 Cal.4th at p. 1251)

During his cross-examination of Magee, defense counsel asked who "ran Calipatria for the [Aryan Brotherhood] from '95 to '03?" Magee was unsure. When defense counsel asked if the Aryan Brotherhood kept "records of matters that involve the organization," the trial court sustained the prosecutor's objection on the ground that the inquiry exceeded the scope of direct examination. The trial court sustained an objection on the same basis to defense counsel's question whether the Aryan Brotherhood has "to coordinate what they do up north?" When defense counsel asked Magee whether "there's factions of whites that do not allow [prisons] to be run" by the Aryan Brotherhood, the trial court sustained the prosecutor's objection to that question as irrelevant. The trial court explained, "Look. As much as it probably should be on trial somewhere, the Aryan brotherhood isn't on trial in this courtroom today." Defense counsel then asked Magee whether he had "been testifying in

[Aryan Brotherhood] cases?" The prosecutor objected to the question as irrelevant and beyond the scope of direct. Defense counsel proffered, "I want to show that he's, in effect, an informant that gets benefits by giving testimony." The prosecutor responded, "He's in the hat because of his testimony" and the court underscored that Magee already testified "that he's not getting any benefits." The trial court advised defense counsel that he could only inquire into "any benefit he might be getting for testifying in this case, because that's the only way it would be relevant." Defense counsel persisted in asking whether Magee had volunteered himself "to be a witness in matters touching on [the Aryan Brotherhood] anywhere in the state and federal system." The trial court reiterated its ruling that any inquiry into benefits for testifying "would only be relevant if [Magee] is getting some benefit for testifying in this case."

Defendant contends he should have been able to question Magee about the Aryan Brotherhood's presence at Calipatria because, if the defense could show that defendant had not previously attempted to justify his actions to Aryan Brotherhood affiliates at Calipatria, "it would have seriously undercut the reliability of Magee's claim [that he subsequently justified his actions to him at Pelican Bay]." Moreover, defendant argues that he was entitled to ask Magee whether he testified in *other* Aryan Brotherhood cases because the question was relevant to "his motives for testifying." Defendant contends he was improperly "denied an opportunity to establish whether [Magee] was a serial informant whose testimony, as a result should have been viewed with extreme skepticism."

However, during cross-examination, defense counsel was able to ask several questions of Magee that bore on his

credibility and the trial court did not err by exercising its "wide latitude" to prohibit questions that were of "marginal relevance." (See *Virgil, supra*, 51 Cal.4th at p. 1251.) For instance, defense counsel asked Magee whether he "want[ed] anything from the D.A. [or "the prison"] in this case." To which Magee responded negatively. Defense counsel further asked, "Isn't it true that you're doing this and testifying in this case on behalf of the People to further your own agenda?" Magee said, "No, that's not true." Magee stated that he was "in the SHU" without any "different privileges," and he was "put in the hat" after disassociating with the Aryan Brotherhood. As a gang dropout, Magee was housed in a specific building for his safety. Defense counsel asked whether "it would be an impetus for you to cooperate as much as you can so you can assure that you would be in that unit," to which Magee said "No, that's not necessary. I've already done everything necessary to be entitled to stay in that particular building." Magee would also be "in the hat for testifying in this case" as soon as "they [the Aryan Brotherhood] find[s] out about it."

On this record, where Magee testified that he was already "in the hat" for dissociating with the Aryan Brotherhood, i.e., he had a contract out on his life at the time of his trial testimony; and testified that he further endangered his life by testifying in defendant's case; and explained to the jury that he had no incentive to cooperate with prison officials or the prosecutor, the trial court could deem any testimony about any possible benefits Magee received in exchange for his testimony in prior cases to be of little additional relevance to the jury's assessment of his *current* credibility. Moreover, Magee testified that he was not sure who ran Calipatria for the Aryan Brotherhood from 1995 to 2003. As such, it would be unlikely that Magee would be able

to testify with any certainty about the Aryan Brotherhood's recordkeeping and coordination efforts at Calipatria during the same timeframe. Therefore, the trial court's prohibition on such questioning did not deprive the jury of any testimony material to assessing Magee's credibility. In other words, defendant was not prohibited in engaging in any cross-examination "designed to show a prototypical form of bias on the part of the witness." (See *Virgil, supra,* 51 Cal.4th at p. 1251.) The trial court did not violate defendant's constitutional right to confront the witnesses against him.

### 9. *Prosecutorial Misconduct During the Guilt Phase*

Defendant alleges the prosecutor committed multiple instances of misconduct during the guilt phase of his trial, both in his examination of witnesses and his argument to the jury. We find no reversible misconduct.

" ' "[T]he applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citation.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the

claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citation.]" (*People v. Ayala* (2000) 23 Cal.4th 225, 283–284 (*Ayala*).)

### a. *Alleged Misconduct During Wilson's Testimony*

Defendant contends the prosecutor's "speaking objection" during Wilson's testimony was misconduct because it suggested he had evidence that Wilson would be in danger if defendant knew where he was housed, and effectively made "the prosecutor an unsworn witness" as to defendant's dangerousness.

### i. *Background*

During Wilson's testimony, defense counsel asked Wilson where he was housed. The prosecutor objected on "relevance" grounds. In the presence of the jury, defense counsel responded, "My offer of proof is this man has been conferring with other witnesses, getting their little stories together and coming to court to testify to gain favor with the D.A.'s office, and also with the [prison authorities]." The prosecutor objected, asserting that defense counsel's statements were "totally unfounded, uncalled for, and inappropriate." The trial court advised the prosecutor and defense counsel to "calm down" and told the jury "[w]hat the attorneys say is not evidence at all. They're not sworn. They're not compelled to tell the truth. So don't consider anything [they] have said as evidence." The trial court overruled the prosecutor's objection to the extent defense counsel was "trying to show that [Wilson] was talking with other witnesses, I'll allow it for that purpose only." The prosecutor then responded before the jury, "Excuse me, Your Honor, can't

he just ask if he talked to the other witnesses? Why should he have to disclose where he is in Calipatria? With [defendant] being in Calipatria, *we're asking for bigger problems than we can even imagine.*" (Italics added.) Defense counsel began to "object to that statement implying —," but the trial court cut him off, saying "I object to both of the statements you guys are making lately." The prosecutor apologized and defense counsel proceeded to ask Wilson whether he was currently in protective custody and the extent to which he knew defendant.

### ii. Analysis

Even accepting that the prosecutor's remark was understood by jurors to improperly suggest that defendant could pose a danger to Wilson, there is no reasonable likelihood the jury construed or applied the complained-of remark in an objectionable fashion. During the relevant exchange, the trial court admonished both parties and specifically instructed the jury that the statements of counsel are not evidence. We presume the jury followed those instructions (*People v. Sanchez* (2001) 26 Cal.4th 834, 852), which immediately preceded the prosecutor's challenged remark. Nor could there be any prejudice. During the prosecutor's cross-examination of defendant, which preceded Wilson's testimony, defendant stipulated that "if a known informant is in [defendant's] cell with him it would be dangerous for the known informant." The trial immediately explained, "that fact is to be deemed conclusively proved." Thus, the jury had to accept as true that defendant was a danger to known informants housed in his cell. The prosecutor's subsequent suggestion that defendant could be a danger to a known informant housed in the same prison therefore posed no risk of prejudice.

### b. Alleged Misconduct During Brumbaugh's Testimony

Defendant next contends the prosecutor improperly invoked Brumbaugh's status as a correctional officer to bolster his credibility.

### i. Background

Brumbaugh was working as a correctional officer in Ad Seg at Calipatria in April 1996. He testified for the prosecution about his interactions with defendant on the morning of Richmond's death. On cross-examination, defense counsel questioned Brumbaugh about why he did not note in his report that he observed defendant eating an apple in a holding cell. Defense counsel further inquired why there was no documentation substantiating the conversation Brumbaugh testified to having with defendant during which defendant made "a comment about his cellie suffering from steel poisoning." Defense counsel asked whether Brumbaugh could be mistaken about his recollection of an incident occurring almost eight years prior. On redirect, the prosecutor immediately inquired of Brumbaugh, "Sir, you are a sworn peace officer?" Brumbaugh said "Yes," and the prosecutor followed up with, "Is there any reason to come into this courtroom and lie?" Defense counsel objected, "That's improper. I'd ask the Court cite that for misconduct." Before the trial court could rule, the prosecutor withdrew his question.

### ii. Analysis

Defendant asserts that the prosecutor's question was essentially a disguised attempt to vouch for Brumbaugh's credibility. (See *U.S. v. Torres-Galindo* (1st Cir. 2000) 206 F.3d 136, 142 [a "general appeal to believe the police or FBI because

of their history, integrity, or public service is inappropriate . . . . While not vouching in the most familiar sense, it does invite the jury to rely on the prestige of the government and its agents rather than the jury's own evaluation of the evidence"].) However, the prosecutor withdrew his question, and the jury was generally instructed before its deliberations that the statements of counsel are not evidence. Under these circumstances, there is no reasonable likelihood the jury applied the prosecutor's question in an objectionable fashion.

### c. Alleged Misconduct During Defendant's Testimony

Defendant further contends the prosecutor, during his cross-examination of defendant, improperly attempted "to elicit [inadmissible] evidence of a non-violent escape attempt by defendant from CYA [the California Youth Authority]," as well past violent acts defendant committed in prison.

### i. Background

During cross-examination, the prosecutor asked defendant about his conviction for "a crime in San Francisco at the age of 17." Defendant admitted he was sentenced to life for that crime, to begin in CYA. The prosecutor then inquired how long defendant was supposed to be in CYA, to which defense counsel objected on relevancy grounds. The trial court overruled defense counsel's objection upon the prosecutor's assurance that he would "tie it in." The prosecutor thereafter asked, "You began your life sentence in C.Y.A. How long were you supposed to be in C.Y.A.? To what age?" Defense counsel renewed his "objection for the record," and the trial court overruled it. Defendant answered that he was supposed to be in CYA until the age of 25 or until CYA chose not to house him. The

prosecutor continued, "Right. In fact, they brought you back to court the following year saying that you're a washout; you can't handle it in there, right?" Defendant said, "No, that is not correct, sir," and defense counsel unsuccessfully objected on relevance grounds. The prosecutor reiterated that defendant was brought back to court at the age of 18, to which defendant responded. "That is incorrect, sir. I'm not following your line of questioning. I think I know what you're getting at, but you're starting to confuse me." At that point, the trial court stopped the prosecutor, "It's getting awfully close to the things that we're talking about. So I would like to avoid that for now." The prosecutor then inquired if defendant was in state prison at the age of 18, which defendant confirmed he was.

Later, the prosecutor asked defendant how many times he had been in Ad Seg before he killed Richmond. The trial court overruled defense counsel's objection, pointing out that the defense had asked questions about how Ad Seg worked. Defendant answered that he had been in Ad Seg "several times." The prosecutor then asked, "And none of those times were for protective custody, was it?" Defendant answered in the negative and the prosecutor followed up, "Violent acts?" The trial court sustained defense counsel's objection.

### ii. Analysis

The prosecutor's questioning about defendant's time at CYA was permissible. The prosecutor did not ask about any attempted escape by defendant.[23] Defendant testified that he

---

[23] As defendant points out, evidence of a *nonviolent* escape attempt is not admissible aggravating evidence under section 190.3, subdivision (b) during the penalty phase of a capital trial.

could be in CYA until "the age of 25 or until CYA chose not to house me." Defendant admitted he was sent to prison before the age of 25, at the age of 18. There was nothing in the prosecutor's questions or defendant's answers to tell the jury that defendant attempted to escape from CYA. (Contra *People v. Gray* (2005) 37 Cal.4th 168, 216 [a prosecutor commits misconduct by intentionally eliciting inadmissible evidence].)

As far as the prosecutor's inquiry into whether defendant was sent to Ad Seg for violent acts, the trial court sustained defense counsel's objection to this question and defendant did not answer. Moreover, the trial court subsequently permitted the prosecution to introduce several prior acts of violence by defendant to demonstrate his character for violence. Thus, there was no risk that the prosecutor's unanswered question prejudiced defendant. Defendant again asserts that defendant's prior acts of violence were improperly admitted under Evidence Code section 1103, but we have already rejected that claim (see *ante*, at pp. 62–67).

### d. Alleged Misconduct By Invoking Prestige of Office

Defendant asserts that the prosecutor should not have been permitted to tell the jury that he represented "the People of the State of California."

---

(See *People v. Castaneda* (2011) 51 Cal.4th 1292, 1334.) Here, the trial court was not asked to rule on the admissibility of defendant's alleged attempted escape at either the guilt or penalty phases of defendant's trial, but it would arguably be irrelevant during the guilt phase, as a general matter, for the same reasons it does not qualify as aggravating evidence.

### i. Background

During voir dire, the prosecutor explained to prospective jurors: "I represent the People of the State of California in this case. I want everybody to be sure that you understand that I don't represent the victim Thomas Kent Richmond in this case, the victim's family, Thomas Kent Richmond's family in this case. And I don't represent the C.D.C. or the California Department of Corrections in this case. [¶] Does anybody have a problem with that? Does everybody understand that I represent the People of the State of California?" The trial court overruled defense counsel's objection on grounds that the prosecutor is "a deputy District Attorney employed by this county." The trial court observed, "Well, but technically, the case is captioned the People of the State of California. And he is a deputy District Attorney employed by this county, but he represents the People of the State of California." The prosecutor commented, "And that's exactly what I've said. I represent the People of the State of California."

During his closing argument, the prosecutor argued in pertinent part, "Now, let's talk about murder. The People of the State of California contend that this is a murder case. When I say the People of the State of California, I want to reiterate what I said to you at the beginning of this trial. I do not represent the California Department of Corrections. I do not represent Thomas Kent Richmond, the victim in this case. I represent the People of the State of California." The trial court overruled defense counsel's "continuing objection to that representation."

### ii. Analysis

In defendant's view, the prosecutor "was seeking to use the prestige of his position as the representative of the People of the

107

State of California in an effort to bolster his own credibility and sway the jury on the murder charge." However, the prosecutor accurately explained his role in prosecuting defendant for murder. (See § 684 ["A criminal action is prosecuted in the name of the people of the State of California, as a party, against the person charged with the offense"].) There was no misconduct.

### e. Alleged Mischaracterization of Richmond's In-Prison Disciplinary Record

Defendant next contends the prosecutor mischaracterized Richmond's disciplinary record to defendant's prejudice.

### i. Background

During his closing argument, the prosecutor asserted that Richmond was a model inmate, "he was doing nothing but what was expected of an inmate to do," until he was transferred to Ad Seg and celled with defendant. "The defendant, on the other hand, can't stop getting into trouble. Both before and all the way up to July of last year, he has committed crimes." The prosecutor asserted "Soon after [Richmond] got [to Ad Seg], in the cell was [defendant]. That's when he began picking up his 115's. And in two weeks, there was a flooding incident in which he was in the cell with [defendant] in which they both received 115's. [¶] In fact, [defendant] testified that he was going to ride the beef on that one . . . [¶] . . . [¶] . . . [¶] . . . [¶] [But] defendant testified that the lieutenant reneged on this agreement [to dismiss the charge against Richmond] . . . and found them both guilty. [¶] No. 1, when [defendant] said that from the witness stand, he wasn't telling you the truth. Because why? He heard from the recordkeeper Vialpando — Mr. Vialpando say that that 115 hadn't been decided yet. There was no determination on any of [Richmond's] 115's while he was in the administrative

segregation because he died within five weeks after getting there." The prosecutor argued that, just as defendant should be presumed innocent until proven guilty, Richmond should "receive that same respect[.]" The prosecutor urged the jury to decide whether it was defendant's influence that led Richmond to be caught with razor blades as he and defendant went out to the yard.

### ii. Analysis

According to defendant, the prosecutor's assertions about defendant's lack of truthfulness, as well as Richmond's disciplinary record, misstated the facts and amounted to misconduct. Defendant points to a memorandum from the Calipatria Warden's Office concerning Richmond's death that was not admitted into evidence, but which states that Richmond was found guilty "for Flooding" on March 19, 1996. Defendant also underscores that Vialpando testified only that there was no record or evidence of misconduct by Richmond before he was placed in Ad Seg, but he did not know whether Richmond was involved in any previous criminal activity.

As an initial matter, defense counsel did not object to the prosecutor's alleged misconduct and the claim is therefore forfeited. (See *People v. Johnsen* (2021) 10 Cal.5th 1116, 1164.) Defendant's broad assertion that an objection would have been futile because the trial judge would have "believed it was the jury's duty to decide the evidence established" is unpersuasive. In any event, even if defendant's claim was preserved, the prosecutor's argument was a fair characterization of the evidence *admitted* at trial. Moreover, defense counsel underscored in closing that Richmond took a weapon to the yard with defendant, spit on a lieutenant, flooded his cell, assaulted

staff, and possessed a weapon, and he argued that any testimony to the effect that Richmond did not lose credits for his misconduct was meant to "mislead us." Defense counsel argued, "Well, if you get yourself killed, you're not going to lose credit. Any pending hearings are going to be dismissed." Where jurors knew Richmond was written up for "115s," but those 115s could not be adjudicated because he died, there is no reasonable probability that any possible mischaracterization of the adjudication of the flooding 115 was applied by the jury in a prejudicial manner.

### f. Alleged Provocation of Defendant

Defendant contends the prosecutor improperly engaged in "petty behavior" throughout the guilt phase that was designed exclusively to provoke him.

### i. Cross-examination of Defendant

The prosecutor started his cross-examination of defendant by inquiring, "On April the 9th of 1996, you killed Thomas Kent Richmond, the 2d, didn't you?" Defendant answered affirmatively. Later, the prosecutor questioned defendant about the bunk he occupied in the cell he shared with Richmond. Given that defendant and Richmond were celled together on two separate occasions, defendant said they rotated bunks in the first cell, but not the second time as "we were not celled together that long." The prosecutor immediately followed up, "the second time . . . more than a week later he was dead, correct?" Defendant confirmed that it was "about a week," and the prosecutor asked, "And his death was as a result of you; is that correct." Second chair defense counsel (see *ante*, p. 60, fn. 13) objected on grounds that the question was already "asked and answered," and the court advised that first chair counsel should

be doing the objecting with defendant.  First counsel then asserted, "I think this is starting to get in the area of argument." The court advised the prosecutor to "[r]estate the question or ask another question," and the prosecutor decided to instead "move on."

The prosecutor also inquired of defendant whether there was a certain hierarchy for who "usually sleeps on what bunk." Defendant replied that people "rotate," and the prosecutor followed up by asking, "So the person with the most juice, so to speak, doesn't always sleep on the bottom bunk; is that what you're saying?"  Defendant responded that bunk arrangements varied, but "[m]y personal experience is that, at least among white inmates, we treat each other as equals rather than superior and inferior."  The prosecutor then followed up, "Well, according to you, the white race is the supreme race, correct?" The trial court sustained defense counsel's objection to the question as being "argumentative."  The prosecutor thereafter inquired whether defendant ever sent an inmate named "Snake" a letter "[r]eferring to how supreme the white people are?" Defense counsel objected, "We're getting into wild areas that are inflammatory."  The trial court stopped the prosecutor from pursuing this line of inquiry, finding defendant's beliefs in this regard irrelevant since "Mr. Richmond was of the same race as [defendant].  So I don't think you need to go into that."

Later, the prosecutor questioned defendant about contraband admittedly found in the walls of his cell.  The prosecutor asked "how did you put them in the [cement] walls of your cell?"  Defendant responded, "I probably couldn't recall how they got there."  And the prosecutor responded, "Like you couldn't recall how you sharpened the weapon?"  Defendant conceded, "You're absolutely right."  The prosecutor continued,

"And you are here to tell the truth today, aren't you, sir." Defense counsel objected to the question as "argumentative" before defendant confirmed he was present to tell the truth. The trial court corrected the prosecutor and defendant, explaining that defendant's lack of recollection pertained to how he cut the weapon out of the desk, not how he sharpened the weapon. Defendant immediately said, "[r]ight, my mistake" and then affirmed that he could not recall but had cut weapons from a desk before. The prosecutor then proceeded to question defendant about a different incident of weapons possession.

The prosecutor subsequently questioned defendant about the razor blade he had secreted after Richmond's killing, which was marked as an exhibit. When the prosecutor asked defendant whether it had "a handle on it" and defendant said "it might," the prosecutor asked defendant if he wanted him "to get a little closer" with the razor blade. Defendant responded, "If you don't want to alarm the jury or the security staff, I'll let you get a little closer." The prosecutor approached with the razor blade and said, "Don't touch. Look." Defense counsel objected that this was "just bullying." The trial court advised the prosecutor not to "engage in that type of stuff."

### ii. Analysis

Defendant asserts that these exchanges during his cross-examination were "inflammatory," meant only to "needle[]" defendant, and "completely unnecessary."

"Prosecutors . . . are held to an elevated standard of conduct. 'It is the duty of every member of the bar to "maintain the respect due to the courts" . . . . A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the

112

interests, and in exercising the sovereign power, of the state." (*People v. Hill* (1998) 17 Cal.4th 800, 819–820.) " ' "It is unprofessional conduct for a prosecutor to engage in behavior or tactics purposefully calculated to irritate or annoy the court or opposing counsel." ' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 742 (*Roldan*).)

We will assume the prosecutor committed misconduct under state law in questioning defendant about his white supremacist beliefs. " '[C]onduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law . . . if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' (*People v. Benavides* (2005) 35 Cal.4th 69, 108.)" (*Camacho, supra,* 14 Cal.5th at p. 126, italics added.) However, the prosecutor's brief questioning about defendant's white supremacist beliefs, which the trial court quickly stopped, could not reasonably have affected the jury's verdict in view of the remaining guilt phase evidence, including defendant's admission to killing Richmond and the extensive evidence of defendant's violent in-prison misconduct. (See *Blacksher, supra,* 52 Cal.4th at p. 828, fn. 35.)

The prosecutor's remaining lines of questioning addressed topics initially introduced by defendant during his direct examination and were therefore within the scope of proper cross-examination. " 'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them. . . .' " (*People v. Chatman* (2006) 38 Cal.4th 344, 382.) Moreover,

"[t]he permissible scope of cross-examination of a defendant is generally broad." (*Ibid*.)

On direct, defendant testified that he "started cutting a knife" when he was alone in his cell. When asked by defense counsel to elaborate, he said, "Cutting a piece of steel from the desktop. I'm sorry I can't be more specific than that." Further, defendant admitted he repeatedly stabbed and killed Richmond. Finally, defendant cautioned the prosecutor that bringing the razor blade closer to him might "alarm the jury or security staff." The prosecutor's cross-examination on these same topics was not misconduct.

### iii. Behavior Towards Defendant During Closing Argument

Defendant underscores that the prosecutor's "petty behavior" carried into his closing argument.

During his closing, the prosecutor directly addressed defendant with the assertion, "The defendant Joseph Anthony Barrett murdered Thomas Kent Richmond by plunging a piece of steel into his body 13 times." The trial court admonished the prosecutor to make his arguments to the jury. During a break in proceedings, defense counsel sought to make a record of what had occurred: "I think it was prosecutorial misconduct to get in the face of [defendant] and attempt to provoke him. [¶] You did caution him not to do that. He did move away, I will concede that. However, I don't think the record clearly reflected what we were objecting to, and I'm making that note for now." The court responded, "It was only for a very brief moment. [. . .] as soon as you objected, and I sustained that, he moved over and began addressing the jury directly again."

Here, where the prosecutor corrected his objectionable behavior upon the trial court's admonition, his actions did not rise to a level of misconduct.

### g. *There Was No Cumulative Prejudice*

Having found no misconduct, or that there was no risk the jury applied any of counsel's comments in an objectionable fashion, we reject defendant's claim that "[t]he cumulative effect of the prosecutor's misconduct" was prejudicial. (See *Roldan, supra,* 35 Cal.4th at p. 742 ["While the record shows the prosecutor was heated and at times inappropriately sarcastic," his behavior did not deny defendant a fair trial]; contra *Hill, supra,* 17 Cal.4th at pp. 814, 818 [finding reversible cumulative prejudice from the prosecutor's "many missteps" and "constant and egregious misconduct"].)

### 10. *Guilt Phase Jury Instructions*

Defendant contends numerous defects in the guilt phase jury instructions combined to deprive him of due process. We disagree.[24]

---

[24] At the outset, defendant generally complains that the parties' discussion of jury instructions was rushed by the trial judge's vacation schedule, thereby compromising the instructions' overall accuracy and completeness. Defendant's criticisms of the trial court's schedule appear to be provided more for context. However, to the extent defendant seeks to independently raise a claim that the trial judge's vacation schedule prejudiced him, he failed to preserve that argument. The trial court met with the parties to discuss the proposed jury instructions over the course of two days and defense counsel did not object to that timeframe as inadequate. Defendant has therefore forfeited the issue. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1038 ["Because defendants did not object

### a. *Instruction on Prior Crimes Evidence*

Defendant repeats his prior arguments about the trial court's instructions regarding the other crimes evidence admitted under Evidence Code section 1103, subdivision (b). Specifically, defendant again asserts that the jury instructions unfairly allowed the jury to consider the other crimes evidence in determining whether he, but not Richmond, had a character for violence. However, the trial court did not have to instruct the jury that Richmond's prior misconduct showed his character for violence in the absence of a request for a pinpoint instruction. (See *ante,* at p. 70.) And any error in permitting the jury to consider defendant's other crimes in assessing his intent and knowledge with respect to the charged crimes was necessarily harmless because the jury was told it could consider defendant's violent acts for the broader purpose of deciding whether defendant acted in conformity with his violent character on the night of Richmond's death. (See *ante,* at p. 72.) Finally, the instructions as a whole accurately conveyed to the jury that, while the prior crimes must be proved by a "preponderance of the evidence" before they may be considered, the People had the burden of proving the charged offenses beyond a reasonable doubt. (See *ibid.*) For the same reasons, these arguments do not support a claim of cumulative instructional prejudice.

### b. *Instructions Relating to Penal Code 4500*

Defendant next contends the trial court's instructions addressing the crime of aggravated assault by a life prisoner causing death (§ 4500) were erroneous in three respects.

---

to the trial court's comments regarding scheduling," they forfeited their state law and constitutional claims related thereto].)

First, he argues that the court prejudicially gave conflicting instructions on the state of mind necessary to sustain a conviction under section 4500. Under CALJIC No. 7.35, jurors were accurately instructed that a section 4500 aggravated assault must be committed with "malice aforethought." Thereafter, the trial court defined simple assault under CALJIC No. 9.00, which told jurors "an assault does not require an intent to cause injury to another person, or an actual awareness of the risk that injury might occur to another person." As to the definition of malice aforethought, the trial court instructed the jury under CALJIC No. 8.11 that "[m]alice is express when there is manifested an intention unlawfully to kill a human being." It "is implied when: 1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life; and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."

Defendant relies on *People v. Jeter* (2005) 125 Cal.App.4th 1212, in which the Court of Appeal agreed with the defendant that the trial "court committed reversible error by instructing with CALJIC Nos. 1.22 and 3.30, and by failing to make certain modifications to CALJIC No. 9.00 because these instructions conflict with the specific intent requirement for assault by a life prisoner." (*Jeter*, at p. 1216.) There, the trial court instructed the jury, like the trial court did here, with CALJIC Nos. 7.35 and 9.00 and the Court of Appeal observed that CALJIC No. 9.00's aforementioned language to the effect that "an assault does not require an intent to cause injury, or an actual awareness of the risk of injury" was erroneous, as it was in direct contradiction of section 4500's "requirement of malice aforethought." (*Jeter*, at p. 1217.) However, in *Jeter*, the trial

court also instructed with CALJIC No. 1.22, "which defines malice as 'a wish to vex, [defraud,] annoy or injure another person, or an intent to do a wrongful act[,]' " and "CALJIC 3.30 on the concurrence of act and general criminal intent even though section 4500 requires the specific intent of malice aforethought." (*Id.* at pp. 1216, 1217.) The *Jeter* court could not conclude the conflicting instructions were harmless to the verdict. (*Id.* at pp. 1217–1218.)

As stated, like in *Jeter*, the trial court here gave CALJIC Nos. 7.35 and 9.00 but, unlike in *Jeter*, it did not instruct on malice and general intent under CALJIC Nos. 1.22 and 3.30. Under the collective instructions given to defendant's jury, defendant's jury, more so than the jury in *Jeter*, may have properly understood the trial court's instruction on simple assault, which followed the instruction on the elements of the section 4500 crime, as relevant only to finding one of those elements, i.e., "[a] person was assaulted," with the understanding that this type of assault must be "committed with malice aforethought." (CALJIC No. 7.35; see CALJIC No. 9.00 ["In order to prove an assault, each of the following elements must be proved . . ."].) Nonetheless, the *Jeter* court's conclusion that the language of CALJIC Nos. 7.35 and 9.00 conflicts is well-taken. Indeed, in 2005, after defendant's trial, the "Use Note" to CALJIC No. 7.35 was revised to remove the requirement that an instruction under CALJIC No. 9.00 (assault) "must be given" when CALJIC No. 7.35 instructions are given. (Compare CALJIC No. 7.35 (Jan. 2005 ed.), at p. 292 with CALJIC No. 7.35 (Oct. 2005 ed.), at p. 297.) Thus, we will assume error.

However, even assuming the conflicting instructions amounted to the failure to instruct on the malice aforethought

element of section 4500, the error was necessarily harmless beyond a reasonable doubt. An instructional error is harmless when the jury necessarily decides the factual questions posed by the erroneously omitted language adversely to the defendant under other properly given instructions. (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) The jury convicted defendant of first degree premeditated murder while lying-in-wait and rejected his claim of self-defense; the same factual allegations that supported the first degree murder charge formed the underlying basis for defendant's aggravated assault charge and defendant's defense to both charges was the same (self-defense). " ' "The words malice aforethought in section 4500 have the same meaning as in sections 187 [murder] and 188 [malice definition]." ' [Citation.]" (*People v. Delgado* (2017) 2 Cal.5th 544, 571 (*Delgado*).) In defendant's case, the instructions on deliberate and premeditated murder (CALJIC No. 8.20) told jurors, "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree. [¶] [. . .] [¶] [. . .] [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation . . . it is murder of the first degree." On this record, the jury necessarily concluded defendant acted with malice aforethought when he fatally assaulted Richmond.

For similar reasons, defendant's claim that the trial court erred by failing to either instruct on proximate causation generally or as an "element" of aggravated assault by a life prisoner causing great bodily injury or death is equally unavailing. Defendant admitted he killed Richmond but argued that he did so in self-defense. Under these circumstances, there

was no contested issue of causation for the jury to decide. Moreover, by finding defendant guilty of first degree premeditated murder, the jury necessarily concluded defendant's assaultive acts caused Richmond's death. In connection with the murder count, the jury was instructed under CALJIC No. 8.55 as follows, "To constitute murder or manslaughter there must be, in addition to the death of a human being, an unlawful act which was a cause of that death." That instruction mirrors the relevant portion of the proximate cause instruction cited by defendant (see CALJIC No. 3.40). Here, where defendant admitted he was the direct, cause-in-fact of Richmond's death, and did not argue there was any other cause, but only that the fatal assault was justified by his need to defend himself, no further explication of proximate causation was warranted. (Contra *People v. Bland* (2002) 28 Cal.4th 313, 335–338 [instruction on proximate cause was required where there were two shooters and the jury had to determine whether shots fired by the defendant hit the victims and, even if they did not, whether the defendant may have proximately caused the harm].)

Finally, defendant claims that the trial court erred by failing to instruct the jury on assault with a deadly weapon as a lesser included offense of aggravated assault by a life prisoner under section 4500. We have previously held assault with a deadly weapon other than a firearm or by means likely to inflict great bodily injury "is by itself necessarily included within the greater crime of aggravated assault by a life prisoner (§ 4500)." (*People v. Milward* (2011) 52 Cal.4th 580, 586.) Indeed, section 4500 is defined by reference to the crime of assault with a deadly weapon, with the added requirement that the assault be committed with malice aforethought. (See § 4500; see also

*Delgado, supra,* 2 Cal.5th at p. 570 [" ' "[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former." ' [Citation.]"].)  However, the failure to instruct on assault with a deadly weapon as a lesser included offense could not have prejudiced defendant because, as previously explained, the jury found defendant committed a premeditated killing with malice aforethought based on the same assaultive acts.  (See *People v. Elliot* (2005) 37 Cal.4th 453, 475 [" ' "In some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant . . . .  In such cases . . . there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury."  [Citations.]' "].)

### c.  *CALJIC No. 2.62 and Refusal to Give Requested Pinpoint Instruction*

Defendant contends the trial court erred by instructing the jury under CALJIC No. 2.62 (Defendant Testifying — When Adverse Inference May Be Drawn) concerning his trial testimony, and refusing his request for a related special instruction, that would have been "more even-handed."  We disagree.

### i.  *Background*

During discussions about jury instructions, defense counsel proposed the following special instruction titled "Defendant's Testimony (Jury Must Consider)," quoting language from *People v. Denton* (1947) 78 Cal.App.2d 540, 551 (*Denton*):   " 'The Court instructs you that you are not to

disregard the testimony of the defendant because he is charged with a crime, but you are to consider his testimony giving it the same weight and credibility as though he were not charged with an offense.  You must consider his testimony along with that of other witnesses, and facts, and circumstances which have been adduced in this case.  And if his testimony is such that it creates a reasonable doubt in your mind, then, you must find the Defendant not guilty.' "  Defense counsel explained to the trial court, "the thrust of it is we want his testimony to be considered by the same standards as you would judge any witness's testimony."  The trial court then queried whether there was an instruction otherwise missing "about in this case the defendant has testified[.]"  The parties flagged the missing instruction as CALJIC No. 2.62.  The court observed, "[T]he use notes to 2.62 . . . [say] 'This instruction should not even be requested by either side unless there's some specific and significant defense omission that the prosecution wishes to stress or the defense wishes to mitigate.' "  The prosecutor responded by quoting defendant's testimony about "how he cut that weapon out of the desk." His statement was, " 'I don't recall.  [¶] 'You cut weapons out of the desk in the past?  [¶] 'Yes.  [¶] 'Since this incident occurred?  [¶] 'Yes.  I don't recall how I cut it out.' "  The trial court said, "Okay, I guess that's enough," and indicated that it was inclined to also give defense counsel's special instruction. Defense counsel made a record of his response to the prosecutor's argument for the propriety of giving CALJIC No. 2.62, "those are not material issues since he's admitted that he cut it from the desk, which is the issue."

Ultimately, the trial court instructed on CALJIC No. 2.62, but not the proposed special instruction.  Specifically, CALJIC No. 2.62 told defendant's jury:  "In this case defendant has

testified to certain matters. [¶] If you find that the defendant failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable. [¶] The failure of a defendant to deny or explain evidence against him does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt. [¶] If a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain this evidence."

### ii. Analysis

Defendant contends the trial court improperly omitted his proposed pinpoint instruction and then compounded that error by giving CALJIC No. 2.62, which he asserts was unsupported by the evidence. According to defendant, these errors were prejudicial because his credibility was central to the defense case.

Penal Code section 1127 permits comment by the trial court on a criminal defendant's "failure to explain or to deny by his testimony any evidence or facts in the case against him[.]" Evidence Code section 413 states that "[i]n determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such

evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."

In *People v. Saddler* (1979) 24 Cal.3d 671, 681 (*Saddler*), we "determined that CALJIC No. 2.62 suffers no constitutional or other infirmity and may be given in an appropriate case." However, we concluded the instruction was improperly given in that defendant's case because there were "no facts or evidence in the prosecution's case within [his] knowledge which he did not explain or deny.  There is no indication that he failed to disclose any facts within his knowledge that would have shed further light on the [charged crime]."  (*Saddler*, at p. 682.)

Subsequent to *Saddler*, we held in *People v. Cortez* (2016) 63 Cal.4th 101 that the CALCRIM counterpart to CALJIC No. 2.62 (CALCRIM No. 361) "applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the [appellant] could reasonably be expected to have that knowledge.  The instruction acknowledges to the jury the 'reasonable inferences that may flow from *silence*' when the defendant 'fail[s] to explain or deny evidence against him' and 'the facts are peculiarly within his knowledge.' [Citation.]  As to incriminating evidence that a testifying defendant denies or explains, there is no silence from which an inference 'may flow.' [Citation.]  Even if the defendant's testimony conflicts with other evidence or may be characterized as improbable, incredible, unbelievable, or bizarre, it is not, as the People assert, 'the functional equivalent of no explanation at all.' "  (*Cortez*, at p. 117.)  *Cortez* explained that "the focus of CALCRIM No. 361, as its language indicates, is not on the defendant's credibility as a witness, but on the role of a testifying defendant's failure to explain or deny incriminating evidence in

how jurors 'evaluat[e] that evidence,' i.e., the evidence the defendant has failed to explain or deny.  In other words, as we have stated, a testifying defendant's failure to explain or deny incriminating evidence — i.e., '[a] defendant's silence' —cannot 'be regarded as a confession' and 'does not create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny.' [Citation.]"  (*Cortez*, at p. 118.)  In *Cortez*, CALCRIM No. 361 was properly given where the defendant previously provided detailed statements to police regarding a gang-related shooting but, at trial, testified that she did not know, inter alia, "what had happened" (*Cortez*, at p. 121)  or "how a bullet ended up on the floorboard of her car."  (*Ibid.*)  In other words, "there was ample evidence that defendant 'could reasonably be expected to know' these facts or circumstances." (*Id.* at p. 121.)

Here, defendant's own testimony provided a basis for instructing the jury with CALJIC No. 2.62.  While defendant could not recall how he cut the weapon out of the desk, he testified that "[i]t takes a while" to cut a weapon from a steel desk and he had "done it" both before and after he cut the weapon he used to kill Richmond.  When the prosecutor asked, "So in your mind when you're cutting this piece of steel out, you're thinking this is going to be a weapon[,]" defendant answered "Right."  By his own admissions, defendant established that he took time to cut a weapon out of his desk, a task he had undertaken multiple times.  Accordingly, defendant's lack of knowledge about *how* he cut the weapon from the desk was a circumstance defendant could reasonably be expected to know.  Thus, the jury was properly instructed that it could consider defendant's failure to explain that incriminating evidence in evaluating it.

Additionally, defendant asserts "CALJIC 2.62 had no logical relevance" in part because the question of how he cut the weapon from the desk "was not a material issue in light of his admission that he did, in fact, cut out the metal piece which was used to kill Richmond." However, as previously explained, the time defendant took to cut out the knife from the desk was relevant to the allegation that Richmond's killing was premeditated. By the same token, the *method* by which the knife was cut out of the desk could bear on the allegations of premeditation and deliberation.

Finally, even assuming the trial court erred by instructing defendant's jury under CALJIC No. 2.62, the error was harmless. Any harmful impact of the instruction was mitigated by its very language, which explained to jurors that the instruction only applies "[i]f you find that the defendant failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge" and any such finding "does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt." Moreover, the jury was otherwise instructed on witness believability (CALJIC No. 2.20) that it could consider "[t]he extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness testified; The ability of the witness to remember or to communicate any matter about which the witness has testified." Regarding discrepancies in testimony (CALJIC No. 2.21.1), the jury was told "[d]iscrepancies in a witness's testimony . . .do not necessarily mean that a witness should be discredited. Failure of recollection is common.

Innocent mis recollection [*sic*] is not uncommon. [. . .] You should consider whether a discrepancy relates to an important matter or only to something trivial." Furthermore, defendant either explained or denied the critical portions of the prosecution's case, including how and why he killed Richmond. Considering the instructions and the record as a whole, it is not reasonably probable that any negative inference drawn from defendant's failure to explain less critical evidence, like how he cut the knife from the desk, affected the outcome of his case. (Cf. *Saddler, supra*, 24 Cal.3d at p. 683 [applying *Watson*'s standard of prejudice for state law error (see People *v. Watson* (1956) 46 Cal.2d 818, 836) to instructional error involving CALJIC No. 2.62].)

Finally, assuming the trial court erroneously omitted defendant's requested pinpoint instruction, which would have told jurors not to disregard defendant's testimony because he is charged with a crime, to consider defendant's testimony alongside the other evidence, and to acquit defendant if "his testimony creates a reasonable doubt," those directives were adequately addressed by other instructions. The trial court's instruction under CALJIC No. 1.00 (Respective Duties of Judge and Jury) told jurors "[y]ou must not be biased against a defendant because he has been arrested for this offense, charged with a crime, or brought to trial. None of these circumstances is evidence of guilt and you must not assume from any or all of them that a defendant is more likely to be guilty than not guilty." CALJIC No. 2.90 explained to jurors that a defendant is presumed innocent, the People have the burden of proving guilt beyond a reasonable doubt, and defined reasonable doubt as involving "the entire comparison and consideration of all the evidence." Moreover, the aforementioned instructions on

witness credibility and believability conveyed that each witness's credibility was to be judged individually. Just as in *Denton, supra,* 78 Cal.App.2d 540, from which defendant's requested instruction was pulled and in which case the trial court likewise failed to give the same instruction, "it is clear that all proper matters included in the refused instruction were fully covered by other instructions and that no prejudice resulted to [defendant] by the court's refusal to give the offered instruction." (*Id.* at p. 552.)

#### d. *Instruction on Heat of Passion*

Defendant contends the trial court erred by providing the jury with the standard instruction on heat of passion or sudden quarrel to reduce a murder to manslaughter (CALJIC No. 8.42), as opposed to defense counsel's proposed instruction covering the same concepts. Defendant does not allege that the CALJIC No. 8.42 instructions were incomplete or incorrectly stated the law, only that they were more convoluted than defense counsel's much shorter proposed instruction. Since the standard instruction covered the matters within the proposed instruction, the trial court did not err in refusing defendant's requested instruction. (See *Mora and Rangel, supra,* 5 Cal.5th at p. 499 [trial court did not err by denying defense counsel's request for a "duplicative" instruction].)

#### e. *Use of former CALJIC Nos. 8.71 and 8.72*

Defendant contends the trial court erred by giving "dangerously misleading" instructions under the former versions of CALJIC Nos. 8.71 and 8.72. The trial court gave the 1996 revised version of CALJIC No. 8.71 (Doubt Whether First or Second Degree Murder), which told the jury: "If you are convinced beyond a reasonable doubt and unanimously agree

that the crime of murder has been committed by a defendant, but you *unanimously* agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree as well as a verdict of not guilty of murder in the first degree." (Italics added.) The 1996 revised version of CALJIC No. 8.72 contained the same "but you unanimously agree that you have a reasonable doubt" language with respect to reducing murder to manslaughter. Defense counsel requested a special instruction entitled " 'Lesser Included Offense, Duty of the Jury' " that would have instead told jurors, " 'If you entertain a reasonable doubt as to which of two offenses was committed, it is your duty to convict of the lesser offense only.' " The trial court denied the requested instruction as "cumulative" of CALJIC Nos. 8.71 and 8.72.

As defendant underscores, in *People v. Moore* (2011) 51 Cal.4th 386, 411–412 (*Moore*), we cautioned that "the better practice is not to use the 1996 revised versions of CALJIC Nos. 8.71 and 8.72 [relating to manslaughter], as the instructions carry at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder, and between murder and manslaughter. The references to unanimity in these instructions were presumably added to convey the principle that the jury as a whole may not return a verdict for a lesser included offense unless it first reaches an acquittal on the charged greater offense. [Citation.] But inserting this language into CALJIC Nos. 8.71 and 8.72, which address the role of reasonable doubt in choosing between greater and lesser homicide offenses, was unnecessary, as CALJIC No. 8.75 fully explains that the jury

must unanimously agree to not guilty verdicts on the greater homicide offenses before the jury as a whole may return verdicts on the lesser." However, in *Moore,* we determined that "[a]ny error in giving these instructions was harmless beyond a reasonable doubt (*Chapman v. California* [(1967)] 386 U.S. [18,] 24) in light of the jury's true findings on the burglary-murder and robbery-murder special circumstances. Having found defendant killed . . . in the commission of robbery and burglary, the jury must also have found him guilty of first degree murder on those same felony-murder theories. The lesser offenses of second degree murder and manslaughter were not legally available verdicts if defendant killed Nicole in the commission of burglary and robbery, as the jury unanimously determined he had." (*Id.* at p. 412.)

In *People v. Scully* (2021) 11 Cal.5th 542, we recently concluded that "any error in giving the 1996 revised version of CALJIC No. 8.71 was harmless beyond a reasonable doubt in light of the jury's true findings that defendant committed the murder for the purpose of avoiding arrest and while engaged in the commission of a robbery, and that defendant intentionally killed a peace officer engaged in the performance of his duties. (*Moore, supra*, 51 Cal.4th at p. 412.) These findings 'left no room for the lesser offense[] of second degree murder.' [Citation.] 'Any confusion generated by the challenged instructions, therefore, could not have affected the jury's verdicts.' [Citation.]" (*Scully*, at p. 598.)

Here, like in *Moore* and *Scully*, any instructional error was harmless beyond a reasonable doubt. By convicting defendant of first degree premeditated murder while lying in wait, i.e., " 'under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and

waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage' " (*Hajek, supra,* 58 Cal.4th at p. 1183), the jury necessarily rejected the notion that defendant committed only second degree murder, or committed voluntary manslaughter in unreasonable self-defense or under adequate provocation.  In other words, the jury's findings " 'left no room for the lesser offense[s].' "  (See *Scully, supra,* 11 Cal.5th at p. 598; *Sandoval, supra,* 62 Cal.4th at p. 416 [" 'Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill.'  [Citation.]  Proof of lying in wait ' "distinguish[es] those cases in which a defendant acts insidiously from those in which he acts out of rash impulse" ' "].)

### f.  Lying-in-Wait Special Circumstance Instruction

Defendant contends the pattern instruction given on the lying-in-wait special circumstance (CALJIC No. 8.81.15) was misleading because it did not distinguish between murder while lying in wait and premeditated murder, did not require a "*substantial* period of watching and waiting," and failed to require that the concealed purpose must be a continuous intent to kill culminating in the victim's death.  As defendant acknowledges, we have previously rejected such challenges to CALJIC No. 8.81.15 and concluded that the instruction correctly explains the elements of the lying-in-wait special circumstance. (See, e.g., *Cage, supra,* 62 Cal.4th at p. 281; *People v. Streeter* (2012) 54 Cal.4th 205, 251; *People v. Bonilla* (2007) 41 Cal.4th 313, 332–333.)  We decline defendant's invitation to revisit our prior decisions.

#### g. *The Jury Instructions Did Not Violate Defendant's Right to Due Process*

Defendant contends the asserted instructional errors, considered either individually or collectively, deprived him of his due process right a fair trial. We have found possible instructional errors related to the prior crime evidence, the section 4500 offense, the CALJIC No. 2.62 instruction, and the instructions under the former versions of CALJIC Nos. 8.71 and 8.72. However, those possible errors were harmless either because any alleged omission was rectified by other properly given instructions, or any factual question omitted from the instructions was necessarily resolved against defendant under other properly given instructions. For instance, any failure of the section 4500 instructions to clearly convey that defendant had to act with malice aforethought to be convicted thereunder was harmless because defendant's conviction for first degree premeditated murder established that the jury necessarily found defendant acted with malice aforethought in assaulting Richmond. Under these circumstances, there was no prejudice that could compound to deprive defendant of a fair trial. (See *People v. Souza* (2012) 54 Cal.4th 90, 139, 141 [two nonprejudicial instructional errors did not collectively warrant reversal]; *Rogers*, *supra*, 39 Cal.4th at p. 890 [where the issue posed by one incorrect instruction was resolved against the defendant under other instructions, it "did not result in any prejudice . . . that could cumulate" and the other error, "standing alone did not render the trial fundamentally unfair"].)

#### h. *Adequacy of the Record of Proposed Jury Instructions*

Defendant contends that the record on appeal is inadequate to preserve his constitutional right to meaningful

appellate review because it is missing several special jury instructions proffered by defense counsel, but not given to the jury.

### i. Background

For purposes of establishing the record on appeal, trial counsel and appellate counsel signed a "Stipulated Settled Statement Re Jury Instructions," which was accepted by the superior court. In the statement, the parties explain that defense counsel submitted a second and third packet of proposed jury instructions, "[o]n January 5, 2004" and "[o]n January 8, 2004" respectively, that were not part of the appellate record and could not be located. The parties did not recall the contents of these proposed instructions.

While discussing defense counsel's proposed special instructions, the trial stated that it was "trying to read them into the record as I discuss them. There should be a sufficient record." However, ultimately, only the titles of numerous proposed instructions were read into the record.

### ii. Analysis

We have previously underscored the importance of preserving a complete record to permit meaningful appellate review. "[W]e note with some disquiet that both the trial and settled statement procedures reflect a certain inattention to the critical role of a proper and complete record in facilitating meaningful appellate review. We cannot urge too strongly that trial judges assiduously preserve a detailed account of all proceedings regardless of their perceived significance, particularly in capital cases, to minimize the need to reconstruct events." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 63; see also Cal. Rules of Court, rule 8.610(a)(1)(D) [providing that the

record in a capital appeal "must include a clerk's transcript containing . . . . All instructions submitted in writing, the cover page required by rule 2.1055 (b)(2) indicating the party requesting each instruction, and any written jury instructions given by the court"].) Moreover, "[u]nder the Fourteenth Amendment, the record of the proceedings must be sufficient to permit adequate and effective appellate review. [Citations.] Under the Eighth Amendment, the record must be sufficient to ensure that there is no substantial risk the death sentence has been arbitrarily imposed. [Citations.]" (*People v. Howard* (1992) 1 Cal.4th 1132, 1166; see also *Dobbs v. Zant* (1993) 506 U.S. 357, 358 ["We have emphasized before the importance of reviewing capital sentences on a complete record"].) However, "[a] record is inadequate 'only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal.' [Citation.] It is defendant's burden to show that any deficiencies are prejudicial. [Citation.] Inconsequential inaccuracies or omissions are insufficient to constitute prejudice. Nor will mere speculation suffice." (*People v. Bennett* (2009) 45 Cal.4th 577, 589 (*Bennett*).)

Here, defendant fails to meet his burden of showing that the record's failure to include instructions that were *not* given to his jury has prejudiced his ability to prosecute this appeal. According to defendant, the missing instructions "apparently went to the critical issue of appellant's mens rea at the time of Mr. Richmond's death. [Citation.] [Defendant] has also set forth . . . how the instructions that were actually given were flawed. This should be enough [to show harm]." By relying upon the instructions that were actually provided to the jury, we have been able to address defendant's claims of instructional error on the record before us, either rejecting them on the merits or for

harmlessness, so his vague claim that the missing special instructions (that were not given to his jury) precluded meaningful review fails.

## C. Death Penalty Eligibility Issues

### 1. The Lying-in-wait Special Circumstance Does Not Violate the Eighth Amendment

Defendant contends the lying-in-wait special circumstance violates the Eighth Amendment by failing to sufficiently narrow the class of death eligible defendants. He posits that lying-in-wait special circumstance murder "encompasses virtually any first degree premeditated murder." As defendant acknowledges, we have repeatedly rejected this argument, and we decline his invitation to reconsider the issue. (See, e.g., *Mataele, supra*, 13 Cal.5th at p. 422; *Smith, supra,* 4 Cal. 5th at pp. 1178–1179; *Delgado, supra*, 2 Cal.5th at p. 576; *People v. Casares* (2016) 62 Cal.4th 808, 848–853; *Cage, supra*, 62 Cal.4th at p. 281.)

### 2. The Use of Defendant's Juvenile Conviction to Prove the Prior-murder Special Circumstance Was Constitutional

Defendant contends that evolving case law from the United States Supreme Court and our court, recognizing that juveniles are less culpable than adults, renders the jury's prior-murder special circumstance finding based on a murder he committed when he was 16 years old invalid. (See § 190.2, subd. (a)(2).)

"In a series of cases, our [Court and the United States Supreme Court] have recognized that 'children are constitutionally different from adults for purposes of sentencing' because of their diminished culpability and greater prospects for

reform. (*Miller v. Alabama* (2012) 567 U.S. 460, 471 [183 L.Ed.2d 407, 132 S.Ct. 2455].) Hence, the Eighth Amendment's prohibition on cruel and unusual punishment has been held to prohibit imposition of the death penalty on juveniles (*Roper v. Simmons* (2005) 543 U.S. 551 [(*Roper*)] [161 L.Ed.2d 1, 125 S.Ct. 1183]); life without possibility of parole (LWOP) on juveniles who commit nonhomicide offenses (*Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) [176 L.Ed.2d 825, 130 S.Ct. 2011]); mandatory LWOP on juveniles (*Miller, supra,* 567 U.S. 460); de facto LWOP on juvenile nonhomicide offenders (*People v. Caballero* (2012) 55 Cal.4th 262 [145 Cal. Rptr. 3d 286, 282 P.3d 291]); and a sentence of 50 years to life for juvenile nonhomicide offenders (*People v. Contreras* (2018) 4 Cal.5th 349, 356 [229 Cal. Rptr. 3d 249, 411 P.3d 445])." (*In re Jensen* (2018) 24 Cal.App.5th 266, 276.)

Defendant contends the *Roper-Graham-Miller-Caballero* line of cases compels the conclusion that use of his juvenile murder conviction to make him death eligible is barred under the Eighth Amendment. Furthermore, he asserts that juveniles face unique disadvantages in criminal proceedings by virtue of their youth, including unfamiliarity with the criminal justice system and difficulty understanding their rights, that render prior juvenile convictions "insufficiently reliable for Eighth Amendment purposes." In support of his argument that juvenile convictions are less reliable than adult convictions, defendant quotes language from *Graham, supra,* 560 U.S. at page 78 describing how "[j]uveniles mistrust adults and have limited understandings of the criminal justice system and the roles of the institutional actors within it. They are less likely than adults to work effectively with their lawyers to aid in their defense." Moreover, *Graham* observed that juveniles have

"[d]ifficulty in weighing long-term consequences; a corresponding impulsiveness; and reluctance to trust defense counsel, seen as part of the adult world a rebellious youth rejects, all can lead to poor decisions by one charged with a juvenile offense." (*Ibid.*)

In *People v. Salazar* (2016) 63 Cal.4th 214, we rejected the defendant's claim that the high court's ban on the death penalty for juveniles in *Roper* precluded use of his juvenile murder conviction as a special circumstance. We concluded that "[i]t does not violate the Eighth Amendment for the Legislature to conclude, as a matter of policy, that an adult who murdered as a juvenile, failed to learn from that experience, and killed yet again, is a person 'within the narrowed class of murderers for whom death would be an appropriate penalty.' [Citation.] The punishment is not imposed for the juvenile offense, but for the crime committed as an adult, considered in light of the defendant's criminal history." (*Salazar*, at p. 226.) *Salazar* further explained that "[t]he prior-murder special circumstance does not turn on the procedures underlying the prior conviction, but on the gravity of the conduct that is the necessary predicate of that conviction." (*Salazar,* at p. 227.) *Salazar* continued, "the procedures for trying juveniles as adults have no bearing on whether a prior murder conviction qualifies as a special circumstance, so long as there is no constitutional infirmity in the procedures themselves." (*Id.* at p. 228.) And "[t]he high court's Eighth Amendment jurisprudence on punishment for crimes committed by juveniles [which includes *Graham*] does not speak to the question of special circumstances for crimes they commit later as adults." (*Ibid.*)

Defendant asserts that legislative and ideological developments concerning juvenile criminal culpability in the

time since *Salazar* was decided require us to reconsider its logic. However, we continue to agree with our reasoning in *Salazar* and defendant fails to persuade that use of his juvenile murder conviction to prove the prior-murder special circumstance violates the Eighth Amendment. (Accord *Smith*, *supra*, 4 Cal.5th at p. 1178 [relying on *Salazar* to reject the defendant's claim that use of his juvenile conviction to prove a prior-murder special circumstance violated the Eighth Amendment].)

### 3. *Section 4500 Sufficiently Narrows the Class of Individuals Eligible for the Death Penalty*

Defendant contends that section 4500, which makes life prisoners committing fatal assaults eligible for the death penalty, fails to rationally identify individuals deserving of the death penalty and thereby violates the Eighth Amendment. Under section 4500, "[e]very person while undergoing a life sentence, who is sentenced to state prison within this state, and who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury [which results in "death within a year and a day"] is punishable with death or life imprisonment without possibility of parole." According to defendant, premising death eligibility on an individual's sentence, rather than his or her conduct, does not constitutionally classify those individuals most deserving of capital punishment. Defendant argues that section 4500 arbitrarily excludes "inmates who are serving determinate sentences which are the functional equivalent of life for heinous, violent crimes while including inmates who have committed comparatively minor crimes and are serving much less severe indeterminate sentences." Nor does defendant believe that the death penalty's "social purposes" (*Roper*, *supra*, 543 U.S. at

p. 571) of deterrence and retribution are sufficiently "served by premising death eligibility on the label given to an inmate's sentence rather than the nature of such sentence."

In *People v. Landry* (2016) 2 Cal.5th 52 (*Landry*), we rejected a nearly identical constitutional challenge to section 4500. There, we first explained that "the statute is based on rationales involving security and deterrence in prison settings [citations], and California is scarcely alone in recognizing that killings committed by life prisoners in prison constitute a special class of homicide as to which the severest penalty should potentially apply." (*Landry*, at p. 106.) Importantly, "[s]ection 4500 is a death eligibility statute as opposed to a death selection statute. [Citation.] . . . [T]he jury selects the penalty following a penalty phase trial at which it considers evidence in aggravation and mitigation under section 190.3. The selection process requires an ' "*individualized* determination" ' of the appropriate penalty based on ' "the character of the individual and the circumstances of the crime." ' " (*Id.* at pp. 106–107.) We concluded in *Landry* that section 4500 satisfied the two requirements of a constitutional capital sentencing scheme. First, it narrowed those eligible for the death penalty to a "quite circumscribed" class of individuals, i.e., "persons serving a life sentence who, with malice aforethought, assault another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury, resulting in the death of the victim within a year and a day." (*Landry*, at p. 107.) Second, section 4500's provision for the death penalty is reasonably justified by the Legislature's determination "that death eligibility for life prisoners who commit an aggravated assault that leads to the victim's death is required to 'protect[] [their fellow] prisoners . . . against the assaults of the vicious, and also to protect the

officers who are required to mingle with the inmates, unarmed.' " (*Landry*, at p. 107.) In sum, "however prisoners subject to life sentences came to hold that status, they are a small and distinct subclass of those who commit homicides punishable as murder. Additionally, the rationale for making such defendants death eligible — to deter and punish crimes by individuals acting under the belief they have nothing left to lose — applies to all life prisoners regardless of the reason for their life sentences. Furthermore, to the extent the reasons for a defendant's life sentence might mitigate his or her punishment, that is an issue that can be raised at the penalty phase." (*Id.* at p. 114.)

More recently, in *Delgado, supra*, 2 Cal.5th at pp. 577–580, we reiterated *Landry*'s reasoning to reject the defendant's constitutional challenge to section 4500's death eligibility provision. There, the defendant, like defendant here, complained that section 4500 arbitrarily excludes individuals serving lengthy determinate terms who may be more culpable than a life inmate. (*Delgado*, at p. 578.) In *Delgado*, we rejected defendant's argument that his indeterminant Three Strikes sentence for nonviolent felonies did not warrant death penalty exposure under section 4500. In rejecting the claim, Delgado reiterated that *Landry* made clear that section 4500 only makes a defendant *eligible* for a death sentence. At the eligibility stage, the Eighth Amendment does not require that " 'a narrowly circumscribed class of defendants for whom the death penalty is reasonably justified be further distinguished according to the particular circumstances that led to their eligibility. Rather, that is a question that goes to the selection stage and its individualized determination requirement.' " (*Delgado*, at p. 579, quoting *Landry*, *supra*, 2 Cal.5th at p. 108; see also

*Tuilaepa v. Cal.* (1994) 512 U.S. 967, 971–972 ["To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' . . . [that applies] only to a subclass of defendants convicted of murder . . . [and is not] unconstitutionally vague"].) For the same reasons articulated in *Landry*, and endorsed in *Delgado*, we find defendant's constitutional challenge to section 4500's death eligibility provision unpersuasive.

### D. Penalty Phase Issues

#### 1. *Admission of Defendant's Racially Inflammatory Words and Conduct*

Defendant asserts that the trial court prejudicially erred by admitting inflammatory details surrounding his 1986 assault of Spychala.

#### a. *Background*

As previously detailed, during the prosecution's penalty phase case-in-chief, Spychala testified that defendant assaulted him with a knife as he was walking with a female friend in San Francisco. During the course of his direct examination of Spychala, and over defense objection, the prosecutor elicited testimony about how defendant also engaged with three African American men. According to Spychala, "He was confronting them with somewhat of an offensive attitude. And he was using derogatory names toward them." When asked to elaborate, Spychala added, "Standing there, calling them [n-words]." [25] Defense counsel objected, "This doesn't go to violence. This is improper." The prosecutor explained that the testimony went to

---

[25] Epithet redacted.

"[t]he threat of violence . . . . And it's going to become even more proper as he explains what transpired." The trial court overruled the objection. Spychala thereafter explained that defendant had a knife "behind his back" while he was "arguing with [the three men]." When asked whether defendant was threatening the men, Spychala responded, "Not that I could see that he was threatening to actually attack them with [the knife], but more waiting for something to happen." Defendant walked away with Spychala and his female companion. On cross-examination, Spychala testified that defendant's encounter with the three men lasted "basically" between "30 seconds to a minute" and he "imagine[d]" the men also called defendant "derogatory names." Spychala confirmed that defendant never attacked anyone. He clarified that defendant had "both his hands behind his back with the knife in it."

### b. *Analysis*

Defendant asserts that his conduct towards the three African American men, as testified to by Spychala, did not qualify as a threat of violence and was therefore inadmissible as aggravating evidence under section 190.3, subdivision (b). Defendant also asserts the defense did not receive constitutionally adequate notice of the prosecution's intent to provide evidence of this incident. Relatedly, defendant alleges that he was deprived of his constitutional rights to a fair trial and a reliable death judgment "due to the extremely inflammatory nature of the derogatory [racial epithet] Spychala claimed that appellant had used."

The People concede that defendant "appears correct" that the evidence of his encounter with the three African American men "did not qualify as a threat of violence, and was thus not an

aggravating factor." However, that question may be closer than the People's concession implies. (See *People v. Michaels* (2002) 28 Cal.4th 486, 536 [detailing cases in which weapons possession constituted an "implied threat" of violence under section 190.3, factor (b)].) Nonetheless, we will assume for purposes of our analysis that the evidence of the encounter should have been excluded in its entirety. Moreover, we will assume that Spychala's more specific testimony about defendant's use of the n-word during the course of describing defendant's encounter with the three African American men was inadmissible. The People do not attempt to claim that defendant's use of a derogatory racial epithet was relevant to any issue in his case, nor can we easily identify one, and " 'a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge' or jury. [Citation.]" (*People v. Young* (2019) 7 Cal.5th 905, 946; see also *People v. Powell* (2019) 5 Cal.5th 921, 960 ["Evidence of a defendant's racist beliefs is inadmissible in the penalty phase of a capital trial if it is not relevant to an issue in the case"].) However, we review such an error, which violates a defendant's First Amendment rights, under *Chapman*'s harmless beyond a reasonable doubt standard. (*Young*, at pp. 951–952, citing *Chapman v. California* (1967) 366 U.S. 18, 24 (*Chapman*).) Similarly, and more generally, "error in the admission of evidence under section 190.3, factor (b) is reversible only if 'there is a reasonable possibility it affected the verdict,' a standard that is 'essentially the same as the harmless beyond a reasonable doubt standard of *Chapman v. California*[, *supra*,] 386 U.S. 18, 24 . . . .' [Citation.]" (*Lewis, supra,* 43 Cal.4th at p. 527.)

On the record here, any improperly admitted evidence about defendant's brief, mutually antagonistic encounter with the three African American men was harmless beyond a reasonable doubt. In his penalty phase argument, the prosecutor focused heavily on defendant's prior murder conviction and Richmond's murder: "Over a ten-year period, two murders. Is that an aggravating factor? It's a very, very, very heavy aggravating factor, I would submit." The prosecutor also highlighted defendant's numerous other violent acts, including prior robberies, his possession of weapons in prison, a fistfight with another inmate in the prison yard, his stabbing of another inmate "in the back six times while the inmate was sitting down reading Bible Scriptures," and "slashing assault[s]" on other inmates. Thereafter, the prosecutor discussed defendant's assaults of correctional officers, including "blood[ying] [an officer's] nose and his upper lip." The prosecutor only discussed Spychala's testimony about defendant's assault on *Spychala* with a knife, without mentioning the encounter with the three African American men; the prosecutor did not discuss Spychala's testimony about defendant's use of racial slurs. Under these circumstances, there could be no prejudice from Spychala's testimony about the encounter between defendant and the three African American men. (See *People v. Lancaster* (2007) 41 Cal.4th 50, 94–95 [the trial court's admission of evidence that defendant possessed handcuff keys pursuant to section 190.3, factor (b) was erroneous because "[t]here was no evidence of an actual escape attempt, or any other crime related to the keys," but the error was harmless beyond a reasonable doubt "[g]iven the insignificant impact of the . . . evidence as a demonstration of conduct involving a threat of violence, the minimal role it played in the prosecutor's argument, and the

144

other compelling evidence presented during the penalty phase"].) The circumstances in this case are very different from those under which we have concluded that the admission of inflammatory and irrelevant character evidence constituted prejudicial error. (See, e.g., *Young, supra*, 7 Cal.5th at pp. 951–954 [finding reversible penalty phase error where the prosecutor presented "testimony from seven different witnesses concerning [the defendant's] racist beliefs, tattoos, and associations, including an expert who testified at length about the nature of the beliefs" and "openly and repeatedly invited the jury to do precisely what the law does not allow: to weigh the offensive and reprehensible nature of defendant's abstract beliefs in determining whether to impose the death penalty"].)

### 2. *The Trial Court Properly Admitted Defendant's Confession to the Prior Murder*

On appeal, defendant asserts that his 1986 confession, when he was 16 years old, to Jackson's murder was improperly admitted during the penalty phase of his trial. He contends it was unreliable and obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436. Defendant did not challenge his confession on these grounds in the trial court, and his claim is therefore forfeited. Petitioner's alternative claim that counsel was prejudicially ineffective for failing to preserve the issue is unpersuasive.

### a. *Background*

After the conclusion of the guilt phase of defendant's trial, defendant stipulated to having been convicted in 1987 of Jackson's murder. The jury thereafter found true the special circumstance allegation that defendant had previously been convicted of first degree murder (see § 190.2, subd. (a)(2)).

145

Prior to the penalty phase, defense counsel filed a written motion to exclude consideration of defendant's 1986 police confession to Jackson's murder as evidence in aggravation. He sought to exclude the confession under *Miranda* on the following basis, "In this case, the defense has been provided with a taped interview and transcription of the [confession]. Although the transcription makes reference to whether or not 'Joe' understood these rights that were explained to him, i.e., presumably *Miranda* rights, there was no transcription of the advisement or assurance that it actually occurred. Thus, such statements should be excludable *absent proper foundation*." (Italics added.) Furthermore, while acknowledging that a juvenile may validly waive his or her *Miranda* rights, defense counsel argued that the failure of law enforcement to inform defendant's parents that he was in custody prior to the interrogation required exclusion under federal law.

At the hearing on defendant's motion to exclude defendant's audiotaped confession, the prosecutor explained, "I'm going to have the inspector who is retired now who handled that case and conducted the interview in court to lay the foundation for the admissibility of the defendant's confession." Defense counsel then sought only to exclude mention of any statements within the confession unrelated to the Jackson murder for which "there would be no evidence to support apart from his admission, unlike with Mr. Jackson where you have a body and —." Defense counsel later addressed the judge, "What happened to Mr. Jackson and his confession to the details of that I understand are probably going to come in. [¶] It's these other misconduct — potential crimes that should not come in since there is no evidence apart from what [defendant] said that actually occurred." The trial court agreed to redact defendant's

murder confession to omit his mention of any other crimes for which there was no independent corroborating evidence.

During the penalty phase, McCoy testified for the prosecution that he interrogated defendant about Jackson's murder; defendant did not appear to be under the influence of alcohol or drugs at the time. The following exchange then took place:

[Prosecutor]: Did you advise him of his constitutional rights?

[McCoy]: Yes, sir.

[Prosecutor]: And why did you do that?

[McCoy]: Any time a police officer speaks to a person for the purposes of interrogation regarding a specific crime and he's a suspect, we're required to do so.

[Prosecutor]: And you did that in this instance?

[McCoy]: Yes, sir.

[Prosecutor]: And did he say that he understood each of those constitutional rights that you gave him?

[McCoy]: He did.

[Prosecutor]: Did he say that he was willing to give those up and speak to you about this freely and voluntarily?

[McCoy]: He did.

Defense counsel did not cross-examine McCoy at that time. The audiotape of defendant's confession was thereafter played for the jury. The transcript of McCoy's interview with defendant, which was later provided to the jury, begins as follows:

[McCoy]: Joe, do you understand each of these rights that I have explained to you?

[Defendant]: Yes, I do.

[McCoy]: Okay. As you can see -ah - we're tape recording this interview and if you would just help us by raising your voice.

[Defendant]: No problem.

[McCoy]: Okay. Ah - do you understand each of these rights that I have explained to you?

[Defendant]: Yes.

[McCoy]: And having these rights in mind do you wish to talk to us now?

[Defendant]: Yes.

During the interview, defendant explained how he met Jackson on Haight Street after Jackson initiated conversation with him. On the night of Jackson's death, 16-year-old defendant went to Jackson's apartment, where he had previously been "at least four" times. Jackson "was a nice guy at first," but that night, Jackson started "making . . . sexual advances" and "tried to force his self upon" defendant. Jackson tried to "place his mouth on [defendant's] penis" and was "playing pornographic movies" with "very explicit sexual material." Jackson continued to "try[] to force his self on [defendant]" and gave defendant beers. Defendant then explained to McCoy, "Um — like I said he kept trying to force his self on me and finally around three-thirty, two-thirty-three o'clock I just-ah-picked up one of his dumbbells-ten pound dumbbell and proceeded to smash his skull in" while he slept.

Defendant eventually left the apartment, taking Jackson's cash, a leather jacket, two spiked wristbands, and two VCRs.

Defendant was "very highly intoxicated" when he struck Jackson with the dumbbell. When asked what was in his mind when he struck Jackson, defendant replied, "I don't know I just hated him at that point in time I really despised him." When asked the reasons for his feelings, defendant answered, "Probably his homosexuality — um — and the fact that he knew that I was sixteen years old and he tried to engage in oral copulation with me." Defendant then explained how, upon his arrest for taking "a slash at a guy [Spychala] with [his] knife" while he was "pretty loaded," he remembered telling officers he had "murdered someone." "What I told them is — ah — that I was a murderer basically. And that I had murdered a man by the name of Jim Jackson, a school teacher at (unintelligible) High School, apartment number eight on Cole Street." Defendant then detailed more about Jackson's apartment and the murder. Defendant placed a pillow over Jackson's head after he struck him with the dumbbell "[t]o cover up the gurgling sounds." When he left the apartment, defendant "thought [Jackson] was still alive cause like I said he was still breathing and making a funny gurgling sound."

At the conclusion of the interview, McCoy asked defendant, "And — ah — do you have any complaints about how the uniformed officers — ah — treated you or how Inspector Dean and I have treated you — ah — since you've been with us — ah —[?]" Defendant replied, "Considering the circumstances they treated me extremely well." McCoy inquired, "Do you have any complaints — ah — or problems with how Inspector Dean and I have dealt with you?" Defendant answered, "None whatsoever. I wasn't forced into a confession

by any means if that's what you're hinting at." McCoy asked for clarification and defendant stated, "I said I wasn't forced into a confession by any means if that's what you're hinting at." McCoy followed up, "Yeah we just want to make it clear to make sure that it's obvious that what you've told uniform [*sic*] officers and us has been freely and voluntary on your — on your behalf." Defendant said, "That's correct," and the interview concluded.

During his subsequent cross-examination of McCoy, defense counsel "compliment[ed] [McCoy] on the professional job of interrogation that you and your partner did in this case." Defense counsel commended McCoy for his "gentleness with [defendant] at a trying time." Defense counsel had McCoy clarify that any laughter from defendant during the interrogation was not interpreted by McCoy as defendant "trying to be humorous." McCoy understood defendant was "slightly nervous." Defense counsel then elicited information from McCoy about the Haight-Ashbury neighborhood where defendant met Jackson. Defense counsel inquired, "Now, at the time this incident occurred, was that an area where — well, we talked about this term 'chicken hawk.' [¶] What is a 'chicken hawk'?" McCoy answered, "The term 'chicken hawk' is — the chicken hawk is an older man, usually 30 years of age to as elderly as, maybe, 80 years of age who goes to certain parts of San Francisco, Haight-Ashbury is one of three that are very popular, looking for younger male companionship usually in the age range between eight years of age and early twenties." Defense counsel prompted McCoy to recall that Jackson "was a high school teacher," and then asked "And, of course, occupation had no necessary bearing on whether one is a chicken hawk or not, does it?" McCoy answered, "Oh, none whatsoever." In response to further questions, McCoy confirmed that defendant

accurately described the crime scene and was not evasive, "Well, he totally took responsibility for the murder. There's no question about that."

During the prosecutor's brief redirect examination, McCoy gave his opinion that defendant voluntarily went to Jackson's apartment.

### b. *Analysis*

Defendant now contends his "confession was fundamentally flawed, and therefore unreliable, because [his] waiver of his constitutional rights was not knowing, intelligent, and voluntary as required under *Miranda*[.]" However, the record shows defense counsel did not seek to suppress defendant's confession on those grounds in the trial court.

In his written motion to preclude the jury from considering defendant's confession, defense counsel acknowledged the transcript of the confession suggested defendant was "presumably" advised of his *Miranda* rights but complained that there was no "assurance that [such an advisement] actually occurred" and defendant's statements "should be excludable absent proper foundation." When McCoy testified during the penalty phase that he advised defendant of "his constitutional rights," defense counsel did not object to the testimony as inadequate to furnish the "proper foundation," i.e., to establish that a *Miranda* advisement "actually occurred." In fact, counsel acceded to the trial court playing the audiotape of defendant's confession after McCoy's direct testimony, seeking only that the confession be redacted to eliminate mention of unrelated crimes supported solely by defendant's statements. During his cross-examination of McCoy, defense counsel commended McCoy for his "gentleness" with defendant during the interrogation and

elicited testimony regarding defendant's forthrightness throughout the interrogation and the habits of "chicken hawks," or older men seeking out young men in specific neighborhoods of San Francisco. During his confession, defendant expressly stated that he was not forced into confessing and confirmed that he spoke to detectives voluntarily.

Having made no claim in the trial court that the transcript and audiotape of the confession, as well as McCoy's testimony, were insufficient to establish the substantive adequacy of the *Miranda* advisements given to defendant or the voluntariness and reliability of defendant's confession, defendant has forfeited those claims here. (See *People v. Holt* (1997) 15 Cal.4th 619, 667 [having "failed to specify either of the *Miranda*-based claims," the defendant "waived the right to assert error on those grounds now"]; *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 [because the defendant "did not raise the issue of the substantive adequacy of the *Miranda* warnings in the trial court, defendant has forfeited that issue on appeal"].)

Nor does defendant persuade that defense counsel acted unreasonably in failing to preserve the issue. A reasonable defense attorney may have determined it would be futile on the record here, which included an audiotape of defendant twice confirming that he understood the "rights" explained to him and asserting that he voluntarily spoke to detectives, as well as McCoy's testimony that he advised defendant of his "constitutional rights," to try to suppress defendant's confession for inadequate *Miranda* advisements or a defective waiver thereof. Instead, defense counsel fairly focused on the degree to which defendant was forthcoming and cooperative with the detectives during the interrogation and counsel highlighted the possible predatory motives of older men, like Jackson, seeking

152

out younger men, like defendant, for sexual purposes.[26] (See *Strickland, supra,* 466 U.S. at p. 687; see also *Yarborough v. Gentry* (2003) 540 U.S. 1, 8 ["When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect"].)

### 3. Counsel's Failure to Object to Evidence Defendant Obtained a Protective Vest and Elicitation of Testimony That Defendant Was Able to Get Out of His Cell

Defendant claims defense counsel was prejudicially ineffective for failing to object to testimony that he had obtained a correctional officer's protective vest and by eliciting "non-statutory, inadmissible aggravation evidence" that defendant could leave his cell as he wished.

---

[26] In arguing that defendant's *Miranda* waiver was not shown to be knowing and intelligent, nor his confession reliable, defendant underscores how defendant was a juvenile at the time of his 1986 confession and his parents were not notified that he was in custody. However, in his written motion to preclude the jury from considering defendant's confession, defense counsel acknowledged that "[a] juvenile may waive his *Miranda* rights" and California law does not require parental consent before police may interrogate a minor. Indeed, the exclusionary rule does not compel suppression of statements for failure to advise a juvenile taken into custody of his right to contact a parent. (See *People v. Lessie* (2010) 7 Cal.4th 1152, 1161 & fn. 2; *People v. Nelson* (2012) 53 Cal.4th 367, 379, fn. 4 [citing *Lessie*].) After his written motion, defense counsel did not reraise any challenge to defendant's confession premised on his status as a juvenile and has therefore forfeited this sub-argument.

### a. Background

Prior to the penalty phase, the prosecutor provided notice to the defense of his intent to introduce "[a]ll evidence, facts underlying, statements of witnesses and the defendant relating to defendant being in possession of an inmate manufactured weapon and/or sharp instrument while being an inmate at Calipatria State Prison on March 6, 1997 . . . ."

During the penalty phase, the People called Roger Lee Martinez to testify. Martinez was working as a correctional officer at Calipatria on March 6, 1997. Martinez testified that, on that date, defendant was suspected of having contraband and initially refused to come out of his cell. A team of officers was formed to extract defendant from the cell before he eventually came out willingly. During the subsequent search of defendant's cell, Martinez observed an inmate-manufactured weapon made out of plexiglass on defendant's bed.

During his cross-examination of Martinez, defense counsel asked Martinez the reason for getting defendant "out of his cell for a search." Martinez did not know the reason. Defense counsel then elicited testimony from Martinez that it took "at least 30 minutes" for defendant to come out of the cell, during which time Martinez did not see defendant with a weapon. Defense counsel thereafter asked Martinez, "Is it true that the extraction team was formed because [defendant] *had allegedly come out of his cell during first watch*?" (Italics added.) Martinez said, "No, I don't recall the reasons why they were forming the team. They were just trying to get him out of the cell."

The People next called Correctional Sergeant Basil Richards to testify about his search of defendant's cell on March

6, 1997. In the cell, Richards found "[s]everal items. One was an inmate-manufactured weapon, Ad. Seg. vest, and some other items in the trash can." The prosecutor asked what an "Ad. Seg vest" is, and Richards explained that it is "a vest that's used for protection for the staff" and "made from metal plates covered with some Kevlar, possibly." When Richards found the vest in defendant's cell, the metal was removed from it. Based on his experience, Richards opined that an inmate would remove the metal "to manufacture some type of weapon."

During his cross-examination of Richards, defense counsel began by asking if vests are "issued to inmates," to which Richards answered "no." Defense counsel then asked a series of questions about how defendant would have acquired a vest:

[Defense counsel]: So Mr. Barrett would have had to have gotten it somewhere; correct?

[Richards]: That's correct.

[Defense counsel]: And you were informed at the time you went there that Mr. Barrett had been out of his cell and there was an Ad. Seg. vest missing, correct?

[Richards]: That's correct.

[Defense counsel]: So during first watch Mr. Barrett had been out of his cell?

[Richards]: That I don't know.

[Defense counsel]: Well, sometime prior to when you went there he had been out of his cell; would that be fair to say?

[Richards]: Yes.

[Defense counsel]: Now, do you know, while [defendant] was out of his cell, do you know whether he assaulted any staff?

[Richards]:  Not to my knowledge.

[Defense counsel]:  There would have been no reason why he couldn't if that had been his intention; is that correct?

[Richards]:  That's correct.

On redirect, Richards confirmed it is a rules violation to have a metal vest.  On re-cross examination, defense counsel elicited from Richards that any such rules violation would be for "contraband," not "weapon stock."

Correctional Lieutenant Lindsey Hunt was thereafter called by the prosecution to testify.  Hunt came into contact with defendant on the evening of March 6, 1997 in Calipatria's infirmary.  Defendant initiated conversation with Hunt.  When asked what they talked about, Hunt, explained, "At that point in time, again, I was watch commander on first watch and there had been a[n] incident where he had gotten out of his cell, and I was the watch commander so it was, basically, my area of responsibility.  So he just kind of wanted to chitchat . . . ." Defendant would not disclose how he got out of the cell.  Defense counsel objected on hearsay grounds, and the parties and trial court met with Hunt outside of the jurors' presence to consider whether defendant's statements might fall within the hearsay exception for party admissions.

During that meeting, the trial court said, "Let's find out if it is an admission."  Hunt explained that defendant told him "he'd already been mirandized, so anything he told me was off the record anyway."  Defendant then told Hunt he was able to get out of his cell and "get some food" during "a cell fight in Ad. Seg." because "the officer responds to the [fight]," which "gave [defendant] the time to get out [and "get some food"]."  When Hunt asked defendant whether he arranged the cell fight,

156

defendant responded, " 'I'm not saying I did. But that sounds about right. You have to admit that that was a pretty good plan.' " When Hunt asked "why he picked up a protective vest," defendant queried, " 'Why do you think?' and then winked at [Hunt]." According to Hunt, defendant also said "he could have taken my cop out at any time if he wanted to." Defense counsel made no further objection and did not question Hunt; Hunt thereafter resumed testifying in front of the jury.

In front of the jury, Hunt testified consistent with what he had told the trial court outside of the jurors' presence. A cell fight created a diversion allowing defendant to get out of his cell. Hunt added that defendant did not tell him exactly how he got out of the cell and "called himself the mystery man." When Hunt asked defendant why he did not take out a cop, defendant replied, " 'If they don't mess with me, I don't mess with them.' "

On cross-examination, defense counsel asked Hunt several questions regarding whether he had confirmed any of the details provided to him by defendant, such as whether there had been a cell fight during the relevant timeframe or whether any food found in defendant's cell might have been taken from a correctional officer's office. Hunt could not confirm any details nor was anyone able to tell him how defendant may have gotten out of his cell. Defendant would have had to scale a wall to be out of obvious view from staff. Defense counsel inquired whether a staff member may have inadvertently opened the cell door; Hunt said the staff members denied doing so. Defense counsel asked Hunt if he recalled telling defendant "that the warden appreciated the fact that he did not harm any staff." Hunt responded, "I don't know if the warden said it, but I told him that." When asked how defendant responded, Hunt said, "He told me that he — if — if he wanted to take out a cop, he

could. But again, if they don't mess with him, he doesn't mess with them." Hunt did not ask defendant whether he had a weapon when he got out of his cell, so Hunt did not know whether defendant did. On redirect and recross, the prosecutor and defense counsel primarily asked questions about the layout of the prison respective to defendant's cell.

### b. Analysis

Defendant contends that defense counsel could have no strategic explanation for his failure to object to evidence that defendant had a protective vest in his possession nor for his elicitation of evidence that defendant had successfully exited his cell. In defendant's view, the evidence surely "would have undermined the jury's confidence that the public and prison staff were safe from [defendant] if he was given life without parole." Defendant argues that Hunt's testimony could have been excluded, "[b]ut of course by the time Hunt took the witness stand, defense counsel had already opened the door to the admission of evidence that [defendant] had been out of his cell."

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. [. . .] On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

The record here does not disclose why defense counsel did not object to Richards's testimony about the protective vest nor does it establish that counsel could have no rational explanation for failing to do so. (See *Mai, supra*, 57 Cal.4th at p. 1009.) For instance, counsel could have conceivably concluded that cross-examining Richards about the vest would be more effective than any objection and possible admonition from the trial court. During his cross-examination, defense counsel got Richards to admit the vest was "contraband," but not "weapon stock."

As for the testimony that defendant got out of his cell, we likewise do not have an explanation from defense counsel as to his reasoning for eliciting this testimony and there could arguably be a logical explanation for counsel's choice. Counsel, for example, may have wanted to emphasize for the jury that defendant did not harm any prison staff while outside of his cell despite having the opportunity to do so. Since we cannot say there was no rational tactical purpose for counsel's conduct on the record before us, defendant's claims are "more appropriately resolved in a habeas corpus proceeding." (*Mai, supra*, 57 Cal.4th at p. 1009.)

### 4. Admission of Evidence That Defendant Assaulted an Elderly Man

Defendant asserts that "a series of errors" by defense counsel, exacerbated by prosecutorial misconduct, unconstitutionally permitted the penalty phase jury to consider prejudicial evidence that defendant assaulted an 81-year-old man when he was 12 years old. We disagree.

### a. Background

In its "Notice of Evidence in Aggravation Pursuant to Penal Code Section 190.3," the prosecution informed the defense

that it intended to present evidence "relating to the use of force during an attempted strong armed robbery with the personal use of a deadly or dangerous weapon against the victim, Lloyd Young on April 19, 1982." During its penalty phase case-in-chief, the prosecution did not present any evidence of the Young assault.

During the defense case, defense counsel called Rand, defendant's juvenile probation officer, as his first witness. Defense counsel asked Rand what he would usually do when assigned a new probationer. Rand explained he "would begin trying to learn as much about him as I knew about myself." To do so, Rand would review "anything and everything, primarily police reports that were written about the offense, which he was later charged, many probation documents, all the probation officers that the youngster had ever seen previous, the minor himself, siblings, parents, relatives, school teachers, employers, anybody I can think of that could tell me something significant about the young man and get me a clearer idea of what brought him to the attention of the Court." In response to questions from defense counsel, Rand testified about defendant's upbringing. When asked if he "discovered any evidence of alcohol or drug abuse in the family," Rand said, "Yes. The probation reports were full of it." "The reports that I read stated that the mother had her personal problems as well as [defendant]." Defense counsel asked Rand whether he got "any sense of a relationship [defendant] had with his sister." Rand responded, "Well, most of the probation reports I read talked about difficulties at school where [defendant] and/or his sister would be victimized by other kids in the school yard. And [defendant] has a very strong attachment, loving attachment to his sister and would always try to protect her while often getting beat up as a result." When

asked whether he knew if defendant had "sufficient food," Rand answered. "Well, I suppose the only direct evidence I have of that was statements in the reports that the minors often went without eating[.]"

Rand spoke to defendant the morning of his testimony. When asked by defense counsel his "impressions" of defendant, Rand testified that he "was amazed" by "the amount of transformation that has occurred in [defendant's] life." Rand previously knew defendant to be "an intellectual manipulator," but defendant could now "admit his own faults" and "see his weaknesses." Defense counsel asked Rand if he saw "anything worthwhile about [defendant]." Rand responded by commending defendant for "the insight that he demonstrated and vocalized . . . for a young man who seemed to have . . . no chance for a future when he was young."

During his cross-examination, the prosecutor asked Rand, "Now, as a probation officer, you worked with, I believe you said, three classes of juveniles. And one class was a law violator." Rand confirmed that defendant fell within that class. The prosecutor then asked, "And what laws had he violated to get him — have him in that class?" Rand explained, "He had come to my attention not as a result of those offenses, but those offenses occurred when he was 12 years old. One day during a 90-minute period, he was involved in three separate events with five different individuals, two of them were robberies and one was an assault." The prosecutor then inquired:

[The Prosecutor]: Let's talk about the assault. Who was that assault on?

[Rand]: An elderly gentleman.

[The Prosecutor]: In fact, the elderly gentleman was what? 82?

[Rand]: He was in his eighties, yes.

[The Prosecutor]: And he ended up in the hospital because of the assault by [defendant]; is that correct?

[Rand]: As far as I know, he was given medical attention, yes.

[The Prosecutor]: And the other two instances you're referring to are robberies.

[Rand]: Yes.

[The Prosecutor]: They're felonies.

[Rand]: Yes.

[The Prosecutor]: And he admitted his guilt to those felonies.

[Rand]: Yes

[The Prosecutor]: That was with a weapon.

[Rand]: A knife was involved in two of those situations.

Defendant later testified on his own behalf. In response to some preliminary questions by defense counsel, defendant said he "hope[d] that maybe I can be a cautionary tale on what not to do." Defense counsel later asked, "How about when you were 12 years old? That one 90-minute spree that Mr. Rand talked about. Did you have anybody at that time to give you any advice?" Defendant confirmed he had no one he could trust or "go to." Defendant hoped to achieve "a sense of fulfillment in prison" and wanted "to further educate" himself. Defendant then answered questions about his childhood, during which questioning defense counsel asked where defendant lived and

moved. During this testimony, defendant explained, "I think next I moved into a group home because ultimately I was convicted of the crimes that have been discussed earlier." Defense counsel followed up, "Those are the 90-minute period in 1982?" Defendant answered, "Yeah." Defense counsel continued, "And in that 90-minute — " Defendant answered, "The robberies, the assault with the deadly weapon on an elderly gentleman." Defense counsel then asked, "Yeah. How do you feel about — you know, we've spoken about this a number of times. How do you feel about the situation that involved an elderly man?" Defendant responded, "It's the single-most shameful thing I've ever done." Later, defense counsel asked if defendant remembered Rand. Rand stood out to defendant "[b]ecause he wasn't a functionary" and "[h]e cared about everyone he worked with." Defendant testified further about his childhood and prison life. Defendant then read a statement in " 'allocution' " to the jury.

During his cross-examination of defendant, the prosecutor asked defendant about the mistreatment he suffered as a child from other kids. The prosecutor asked, "It was cruel?" And defendant replied, "Probably not as cruel as some of the things I've done, but sure it was cruel." The prosecutor continued:

[The Prosecutor]: It was mean what you did to that elderly gentleman, didn't you [*sic*]?

[Defendant]: Undisputably.

[The Prosecutor]: He was how old?

[Defendant]: I believe, he was 80, 81.

[The Prosecutor]: He walked with a cane?

[Defendant]: Yes, he did.

[The Prosecutor]: You attempted to rob him?

[Defendant]: Not only did I attempt to rob him, I beat him with the cane.

[The Prosecutor]: You beat him to where he was on all fours on the ground?

[Defendant]: Undisputed.

Defense counsel objected that "there's no testimony to that." Defense counsel continued "This goes way beyond —" The prosecutor responded that the defense had "brought up a 90 minute crime spree back in 1982, and this is part of it."

The trial court ruled that it would allow cross-examination on the issue since defense counsel "asked him about that." Defendant volunteered, "You can ask me anything you want to ask me." And the prosecutor continued: "You put him in the hospital, didn't you?

[Defendant]: I think he was hospitalized overnight. But, yes, I put him in the hospital.

[The Prosecutor]: In fact, you beat him so badly that his eyes were swollen shut, weren't they?

[Defendant]: I didn't see him, but if that's what the report said, that's what happened.

The prosecutor then referred defendant to his statements about "the transportation team" treating him "with humanity and dignity," and defendant confirmed "the court and its staff had." When asked if he treated people the same, defendant answered, "Those that treat me with respect, I treat with respect." The prosecutor asked, "Did you treat that old man like that?" Defendant said, "No, I didn't."

Later in cross-examination, the prosecutor asked defendant, "You say that the single-most shameful thing you have ever done was in regards to assaulting the older gentleman?" Defendant replied, "An unprovoked assault on a defenseless elderly man, absolutely." The prosecutor followed, "Well, Mr. Jackson, he was sleeping in his bed when you smashed his skull in?" Defendant answered "Yes," over defense counsel's successful objection to the question as "[b]eyond the scope."

During his penalty phase closing argument, the prosecutor argued that defendant's assault on the elderly man was a factor in aggravation, "In 1982 the Defendant, at the age of twelve years old, walked up to an elderly gentleman on the streets of San Francisco. The elderly gentleman was walking down the street with a cane. He had to walk with a cane. [¶] The Defendant and his friend walked up to this gentleman and attempted to hold him up by knife-point. The gentleman resisted. And through the Defendant's own statement, that gentleman was — the cane was taken away from him, and then beaten to the ground with the cane to the point that, when finally someone came to his assistance, the elderly gentleman went to the hospital. He was beaten so bad he had to stay there overnight. He was beaten so bad that his eyes were swollen shut. He was beaten so bad that he was on all fours on the ground at the time of the assault. [¶] That is an aggravating factor if you find it to be true."

Later in his argument, the prosecutor revisited the assault of the elderly man, explaining that he was "wrong" to tell jurors it could be considered "under the 'A' section of 8.85 [circumstances of the charged crime]." Instead it had to be "prove[d] beyond a reasonable doubt" and considered "under the

'B' section" and "give it whatever weight you feel is appropriate." The prosecutor continued, "Again, I would reiterate, that any time somebody beats down an 81-year-old man who's walking down the street with a cane to the point where the man is on all fours on the ground, and after the assault ends the gentleman is taken to the hospital and kept overnight for the injuries he suffered, which include his eyes were swollen shut is very aggravating in anybody's mind. It's only reasonable to assume that."

During defense counsel's closing argument, he addressed the " 'B' factor" evidence and asserted defendant "stood up here and said — there was no evidence of an 81-year-old man. He didn't have to take the stand. I assume he could have denied it, which he wouldn't do, but he could have. And he admitted he struck an 81-year-old man with a cane. And that it was the worst and most disgraceful thing he'd ever done. He just didn't have that coming. [¶] And he said there is no excuse for it and no justification. And I think he was quite hard on himself. And I would say, 'Yeah. That's a crime all right. But you were 12 years old.' Nothing ever came up before that."

### b. Analysis

Defendant contends the admission of evidence about Young's assault requires reversal on several bases.

### i. Ineffective Assistance of Counsel

First, defendant asserts that trial counsel was prejudicially ineffective for failing to object to the prosecutor's elicitation of Rand's testimony about the assault as inadmissible hearsay. The People do not argue that the evidence was admissible under any exception to the hearsay rule. However, as we have previously observed, " ' "an attorney may choose not

to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." [Citation.]' " (*Gurule*, *supra*, 28 Cal.4th at pp. 609–610.) Here, where Rand testified at length for the defense, including about several mitigating circumstances gleaned from outside sources like probation reports, the defense may not have wished to highlight for the jury that other information Rand was privy to was hearsay. Moreover, during defense counsel's subsequent examination of defendant, defendant disclosed that he hoped to serve as "a cautionary tale on what not to do." One of defense counsel's questions revealed that he spoke to defendant "about [the assault on Young] a number of times." Having done so, counsel could have foreseen Rand's testimony about the assault as providing an opportunity to emphasize, in his direct examination of defendant, defendant's veracity and capacity for remorse — both of which would reflect favorably on defendant. Indeed, in response to defense questioning, defendant admitted his assault of Young was "the single-most shameful thing I've ever done," and defense counsel, in closing, underscored how defendant could have denied committing the assault, but instead admitted it was inexcusable. On this record, we cannot say "there simply could be no satisfactory explanation" for defense counsel's failure to object and defendant's claim of ineffective assistance would be better pursued in a habeas corpus proceeding. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

Second, defendant contends defense counsel should have objected to the prosecutor's questioning of Rand as prosecutorial misconduct. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 893–894 [" ' "As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an

assignment of misconduct and requested that the jury be admonished to disregard the impropriety" ' "].)  But the prosecutor did not directly inquire about Young's assault at first.  He simply asked why defendant was a juvenile classified as "a law violator."  Rand then volunteered in response that defendant came to his attention because of a specific sequence of events:  "[o]ne day during a 90-minute period, he was involved in three separate events with five different individuals, two of them were robberies and one was an assault."  The prosecutor could not have anticipated this detailed response referring to a "90-minute" series of crimes, including "an assault," and thus committed no objectionable misconduct to introduce the subject of the assault.  (See *People v. Crew* (2003) 31 Cal.4th at 822, 839 (*Crew*) [no prosecutorial misconduct where "[t]here [was] nothing in the record to show that the prosecutor elicited or attempted to elicit testimony in violation of the court's order"].)  As for defense counsel's failure to object to the prosecutor's follow-up questions about Young's assault as beyond the scope of the aggravating evidence presented by the People, for the reasons explained above, counsel may have foreseen using the evidence of Young's assault to defendant's advantage and the prosecutor cannot be faulted for any possible prejudice from defense counsel's potentially strategic omissions.

### ii.  Sixth Amendment Right to Confrontation

Alternatively, defendant claims the prosecutor's questioning of Rand violated his Sixth Amendment right to confront the witnesses against him.  This claim also fails.

"In *Crawford* [*v. Washington* (2004)] 541 U.S. 36, the United States Supreme Court overruled *Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L. Ed. 2d 597, 100 S. Ct. 2531] (*Roberts*),

which had held that the confrontation right does not bar admission of the out-of-court statements of an unavailable witness if the statements 'bear[] adequate "indicia of reliability." ' Rejecting this approach, *Crawford* held that, in general, admission of 'testimonial' statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable, and the defendant had a prior opportunity for cross-examination. (*Crawford*, at pp. 59–60, 68.) Although the court in *Crawford* 'did not offer an exhaustive definition of "testimonial" statements,' the court has since clarified that 'a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial' (*Ohio v. Clark* (2015) 576 U.S. [237]) — that is to say, unless the statements are given in the course of an interrogation or other conversation whose ' "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution" ' [citations]." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1214 (*Rangel*).)

The Attorney General asserts that defendant forfeited this claim by failing to object to the prosecutor's questions under the confrontation clause. (See, e.g., *People v. Redd* (2010) 48 Cal.4th 691 [failure to raise objection based on confrontation clause forfeited claim on appeal].) However, *Crawford* was decided while the penalty phase jury was deliberating in defendant's case.[27] We have previously concluded "that in a case tried before *Crawford*, a defendant does not forfeit a *Crawford* challenge by

---

[27] *Crawford* was decided on March 8, 2004. The penalty phase deliberations in defendant's case began on February 24, 2004 and ended on March 10, 2004.

failing to raise a confrontation clause objection at trial." (*Rangel, supra,* 62 Cal.4th at p. 1215.) The Attorney General points out that defendant did not raise any claim under *Crawford* in his post-trial motions to modify the verdict or for a new trial and thus should not be excused from forfeiture. Here, where *Crawford* was decided two days before the jury's deliberations concluded, the question of whether counsel should have reasonably anticipated the change in law effected thereby might be more debatable than a case like *Rangel, supra,* 62 Cal.4th at page 1215, where the defendant's trial occurred years before *Crawford.* Nonetheless, we need not decide the question of forfeiture because, assuming the issue is preserved, it fails on the merits.

*Crawford* "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford, supra,* 541 U.S. at p. 59, fn. 9; accord *Williams v. Illinois* (2012) 567 U.S. 50, 57–58 [the confrontation clause "has no application to out-of-court statements that are not offered to prove the truth of the matter asserted"].) During his testimony, Rand first cited "an assault" for the purpose of explaining why he classified defendant as "a law violator" and how defendant came to his attention. Thus, the jury properly learned that defendant committed an assault when he was 12 years old. (See *People v. Clark* (2016) 63 Cal. 4th 522, 562 [" '[A]n out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer, and that the hearer, believing such information to be true, acted in conformity with such belief' "].) However, we will assume Rand's subsequent testimony, revealing details about the assault (i.e. the victim was in his eighties and required medical attention) was based on

testimonial hearsay and should have been excluded. (Cf. *People v. Sanchez* (2016) 63 Cal. 4th 665,694–695 [the gang expert's statements based on police reports were testimonial because the reports were compiled during police investigation of the completed crimes].) Nonetheless, we find the mention of these details to be harmless in light of the otherwise uncontested testimony about the assault itself, as well as the other evidence presented by the prosecution in aggravation.

Under *Chapman*'s federal harmless error standard applicable to confrontation clause violations, the People must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman, supra,* 386 U.S. 18, 24; see also *People v. Schultz* (2020) 10 Cal.5th 623, 660–661 (*Schultz*).) The details about Young's assault provided by Rand were relatively innocuous in comparison to those later disclosed by defendant himself. Moreover, defendant does not challenge Rand's concurrent testimony concerning the two robberies with use of a knife occurring during the same "90-minute period" as the assault, for which there was independent victim testimony. In his direct testimony about his various housing placements, defendant volunteered, "I think next I moved into a group home because ultimately I was convicted of the crimes that have been discussed earlier." Defense counsel then followed up, "Those are the 90-minute period in 1982?" Defendant answered, "Yeah." Defense counsel continued, "And in that 90-minute — " Defendant answered, "The robberies, the assault *with the deadly weapon* on an elderly gentleman." (Italics added.) Defendant's answers that he was "ultimately convicted of the crimes discussed earlier" (Rand spoke only of "offenses" and defendant's involvement in "three separate events") and that the assault involved a deadly weapon willingly

put damaging details about the assault before the jury.[28] Defendant does not argue, nor could he, that this testimony was improperly presented to the jury. Moreover, as previously noted, the prosecutor's case in aggravation included defendant's numerous acts of violence, including two murders and multiple in-custody assaults. On this record, Rand's fleeting testimony about Young's age and the fact that he required medical attention after the assault could not have impacted the jury's verdict. (See *Schultz*, at p. 661 [explaining that, to determine prejudice from the admission of testimony in violation of the Sixth Amendment, "we examine the record as though [that portion of the trial testimony] had not been admitted"].)

### iii. *Prosecutorial Misconduct During Closing Argument*

Defendant contends the prosecutor committed misconduct during his closing argument by misstating the evidence and arguing facts not in evidence in relation to Young's assault. As defendant acknowledges, he did not object to the prosecutor's comments, but he asserts that counsel's failure to object should be excused because the record demonstrates that any objection and request for an admonition would have been futile. (See *ibid*.) We agree that any objection would have been futile.

Before the parties' penalty phase closing arguments, the trial court advised the parties to act "professionally." The trial court then proffered, "The other thing is, if one of you wants to

---

[28] As we previously concluded, the record does not establish that defense counsel was ineffective for questioning defendant about Young's assault and thereby opening the door to the prosecutor's subsequent cross-examination of defendant about several details of the assault.

say, 'Objection, he's misstating the evidence.' [¶] You are going to hear from me, 'The jury will decide what the facts are.' I'm not going to say, 'That's right,' or 'That's wrong.' That's their bailiwick. That's their duty, and I'm not going to jump in and say, 'Yeah, you're getting the facts wrong.' Because I am not the decider of facts." Defense counsel expressed a "need to make a record," and the trial court responded, "Sure, you can make a record. But I'm just going to look at the jury, 'These people are going to decide what the facts are. Statements of attorneys are not evidence.'" The parties flagged the issue of having to preserve some claims. The prosecutor observed, "But for tactical reasons, there may be a reason why one side or the other would make that type of objection during closing argument." Defense counsel then explained, "One which would be — if we don't make some statements that might amount to counsel misconduct, then we waive them." The trial court responded, "Yeah, you can make — I anticipate those statements. I don't think I've been through a trial of any seriousness yet where that wasn't constantly coming up. But that's just the way I always respond to them. I think it is the appropriate way to respond." On this record, the trial court made it clear that it was not going to sustain any objections regarding an attorney misstating the evidence and an objection on that basis would have been futile. However, defendant cannot demonstrate that any misstatement of the evidence by the prosecutor prejudiced him.

First, defendant urges that the prosecutor improperly misstated the evidence by arguing that defendant attempted to "hold [Young] up by *knife-point*." According to defendant, there was no evidence that defendant used a knife during the assault. However, there was evidence that defendant used a knife in the two robberies that occurred within the same 90-minute

timeframe as Young's assault; Condencia and Dimitrou testified during the prosecution's penalty phase case-in-chief that defendant robbed them while armed with a knife and Rand confirmed the same. Furthermore, during his direct testimony, defendant himself referred to "the assault with the deadly weapon on an elderly gentleman." On this record, the prosecutor appears to have fairly deduced that "the deadly weapon" to which defendant referred was a knife. (See *People v. Stanley* (2006) 39 Cal.4th 913, 951 [" ' " ' 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom' " ' "].) In any event, it is unlikely the prosecutor's specific reference to a knife, which the jury already knew defendant had used in the close-in-time robberies, as opposed to a more general reference to "the deadly weapon" defendant spoke of, had any impact on the jury's assessment of the case. (See *Ayala*, *supra*, 23 Cal.4th at p. 284.)

Defendant next argues that the prosecutor also mischaracterized the evidence when he argued that Young's eyes were swollen shut as a result of the beating. Defendant is correct that he never admitted this point, but only testified that, "if that's what the report said, that's what happened." There was no other evidence offered to prove that Young's eyes were swollen shut as a result of defendant's assault. However, looking at the evidence before the jury, including defendant's admission to beating Young to the ground with a cane to the point where Young needed to be hospitalized, the prosecutor's assertions that Young "was beaten so bad that his eyes were swollen shut" were comparatively minor. Defendant shows no prejudicial misconduct.

### 5. *Additional Allegations of Prosecutorial Misconduct*

In addition to his claims of prosecutorial misconduct related to Young's assault, defendant asserts that the prosecutor "[c]ompound[ed] this misconduct" with "numerous other inappropriate acts during the penalty phase." More specifically, defendant asserts the prosecutor committed misconduct in his questioning of certain witnesses by seeking to elicit inadmissible evidence or implying prejudicial facts. He further contends the prosecutor misstated the law and the facts during his penalty phase closing argument.

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order. (*People v. Silva* (2001) 25 Cal.4th 345, 373 [106 Cal. Rptr. 2d 93, 21 P.3d 769].) It is also misconduct for a prosecutor to make remarks in opening statements or closing arguments that refer to evidence determined to be inadmissible in a previous ruling of the trial court. Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 822–823 & fn. 1 [72 Cal. Rptr. 2d 656, 952 P.2d 673].) A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*Crew*, *supra*, 31 Cal.4th at p. 839.)

### a. *Prosecutor's Questioning of Esten*

Defendant contends the prosecutor committed prejudicial misconduct during his cross-examination of Esten by eliciting inadmissible evidence and making damaging insinuations.

### i. Background

During the penalty phase, the defense called Esten, a retired correctional consultant with the California Department of Corrections, to testify. Esten's consulting job involved assessing inmates to identify their most appropriate prison classification. Esten testified that defendant was eligible for indeterminate placement in the Secured Housing Unit (SHU) at Pelican Bay. Esten presented a video of Pelican Bay's SHU to the jury to "show that there is a place where inmates can be housed where they no longer have the ability to pose a threat to staff and inmates[.]" Esten opined that defendant would be single celled in Pelican Bay's SHU if he were not sent to death row. When asked to rate defendant on a scale from one to ten "in dangerousness," Esten answered "[p]robably an eight." Asked "[w]ho would be above him," Esten replied, "above him would be the gang member who is a shot caller, who directs homicides from prison to another, who has ties to the street and is involved in the movement of contraband into the prison, involved in killings on the street. [¶] There are a number of inmates who are currently under Federal indictment. Those inmates are considered more dangerous than [defendant]."

During cross-examination, the prosecutor inquired whether, "if an inmate's past behavior is one of violence, the future is expected to be the same." Esten explained, "Again, based on [defendant's] past behavior, it is my expectation that his future behavior would be dangerous as well. [¶] Consequently, the placement in Pelican Bay SHU on indeterminate status where that behavior can best, in all institutions, be monitored." The prosecutor inquired whether Esten had interviewed defendant; Esten had not. He spoke only with defense counsel and did not "prepare any reports in this

case." Esten confirmed that he reviewed defendant's disciplinary history. When asked what the "most recent report" he reviewed was, Esten could not give a date. The prosecutor then inquired, "Did you look at the incident involving February the 8th of this year?" The trial court sustained defense counsel's objection. The prosecutor continued, "After you reviewed the history of [defendant], what was your conclusion about his violent behavior?" Esten responded, "he needs to be retained in a place that provides the most security possible." Esten acknowledged that "[s]everal" murders have taken place in the Pelican Bay SHU. The prosecutor inquired, "What is [*sic*] shot-caller?" Esten responded "A shot-caller would be an inmate of a particular ethnic group who is the leader of that group and controls and directs the activities of other members of that group." The prosecutor continued, "How does one become a shot-caller in prison?" Defense counsel objected as "beyond the scope of direct." The trial court overruled the objection because the phrase was "brought out on direct" when defense counsel asked Esten to rate defendant's dangerousness. The prosecutor asked Esten again "what is a shot-caller?" Esten said, "a member of a particular ethnic group who had leadership of that group and directs other inmates to perform specific acts on his behest." The prosecutor followed up, "When you say, 'specific acts,' are we talking about even violent acts?" Esten said the acts could include "assaults" and "murders." When asked "[h]ow does one become a shot-caller?" Esten explained, "[b]y earning the respect of those in your ethnic group by behavior that warrants your being elevated to the leadership position." This behavior would typically be "homicides." The prosecutor inquired whether "an inmate who is single-celled . . . can still be a shot-caller[?]" Esten said, "[Y]es." Esten testified that "inmates who

are involved in gang activity" would consider being a shot-caller important. The prosecutor asked whether inmates "manipulate cell moves," and Esten confirmed "[a]n inmate will manipulate a cell move so that he can be celled with someone else." The trial court sustained defense counsel's objection to Esten's answer as "beyond the scope" and "getting far afield."

The prosecutor later asked "do inmates who are in the 25 to 44 age group tend to dominate the inmates who are young[?]" Esten confirmed "[t]he younger inmate is always dominated by the older inmate." The prosecutor asked Esten if he had been to Calipatria, which Esten had. The prosecutor inquired, "Have you seen the Barrett cell?" The trial court sustained defense counsel's objection to the question as "prejudicial" and "instruct[ed] the jury to disregard the question. A question isn't evidence." Esten testified that an inmate, regardless of housing placement, could still choose to be violent.

On redirect examination, Esten gave his opinion that Pelican Bay SHU is "definitely" more secure than death row. Defense counsel asked what a "shot-caller" meant to Esten. Esten replied, "A shot-caller is one and one with gang involvement [*sic*]. This case has no gang involvement in it." Esten continued, "So other than for an education purpose as to what a shot-caller is, it has no bearing on Mr. Barrett's placement. His placement in Pelican Bay SHU is as a result of his disciplinary behavior, not his gang behavior, because there is no gang behavior."

On further redirect questioning by defense counsel about whether an individual with an LWOP sentence will get out of prison, Esten said, "An LWOP inmate will die of natural or other

causes in prison regardless of where he is housed . . . all LWOPs will die in prison."

On further re-cross, the prosecutor inquired whether there are "LWOPs who have their convictions overturned on appeal and get out of prison." Esten did "not know." Esten continued, "the only LWOP sentence modifications have been to 25 to life or 15 to life. I have never seen an LWOP sentence overturned. I've seen death cases overturned, but not LWOP sentences."

On further redirect, Esten said defendant would not "get out with two life terms consecutive."

On further recross, the prosecutor asked, "What if he escaped?" The trial court sustained defense counsel's objection before Esten could respond. Esten was then excused as a witness.

In the jury's absence, defense counsel moved for a mistrial, arguing "it's totally improper to bring up the possible specter of an escape in prison. It's prosecutorial misconduct. It's not admissible for any purpose in trial. It is reversible error, and we are asking for a mistrial at this point." The prosecutor responded that defense counsel, "opened the door. His last statement to [defense counsel] was, 'There's no possibility of him ever getting out of prison,' and that's not true. That is absolutely a misstatement." The trial court denied the mistrial motion but offered to instruct the jury "not to consider the remark about an escape. [¶] Although I've already instructed them, at least twice, at least once today that questions aren't evidence. And the question was never answered, so there is no evidence on the issue." Defense counsel declined the trial court's offer for an instruction.

### ii. Analysis

Defendant takes issue with various aspects of the prosecutor's cross-examination of Esten.

First, defendant contends the prosecutor tried to elicit inadmissible aggravating evidence from Esten when he asked, "Did you look at the incident involving February the 8th of this year?" The trial court sustained defense counsel's general objection to the question before Esten answered.

On February 8, 2004, after the prosecution began presenting evidence at the penalty phase and less than two weeks before Esten testified, defendant was allegedly "involved in another . . . assaultive behavior act on an officer when he allegedly pulled the officer's arm into — through his food port and was attempting to break his arm." The prosecutor initially expressed an intent to present evidence in his penalty phase case-in-chief about the alleged incident, but ultimately did not do so.

According to defendant, the prosecutor improperly attempted to get evidence of the alleged assault, which the court had not otherwise deemed admissible, in through Esten's testimony.

" 'The scope of cross-examination [of expert witnesses] permitted under [Evidence Code] section 721 is broad, and includes examination aimed at determining whether the expert sufficiently took into account matters arguably inconsistent with the expert's conclusion.' (*People v. Ledesma* (2006) 39 Cal.4th 641, 695 [47 Cal. Rptr. 3d 326, 140 P.3d 657].) [. . .] 'It is common practice to challenge an expert by inquiring in good faith about relevant information, including hearsay, which he may have overlooked or ignored.' [Citation.].)" (*People v.*

*Townsel* (2016) 63 Cal.4th 25, 55–56; see also Evid. Code, § 721, subd. (a).)

Here, where Esten offered his expert opinion that defendant was "about an eight" out of ten on the scale of dangerousness, the prosecutor's inquiry about whether Esten had read defendant's most recent disciplinary report, which would have bearing on the accuracy of Esten's opinion, was within the scope of permissible cross-examination. Even if we assume the prosecutor's question specifically referencing the February 8th incident went too far and ran the risk of eliciting improper testimony, there was no harm to defendant. The trial court sustained defense counsel's objection and jurors heard nothing about defendant's alleged conduct on February 8th. The jurors were instructed that, "[i]f an objection was sustained to a question, do not guess what the answer might have been." We presume jurors follow their instructions and defendant fails to demonstrate prejudice from the prosecutor's fleeting inquiry.

Second, defendant contends the prosecutor committed misconduct by trying "to create the impression that [defendant] had killed Richmond to become a 'shot caller' among white inmates." Here, the trial court overruled defense counsel's objections to the prosecutor's inquiries about "shot-callers," finding them within the scope of Esten's direct testimony. Defendant's claim therefore may be better framed as one of alleged trial court error. However, where defense counsel elicited information from Esten that a "shot caller" would be an example of an inmate more dangerous than defendant, the trial court did not abuse its discretion by permitting the prosecution to thereafter elicit specifics about why that was so and to draw comparisons to defendant's conduct. Moreover, it was made clear to the jury during defense counsel's redirect examination

of Esten that defendant was not a gang member. On this record, defendant fails to show any prosecutorial misconduct.

Next, defendant contends the prosecutor "inappropriately sought to elicit evidence that Calipatria State Prison had purportedly designed a cell specially for [defendant]." During the prosecution's penalty phase case-in-chief, over defense counsel's unsuccessful objection, Correctional Officer Jess Landin testified that, on January 31, 2000, a weapon was found in a cell "specially made for [defendant]" called the "Barrett cell." Subsequently, as explained, the prosecutor asked Esten whether he had seen "the Barrett cell." The trial court sustained defense counsel's objection to the question, Esten did not answer the question, and the trial court immediately admonished the jury to disregard it. The jury was also generally instructed that "[s]tatements made by the attorneys during the trial are not evidence." On this record, there was no risk of prejudice to defendant from the prosecutor's unanswered inquiry of Esten.

Finally, defendant contends the prosecutor committed misconduct "when he sought to elicit 'evidence' that [defendant could get out of prison, either by escape or appeal, if the jury returned a verdict of life in prison without the possibility of parole." However, the trial court reasonably ruled that the prosecutor's initial questions about whether "LWOPs" can have their convictions overturned were within the scope of proper cross-examination based on Esten's direct testimony that "LWOPs will die in prison." An objection to the prosecutor's subsequent question on recross about whether defendant might escape was sustained before Esten answered. In denying defendant's motion for a mistrial based on the prosecutor's mention of the possibility of escape, the trial court offered to instruct the jury "not to consider the remark" even though other

instructions already told jurors that questions are not evidence. Defense counsel declined the court's offer. As previously noted, the jury was instructed not to speculate as to what an answer may have been when an objection to a question is sustained and not to "assume to be true any insinuation suggested by a question asked a witness." Under these circumstances, even if the prosecutor's escape question constituted misconduct, there is no risk the jury applied it in an "objectionable fashion." (See *Ayala, supra*, 23 Cal.4th at p. 284.)

### b. *Prosecutor's Questioning of Defendant*

Defendant contends the prosecutor also committed misconduct during his cross-examination of him, asking argumentative questions and eliciting inadmissible evidence.

### i. *Background*

The prosecutor began his cross-examination of defendant by inquiring about the issues defendant had with other kids on his bus rides to school. The prosecutor inquired, "What they did to you was mean, wasn't it?" Defendant responded, "Sure it was mean." The prosecutor continued, "It was cruel?" Defendant answered, "Probably not as cruel as some of the things I've done, but sure it was cruel." The prosecutor then asked, "It was mean what you did to that elderly gentleman, didn't you [*sic*]?" Defendant said, "Undisputably [*sic*]." After eliciting more details about the assault on Young, the prosecutor asked whether defendant treated the "old man" with respect. Defendant said he did not.

The prosecutor then proceeded to ask about defendant's home life growing up and whether he ran away and violated curfew. Defendant said, "Mr. Robinson, I stayed out beyond curfew. I have been on drunken binges. I have robbed people.

I have killed people.  I have assaulted people.  You don't need to dramatize it.  Ask me the question."  The prosecutor responded, "would you like me to shut up?"  Defendant stated, "I wouldn't say it like that.  Not in a courtroom anyway."  The prosecutor proceeded to ask defendant whether he respected his former probation officer Rand, defendant said, "Sure.  No, I respect him now.  I probably didn't respect him then."  Defendant admitted Rand tried to help him.  The prosecutor then asked, "In fact, what about your mom?  Did you respect your mom growing up?"  Defendant answered, "Mr. Robinson, you're treading on thin ice there."  The prosecutor thereafter stated, "That's the story of my whole life."  Defendant said, "Mine, too."  Defense counsel objected, "Your Honor, then, [the prosecutor] ought to go for a swim and get off of it.  My client is trying to treat him with dignity, and he's trying to be a jerk."  Defendant indicated he would answer the prosecutor's question, and the trial court told defense counsel to "object in the legally proper fashion."  The trial court also wanted cross-examination "done in a matter fact way[.]"  Defendant then explained, "I can honestly answer that I probably did not respect her [his mom] then.  Like I said, I didn't respect anyone then.  I love her.  I loved her then.  Probably didn't have a whole lot of respect for her."  Defendant said he was "manipulative" when he was young and still is "every day," except "today" as he gave testimony.

The prosecutor proceeded to reference defendant's time at the "Log Cabin," and defendant interjected, "You're taking pieces of time and splicing them together.  So if you are going to have me answer your questions, answer them or ask them properly and I'll answer them as best I can.  You have my word."  The prosecutor asked, "You say that the single-most shameful thing you have ever done was in regards to assaulting the older

gentleman?" Defendant agreed. The prosecutor then said, "Well, Mr. Jackson, he was sleeping in his bed when you smashed his skull in?" Defense counsel objected as "beyond the scope," and the trial court sustained the objection. Defendant replied, "Yes," over the objection. The prosecutor queried, "You don't listen to people, do you?" The trial court sustained defense counsel's objection. Defendant then offered, "Actually, I do listen to people. But at the same time, I do what I believe to be right, okay. That's it."

The prosecutor thereafter inquired about defendant's time in juvenile hall and on probation before he was returned to his mother's custody. Defendant confirmed his "mother wanted [him] back[.]" Defendant was then asked if he "move[d] to Florida?" Defendant said, "[e]ventually." The prosecutor asked, "Committed assaults on your relatives in Florida?" Defense counsel successfully objected to the question as "beyond the scope," but defendant answered: "Again, I'd like to answer it. I don't want to leave it hanging in the air. [¶] Did I commit an assault on anyone in Florida? [¶] You know, technically I did. My uncle, who outweighed me by about seventy pounds, punched me in the eye. I chased him out of the house with a knife." The prosecutor proceeded to ask defendant if he went to school, and defendant said, "I'm not done yet. [¶] [. . .] [¶] I later went down and engaged him [his uncle] in a fistfight." The prosecutor inquired whether defendant "obey[ed] any of the court orders in Florida like go to school, obey your mother?" Defense counsel objected to this question as "argumentative." Defendant answered, "Probably not." Defense counsel added, "This is beyond the scope also." The trial court then sustained the objection. The prosecutor later asked defendant if he "went to Florida to make a new life for [himself], so to speak?"

185

Defendant answered, "I went to Florida because I was given two choices:  Go to YA [Youth Authority] or go to Florida.  [¶] Obviously, I didn't want to go [to] YA.  No matter how bad my home life was it's not as bad as being locked up."  The prosecutor then asked, "But to avoid being locked up all you had to do was obey the laws."  Defense counsel successfully objected to this question as "argumentative," but defendant still replied, "Absolutely."

The prosecutor then asked defendant about his time at "Log Cabin Ranch," which defendant described as "basically a juvenile correctional setting.  Lighter security, I guess, but they have — you know, it varies.  It's more like a boot camp type of thing, I guess, without the boot camp aspect.  You know, it's out in the boonies."  The prosecutor inquired whether, up to the time of his placement at Log Cabin Ranch, defendant "had . . . escaped from any of these institutions?"  Defense counsel objected to this question as "way beyond the scope."  The prosecutor argued that defense counsel "opened the door" by eliciting from defendant that he "had been placed in different placements during this time period."  The trial court overruled the objection and defendant answered, "No."  The prosecutor then asked about defendant's "furloughs" while at the Log Cabin Ranch and whether he ever went back to the ranch after his July 1996 furlough.  Defendant said "No," and the prosecutor immediately inquired how defendant "survive[d]."  Defendant began to answer, but defense counsel interrupted and asked to approach the bench.

Outside the presence of the jury, defense counsel argued to the trial court that the question is "totally improper" if meant "to elicit additional incidents in aggravation."  The trial court observed that defense counsel "has a right to cross-examine on

186

your issues in mitigation. He can't be handcuffed. [¶] When you — you know, [the prosecutor] asked him, and I saw it coming, 'How did you survive?' [¶] He said, 'Well, I had jobs sometimes.' [¶] I don't think I could stop him from asking, if that's all." Defense counsel reminded the trial court that the tape of defendant's confession to Jackson's murder was redacted to remove defendant's admission to crimes, including robbing homosexual persons, for lack of supporting evidence. The trial court agreed, "we would need a corpus before any admission would be allowed in." Defense counsel asked for "a short recess to advise [defendant] or to instruct not to go into that area." The court responded, "I just said he can't go into it unless he can prove the corpus first."

Once the parties were again in the jury's presence, the prosecutor moved on from his prior inquiries and began asking defendant about his 1987 murder conviction and whether he was referred to CYA. Defendant confirmed he was referred to CYA and persons could be there up until the age of 25. The prosecutor asked, "But you went into prison, adult prison at the age of 17?" Defendant confirmed he did, and the prosecutor asked "[w]hy," at which point defense counsel requested "another sidebar." Outside of the jury's presence, defense counsel asserted, "this is an attempt, I believe, Your Honor, to evidence an attempted escape from the California Youth Authority as a further aggravation factor." The prosecutor explained, "I was never bringing — planning on bringing up the escape from CYA until counsel just mentioned it. There is case law that indicates that escape is an implied threat of force because you are assumed, if you are going to escape, you are going to use force if you are forced to during your escape. So

there is case law on it. [¶] But I will leave it alone. I want to get through this, too."

When the parties returned before the jury, the prosecutor asked for a readback of his last question and defendant responded, "Attempted escape." Defense counsel objected, contesting the prosecutor's claim that he "had no idea [defendant] was going to say that." The trial court addressed the jury, "Ladies and gentleman, we have a very old rule of evidence, that is, that says an admission or a confession to a crime can't come into evidence until there's been evidence that the crime actually occurred independent of the admission or confession. [¶] We have no independent evidence of this supposed escape. We just have [defendant's] admission or confession to this event. I can't let it into evidence. I'm going to have to instruct you not to consider it for any purposes in your deliberation. There's a good reason for that rule." Defense counsel asked that the parties' in-chambers conversation be reflected on the record, and the trial court observed that it was. Defense counsel followed, "We knew it was coming, all of us." Defendant then stated, "You know, I have a question, too. [¶] If I'm expected to be truthful, I don't know about these rules of evidence. If he is going to ask a question, I'm going to answer it." The trial court responded, "I know. Sometimes people don't understand the reasons for these rules, but there are very good reasons for them. [¶] In other countries this rule gets abused terribly and that's why confessions are always admitted to crimes that nobody could ever prove even happened. So our rule makes a lot more sense. [¶] And don't consider that statement for any reason at all. Don't discuss it, don't consider it in your deliberations."

Defendant subsequently testified to using violence in prison. When the prosecutor inquired, "Have you continued your violence over the past eight years, sir?" Defendant replied, "Sure." The prosecutor asked, "You said that you shed no tears for Thomas Kent Richmond; was that your testimony?" Defendant testified, "I didn't. No, I didn't." The prosecutor inquired, "But you felt sorry for his mom and sisters when they were in court the other day?" Defendant said, "you know that as well as I do." The prosecutor followed up, "You didn't feel sorry for them on the day that you punched a steel weapon into his heart — " The trial court sustained defense counsel's objection to this question as both "argumentative" and "improper."

### ii.  Analysis

First, defendant contends "the prosecutor routinely posed questions to [defendant] which were not designed to elicit relevant testimony from him but rather to provoke him and argue the state's case to the jury."

" 'An argumentative question is designed to engage a witness in argument rather than elicit facts within the witness's knowledge.' [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 435–436.) "The 'critical inquiry on appeal is not how many times the prosecutor erred but whether the prosecutor's errors rendered the trial fundamentally unfair or constituted . . . reprehensible methods to attempt to persuade the jury.' [Citation.]" (*People v. Peoples* (2016) 62 Cal.4th 718, 794 (*Peoples*).)

Defendant cites the prosecutor's inquiries about his assault upon Young, his respect for his mother, the "smash[ing]" of Jackson's skull, his inability to obey laws in Florida, and his

lack of remorse for Richmond's family as inappropriately argumentative. Defendant faults the prosecutor for "ignor[ing] defense objections and trial court rulings, knowing that [defendant] would insist on answering whatever was asked of him."

"The permissible scope of cross-examination of a defendant is generally broad" (*People v. Chatman* (2006) 38 Cal.4th 344, 382), and we might expect a certain level of contentiousness between a prosecutor and a defendant during cross-examination. However, the record here reveals that some of the prosecutor's questions were seemingly meant only to goad defendant. Indeed, the prosecutor's inquiries of defendant as to whether he wanted the prosecutor to shut up or whether defendant listened to people could not yield testimony of any evidentiary value. We do not condone such tactics. (*Hill*, *supra*, 17 Cal.4th at p. 819 [explaining that prosecutors should maintain "an elevated standard of conduct"].) However, the prosecutor's errors did not render defendant's trial unfair nor were they meant to improperly persuade the jury. During his testimony, defendant interacted with the prosecutor in a familiar way, saying things like "[y]ou don't need to dramatize it," "you're treading on thin ice," and "ask [questions] properly." Defense counsel's objections to questions as "beyond the scope" or "argumentative" were either sustained or otherwise met with acquiescence by the prosecutor to abandon certain lines of questioning. Nonetheless, defendant consistently volunteered incriminating answers to the prosecutor's questions, often over his counsel's successful objections. Under these circumstances, defendant fails to persuade that the prosecutor's conduct constituted prejudicial misconduct. (See *Peoples*, *supra*, 62 Cal.4th at p. 794 [no reversible prosecutorial misconduct

where the trial court sustained an objection to the prosecutor's improper question]; see also *People v. Morelos* (2022) 13 Cal.5th 722, 762, citing *People v. Bloom* (1989) 48 Cal.3d 1194, 1222 [having decided to testify at his capital trial, the defendant was free to do so in whatever manner he chose].)

For similar reasons, defendant fails to demonstrate that the prosecutor improperly elicited inadmissible aggravating evidence during his testimony. Defendant points to the prosecutor's questions about defendant assaulting a relative in Florida and disobeying his mother and court orders. However, defendant answered these questions over successful defense objections. Defendant contends that, by asking defendant how he survived on his own, "[t]he prosecutor improperly tried to bring out evidence that [defendant] targeted homosexuals." Even assuming this was the case, which requires speculation, the prosecutor did not pursue this line of questioning after the parties' sidebar and the challenged general question about survival was not answered.

Defendant next asserts that the prosecutor "improperly sought to create the impression that [defendant] had escaped from the California Youth Authority." The trial court concluded the prosecutor's first question about whether defendant tried to escape from any institutions up until his time at Log Cabin Ranch was within the scope of defendant's direct testimony about his various placements during the same time frame. Defendant answered the question in the negative. As for the prosecutor's subsequent inquiry as to why defendant went to prison at the age of 17, the prosecutor explained, outside the jury's presence, that he had not planned "on bringing up the escape from CYA" and did not wish to pursue the topic any further. When the parties returned before the jury, the

prosecutor's readback request of his last question was arguably meant simply to reorient the parties with where his questioning left off, with no improper goal of getting defendant to admit an "[a]ttempted escape." Nonetheless, even if we presume the prosecutor had improper motives, the trial court thereafter twice advised the jury not to consider defendant's admission for any purpose. We presume the jury followed the court's instructions. Under these circumstances, defendant fails to demonstrate any prejudice.

### c. *Closing Argument: Alleged Misstatement of the Facts*

Defendant contends the prosecutor committed prejudicial misconduct during his closing argument by mischaracterizing the evidence.

" 'Prosecuting attorneys are allowed "a wide range of descriptive comment" and their " ' "argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " [Citation.]' However, '[a] prosecutor's "vigorous" presentation of facts favorable to his or her side "does not excuse either deliberate or mistaken misstatements of fact." [Citation.]' " (*People v. Jackson* (2016) 1 Cal.5th 269, 349 (*Jackson*).)

### i. *Background*

The prosecutor began his penalty phase closing argument by reviewing the relevant factors under the jury's consideration. In highlighting "[t]he age of the defendant at the time of the crime" as a relevant factor, the prosecutor underscored how defendant was 16 years old when he killed Jackson and told jurors, "If you think that's a mitigating factor, put it down as a

mitigating factor . . . ."  The jury was provided with the transcript and audiotape of defendant's confession to Jackson's murder for consideration during its deliberations.  The prosecutor then referred the jury to the following question from Inspector McCoy to defendant, as reflected in the transcript, " 'Why did you strike Mr. Jackson on the head the way you've described?' "  The prosecutor pointed out that defendant's "initial response to that question without thinking about it" was " 'I don't know.  To tell you the truth, I really don't know.' "  The prosecutor then directed the jury to McCoy's subsequent question, " 'why didn't you just walk out of the apartment?' "  Defendant replied, " 'I don't know that either.' "  The prosecutor continued, "Inspector McCoy says, 'At the time you struck Mr. Jackson with the dumbbells, what was in your mind for the reason for doing so?' [¶] [. . .] now the wheels are turning.  [¶] 'I don't know.  I just hated him at the point in time.  I really despised him.'  [¶] That's all he said.  [¶] Inspector McCoy goes on and says, 'And what were the reasons at that time that you had for these feelings?'  [¶] [. . .] [¶] [Defendant]: 'Probably his homosexuality and the fact that he knew I was 16 years old and that he tried to engage in oral copulation with me.'  [¶] That's his reason for killing Mr. Jackson.  [¶] You can't assume the fact that Mr. Jackson really knew his age.  Because as you recall, the defendant had a fake I.D. on him when he was picked up six days later with the age of at least 18 on it.  [¶]  If you believe that to be an aggravating factor . . . .  Go back into the deliberation room and . . . determine what weight you want to put on that factor.  [¶] [. . .] [¶] Also, if I could . . .  go back to Mr. Jackson.  [. . .]  Bear in mind, if you listen to this tape and read your transcripts, you'll see that defendant had gone to Mr. Jackson's home over a course of a month at least four times.  [¶]

The first time he went to Mr. Jackson's residence a month or so prior to the killing of Mr. Jackson, the defendant stayed overnight. You will hear that on the tape." The prosecutor later directed the jury to, "listen to the tape. Please read the transcript. Listen to the tape, because this thing about sexual advances to Mr. Barrett may or may not have been true. And the reason I say that is because in the tape, you'll hear that the sexual advances by Mr. Jackson allegedly occurred in two different locations. [¶] First details to the officer, Inspector McCoy, is it happened in the bedroom. [¶] [. . .] You read later on, Inspector Dean on the same tape is asking the same questions approximately an hour later . . . . He changes the story. [¶] [. . .] [¶] The defendant says, 'In the living room.' [¶] Well, if, in fact, it really did happen, why did it supposedly happen in two different places? [¶] So before you take too much of that weight away from that situation based upon [defendant's] testimony that 'he made sexual advances toward me,' please listen to that tape."

Later in his argument, the prosecutor addressed defendant's stabbing of another inmate. The prosecutor argued, "Move on to February the 20th of 1995. Defendant walked up behind Inmate Chojnacki stabbing him in the back six times while the inmate was sitting down reading Bible Scriptures. Officer Charles Stuckey witnessed the assault. And Lieutenant Mark Hill personally observed the victim's stab wound . . . . [¶] People's Exhibit 356 was introduced into evidence. It was identified as being the victim's back in this case. [¶] People's Exhibit 355 was identified as being the victim's back in this case. [¶] [. . .] [¶] If you believed it happened beyond a reasonable doubt, you should write it down as an aggravating factor and place whatever weight you wish to place on it. [¶] [. . .] And

according to [defendant], and we haven't heard anything other than [defendant's] testimony, he was a child abuser.  Be that as it may, whatever he was, he was sitting on the curb on the bench while he walked up behind him, 'he' being [defendant], and stabbed him in the back six times.  The man was reading Bible Scriptures.  What does that tell you about the victim?  Whatever he was in prison for, he was trying to make a change in his life."  Defense counsel began to interject, "That's — that's — ," and the trial court stated, "That's argument."

The prosecutor subsequently argued to the jury that defendant's "aggravated battery on Lieutenant Fast by spitting on him" was "an aggravating factor, but [] certainly not the most aggravating factor you are going to hear in this case."  The prosecutor highlighted defendant's testimony that he " 'wanted to assault' " the officer, but his " 'hands were tied behind his back,' " so he " 'spit on him' " instead " '[b]ecause [the officer] didn't follow his agreement with [him].' "  The prosecutor further reiterated defendant's testimony to the effect that he and Lieutenant Fast agreed that defendant would "ride the beef" for "the flooding incident" and the "115 against Mr. Richmond" would be dismissed.  The prosecutor concluded his argument regarding this incident by stating, "In fact, you heard testimony that Mr. Richmond's 115 hearing was never heard because he died shortly later.  So."  Defense counsel objected, "that's a misstatement," but the trial court told him he could argue any inaccuracy during his argument.  The prosecutor then proceeded to discuss a different in-prison incident involving defendant.

In arguing the existence of additional aggravating evidence, the prosecutor underscored an incident on January 6, 1999, during which "the defendant broke away from Officer Stanley Whiting while being unshackled and assaulted Inmate

Foster by ramming his body into Foster. Inmate Foster was in a sitting position with his hands handcuffed behind his back at the time he was attacked[.] [. . .] During the incident Lieutenant Hunt was injured." The prosecutor continued, "Officer Whiting testified first concerning this incident. And through cross-examination it was determined that Officer Whiting lost a promotion to become a sergeant because of this incident. [¶] Officer Whiting says, 'He was able to do that only because of me.' He admitted it on the stand. 'It was my fault. I didn't follow procedure.' [Defendant] was waiting for an opportunity just like that. He's waiting for people to make mistakes, and then he takes advantage of it." The prosecutor concluded speaking about this incident by stating, "There are people inside that prison who are working, who are useful, productive members of society are subject to the abuse by [defendant] and others in there. Yeah, he does pose a threat to society."

The prosecutor drew the jurors attention to a different incident on, "February the 2nd the Year 2000. Now, [defendant's] in Tehachapi [State Prison] or being brought into Tehachapi to do a SHU term for some incident. [¶] The defendant set off the metal detector when being processed in the facility from Calipatria State Prison. Officer Cleto Navarro discovered several razorblades in a bucket the Defendant defecated in after setting off the metal detector."

### ii. Analysis

Defendant first contends the prosecutor "distorted the facts surrounding the death of James Jackson" by suggesting, based on defendant's possession of a fake ID upon his arrest days later, that Jackson may not have known he was 16 years old. Defendant further faults the prosecutor for suggesting

196

defendant may have been lying about Jackson's sexual advances because he contradicted himself about where in the apartment Jackson made those advances. However, the prosecutor's statements about the ID card and defendant's description about where Jackson's sexual advances occurred were fair comment on the evidence presented. Defendant testified that he had a fake identification card reflecting the age of "18 or older" on him when he was "picked up" in October of 1996; the prosecutor could fairly argue that jurors could infer defendant may have misrepresented his age prior to that date. Moreover, defendant first told detectives that Jackson's sexual advances occurred in the bedroom, and then the living room. Finally, during his discussion of these points, the prosecutor consistently referred jurors back to the tape and transcript of defendant's confession and urged them to form their own opinions in determining what weight to place on Jackson's murder as a factor in aggravation. On this record, defendant fails to persuade the prosecutor's comments amounted to misconduct.

Defendant next claims defendant misstated the circumstances of the evidence surrounding defendant's stabbing of inmate Chojnacki. Defendant argues that the evidence did not establish that Inmate Chojnacki was stabbed "six times." He points to Officer Stuckey's testimony that he saw defendant walk "up behind the other inmate and hit him in the back a couple of times," thus suggesting that he stabbed him fewer than six times. However, Stuckey also testified that he never approached the victim. Lieutenant Hill testified that he observed the victim's injuries and identified Exhibits 355 and 356 as "showing *some of the* puncture wounds that was [*sic*] on the back of the victim of this battery" and showing "further evidence of the puncture wounds on the back of the victim,"

respectively. (Italics added.) During his guilt phase cross-examination, defendant testified about the incident on February 20, 1995; he remembered "stabb[ing], I think it was a child abuser *several* times in the back while he was reading Bible Scriptures on the yard." (Italics added.) On this record, where witness testimony referenced "several" and "some" stab wounds, and the jurors had pictures of the wounds in front of them, defendant fails to show the prosecutor employed any unfair or deceptive means in arguing that Chojnacki was stabbed "six times" and referring the jury to the exhibits picturing his wounds. Moreover, on this record, any miscount by the prosecutor, i.e., the difference between "several" and "six," was negligible and could not harm defendant. (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1060 ["the penalty jury may consider *all* evidence relevant to aggravation or mitigation, whether admitted at an earlier phase for another purpose or at the penalty phase"].)

Furthermore, contrary to defendant's claim, the prosecutor's contention that Chojnacki's bible reading indicated he was trying to "make a change in his life," even if drawing a debatable deduction from the evidence, was arguably still within the realm of reasonable argument. (*Jackson*, *supra*, 1 Cal.5th at p. 349; cf. *People v. Dworak* (2021) 11 Cal.5th 881, 910–911 ["we have said that using colorful or hyperbolic language generally will not by itself establish prosecutorial misconduct"].) In any event, given that the jury knew defendant approached Chojnacki from behind, while he was defenseless and reading a bible, and stabbed him multiple times, there was no reasonable likelihood the jury would apply any improper embellishment by the prosecutor regarding Chojnacki's motive

for reading that Bible in "an objectionable fashion." (See *Ayala, supra*, 23 Cal.4th at p. 284.)

Defendant next asserts that the prosecutor provided an inaccurate characterization of the incident in which defendant and Richmond "received 115's for flooding their cell." Defendant asserts the prosecutor, based on a memorandum from the Calipatria Warden's Office provided to defense counsel but not admitted into evidence, knew the flooding 115 against Richmond had been adjudicated before his death. However, the prosecutor's argument in aggravation was focused on *defendant's act* of spitting on Lieutenant Fast after the flooding incident, and the passing reference to the tangential fact that Richmond died before he could be adjudicated for the incident posed no risk of harm to defendant.

Defendant next asserts that the prosecutor erroneously argued that Correctional Officer Stanley Whiting "lost a promotion" because of defendant. Defendant is correct that Officer Whiting only confirmed, during defense counsel's cross-examination, that defendant "was concerned about the fact that [his] transfer was held up because of his conduct." Whiting did not say he lost a promotion because of defendant. Regardless of whether it was reasonable to infer from Whiting's admitted fault in not keeping defendant adequately shackled and Whiting's delayed transfer that he lost out on a promotion, defendant fails to demonstrate that the prosecutor's passing statement caused him any harm. The focus of the prosecutor's argument with regards to this incident was that defendant took advantage of Whiting's mistake to attack another inmate, injuring an officer in the process. The prosecutor's mention of Whiting's missed promotion was insignificant to this argument in aggravation

and there is no reasonable probability the jury applied it in an objectionable fashion.

Finally, defendant faults the prosecutor for mentioning a "SHU" term in conjunction with introducing the February 2000 weapons possession incident as evidence in aggravation. In defendant's view, "the prosecutor's argument created the impression that in 2000, appellant had committed an *additional* serious act which made him too dangerous to remain in Calipatria's Ad Seg." We disagree. As defendant acknowledges, he was, in fact, serving a "SHU" term at the time of his transfer to Tehachapi as the result of an incident which occurred in June 1995. "The jury heard evidence about this incident, but was not told that [defendant] had received a [SHU] term as a consequence." Thus, the prosecutor's statement that defendant was "being brought into Tehachapi to do a SHU term for some incident" was true, but whether that truth was properly brought to the jury's attention is another question. Assuming it was not, we find no risk of harm. The jury was informed about the June 1995 incident itself, during which defendant assaulted another inmate with a weapon in the yard. Moreover, defendant's resulting SHU term from that incident was only mentioned briefly in highlighting a different incident in aggravation, i.e., defendant's weapon possession upon entering Tehachapi on February 2, 2000. The incidents themselves provided the aggravating evidence and there is no risk that the jury misapplied the prosecutor's reference to defendant's SHU term.

### d. Closing Argument: Alleged Misstatement of the Law

Defendant contends the prosecutor committed prejudicial misconduct by misstating the law at various points during his closing argument.

### i. Consideration of Remorse

First, defendant contends the prosecutor committed misconduct by telling jurors they could consider defendant's lack of remorse as an aggravating factor in support of the death penalty.

" 'Conduct or statements demonstrating a lack of remorse made at the scene of the crime or while fleeing from it may be considered in aggravation as a circumstance of the murder under section 190.3, factor (a). [Citations.] "On the other hand, *postcrime* evidence of remorselessness does not fit within any statutory sentencing factor, and thus should not be urged as aggravating." [Citations.]' When evidence of postcrime remorselessness has been presented, however, the prosecutor may stress that remorse is not available as a mitigating factor. [Citations.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 766.)

The prosecutor argued that defendant's actions around the time of Jackson's killing showed he had no remorse. He then told jurors: "I submit to you, ladies and gentleman, under CALJIC 8.85, Subsection 'A,' we're talking about the circumstances of the crime. You can consider remorse or lack of remorse as either a mitigating or an aggravating factor. [¶] Again, if there was remorse, it's mitigating. Put it on your mitigation list and put whatever weight you want on it. [¶] If it's aggravating, which I submit it is, lack of remorse is something that you should, in fact, put weight on and place on your aggravating factor list. The prosecutor then proceeded to discuss defendant's lack of remorse for Richmond's death. He highlighted defendant's "own statements concerning remorse." The prosecutor quoted defendant's statement in allocution, during which he told jurors, " 'I won't insult you. I have shed no

tears for Thomas Richmond. [¶] Someone once said that when you kill someone you take not only what he has, but all he could have, a future, and the possibilities that can never be. And I robbed him of that future. I know I did this, and I bequeath only pain to those that loved him. And there is no just compensation for a parent's loss. [¶] It's absolutely their right to request my death, and I don't flinch from that. Were the positions reversed, I would do the same thing.' " The prosecutor then stated, "Lack of remorse is an aggravating circumstance that you can apply under the 'A' section of CALJIC 8.85," and "you've got to make an independent choice as to how much weight you should put on that aggravating circumstance."

Here, the prosecutor's comments regarding defendant's lack of remorse for Jackson's killing in 1986 could not have qualified as "circumstances of the crime of which the defendant was convicted in the *present* proceeding" under section 190.3, subdivision (a) and were therefore improper. (Italics added.) As for defendant's lack of remorse for Richmond's murder, by quoting defendant's own statement in allocution, which he voluntarily gave during the penalty phase,[29] the prosecutor was arguably just inviting the jury to listen to defendant's own perspective about the harm he caused. (Cf. *People v. Edwards* (1991) 54 Cal.3d 787, 833 ["The word 'circumstances' as used in factor (a) of section 190.3 does not mean merely the immediate temporal and spatial circumstances of the crime. Rather it extends to '[t]hat which surrounds materially, morally, or

---

[29] As the trial court instructed the jury before defendant's statement in allocution, "Ladies and gentleman, the law does allow the Defendant to exercise a right to what we call 'allocution,' which means just being able to tell you what he wants to tell you [subject to cross-examination]."

logically' the crime. [Citation.] *The specific harm caused by the defendant does surround the crime* 'materially, morally, or logically' "], italics added.) However, to the extent the prosecutor's subsequent comments equated defendant's statements about his feelings regarding Richmond's death with aggravating post-crime lack of remorse, they were improper. Nevertheless, we conclude there was no prejudice to defendant.

The prosecutor's case in aggravation was based on defendant's numerous acts of violence, including two murders, six different in-custody assaults on other inmates, including a stabbing, and four assaults on correctional officers, including punching an officer in the face. In the context of the prosecutor's entire case, there is no reasonable probability that any impropriety in the prosecutor's reference to defendant's lack of remorse as an "aggravating factor" affected the outcome of his penalty phase trial. (See *Dworak, supra*, 11 Cal.5th at pp. 914–915 [no need to resolve the question of whether the prosecutor's statements alluding to the defendant's lack of remorse constituted misconduct because there was "no reasonable possibility that the error affected the jury's death verdict" when "[t]he bulk of the prosecutor's case in aggravation concerned other evidence"]; *People v. Brown* (2003) 31 Cal.4th 518, 553 [no prejudicial misconduct from the prosecutor's comments before the jury where "the remarks were brief and fleeting, asserting nothing the evidence did not already suggest"].)

### ii. Consideration of the Circumstances of the Crime

Next, defendant asserts that the prosecutor "significantly distorted the jury's understanding of how it could consider the circumstances of the crimes under factor (a), in more than one way." The Attorney General concedes that the prosecutor

incorrectly advised jurors that "the circumstances of the crime" under section 190.3, factor (a) can be considered "[s]trictly for aggravating circumstances only." To the contrary, "[s]ection 190.3, factor (a), permit[s] the jury to consider the 'circumstances of the crime' as a factor in aggravation *or* mitigation[.]" (*People v. Bell* (2007) 40 Cal.4th 582, 619, italics added; see also *People v. Jones* (2012) 54 Cal.4th 1, 76 [same].) Thus, the prosecutor misstated the law. However, defendant fails to show prejudice. The trial court provided the jury with instructions under CALJIC 8.85 that accurately stated the law, and we presume the jury understood and followed those instructions. (*Bennett*, *supra*, 45 Cal.4th at p. 596.)

Next, defendant argues that the prosecutor prejudicially misstated the law by telling jurors they could consider the assaults on Young and Spychala as aggravating evidence under section 190.3, factor (a). In fact, the prior acts of violence fell under factor (b)'s provision for "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, subd. (b).) However, despite initially telling jurors they could consider Young's assault under factor (a), the prosecutor self-corrected, admitting he was "wrong" to state that Young's assault could be considered as factor (a) evidence; it had "to be proven beyond a reasonable doubt" under factor (b). Similarly, while initially telling jurors they could consider Spychala's assault as factor (a) or factor (b) evidence, the prosecutor ultimately told jurors, "Back under the 'B' section you probably should because the burden of proof, once again, is proof beyond a reasonable doubt." Given the prosecutor's corrections, there was no risk of prejudice. To the extent the prosecutor's explanation of the proper consideration

of Spychala's assault suggested that the People did not have to prove the offense beyond a reasonable doubt, there could be no prejudice to defendant on the record here. Defense counsel conceded that defendant, by his own admissions, assaulted Spychala, but argued to jurors the admittedly "small point" that defendant "slashed down" on Spychala as opposed to "stab[bed] him." Defense counsel further highlighted defendant's forthrightness about the incident, "He owned up to everything. You can't call him evasive. 'I struck at him when he punched me in the face.' Maybe that's an overreaction. Probably is. But there is an element of self-defense there." Moreover, Spychala's assault formed a very small part of the prosecution's case in aggravation. Any misstatement was therefore harmless. (See *Dworak*, *supra*, 11 Cal.5th at p. 915.)

### e.  Closing Argument: Alleged Misuse of Prestige of His Office

Lastly, defendant alleges the prosecutor improperly invoked the authority of his office during the penalty phase by equating his role as a prosecutor with the pursuit for justice.

During the penalty phase arguments,[30] the prosecutor quoted the jury's instruction under CALJIC No. 8.88, which describes, inter alia, how the jury should weigh aggravating and mitigating circumstances in deciding whether to impose a sentence of life without parole or death. The prosecutor reminded jurors that the instruction provides, " 'To return a judgment of death each of you must be persuaded that the aggravating circumstances are so substantial in comparison to the mitigating circumstances that it warrants death instead of

---

[30]  Both the prosecutor and defense counsel argued twice to the jury during the penalty phase.

life without parole.' " The prosecutor then told jurors, "you don't just take aggravating circumstances and mitigating circumstances, put them on a scale, and see which one weighs more than the other. Uh-uh. [¶] You take each one individually. You evaluate it. You go back in that jury deliberation room, you talk about it amongst yourselves and then you subjectively each place a weight on each aggravating factor, each mitigating factor. [¶] After you've done that, then, you look and see whether or not the aggravating factors are so substantial in comparison to the mitigating factors that justice demands a death penalty. [¶] And that's exactly what he have here. We have a situation where if you do that you will find that the aggravating factors or aggravating circumstances are so substantial when you compare them against the mitigating circumstances that justice demands the penalty of death. [¶] And I don't say that lightly. I'm not up here to — it's difficult for me, too. It's no fun for me as well. I don't get any enjoyment out of this. I believe in justice, as I've told you from the beginning, and that's all I'm asking you to do in this case."

Defendant refers back to his argument, which we previously rejected (see *ante*, at pp. 107–108), that the prosecutor committed misconduct during the guilt phase by telling jurors he represented the People of the State of California and asserts that the prosecutor "returned to this improper theme" by arguing that he "got no personal satisfaction in asking for a death verdict."

Read in context, the prosecutor's comments did not equate to improper "vouch[ing] for the strength of [his] case[] by invoking . . . the prestige or reputation of [his] office." (See *People v. Huggins* (2006) 38 Cal.4th 175, 206–207.) The prosecutor reminded jurors that to legally return a death

verdict, the aggravating circumstances had to be "so substantial in comparison with the mitigating circumstances" that the death penalty was warranted. The prosecutor then said that, under that standard, jurors should return a death verdict, which would be consistent with "justice." There was no misconduct.

### f. There Was No Cumulative Prejudice From The Prosecutor's Penalty Phase Argument

Defendant argues that, even if the alleged instances of prosecutorial misconduct during the penalty phase closing argument did not individually prejudice defendant, they combined to deprive him of a fair trial. Having either found no misconduct or that any possible misconduct could have no impact on the jury's assessment of the penalty phase evidence, there was no risk of cumulative prejudice.

### 6. The Trial Court Did Not Err by Suspending Penalty Phase Jury Deliberations For 11 Days

Defendant asserts that the trial court abused its discretion and violated his constitutional rights by taking an 11-day recess during the jury's penalty phase deliberations.

### a. Background

On February 3, 2004, prior to the prosecution's penalty phase opening statement, the trial court explained, "Juror No. 1 informed the bailiff this morning that if this trial goes into March, she's going to have a problem because she has a pre-paid vacation in Hawaii." The court then inquired of the parties how long they expected to need to put on their evidence; the prosecutor said "[n]o more than three weeks" and defense counsel said "[a] week." The trial court stated, "we're not going to be able to take any breaks then[,]" apart from Wednesdays. The prosecutor thereafter offered an opening statement.

On Tuesday, February 24, 2004 at 10:54 a.m., the jury began its penalty deliberations. At 11:20 a.m., the court and the parties convened outside the jury's presence. The trial court explained, "The bailiff has handed me a note from the foreperson [Juror No. 7] that says, '[Juror No. 1] will be going to Hawaii Monday, March 1st to March 9th. If we do not come to a decision before then, will it be okay to take that week off?' [¶] And my inclination would be to say yes." Defense counsel replied, "Yes. I agree." Defendant interjected, "Encourage them to make a decision before then, but — " Before defendant could finish his statement, defense counsel said: "Don't do that." The court then stated, "The longer it lasts, the better off it generally is for your side." Defense counsel added, "We're not juror shopping at this point in the trial." The court "direct[ed] the bailiff to inform the jury that counsel have agreed to their request and also to inform them that they may now set their own hours." The trial court thereafter advised the parties, "We have the follow-up note now. [. . .] They're going to break March 1st through March 9th and start back up on March 10th." The prosecutor responded, "Okay," and defense counsel did not say anything. The jury continued deliberations until 4:00 p.m. on that day (Tuesday, February 24th). The jury deliberated from 9:40 a.m. to 4:00 p.m. the following day (Wednesday, February 25th). The jury recessed all day on Thursday, the 26th to accommodate Juror No. 6's day trip to San Diego. The jury reconvened on Friday, February 27th at 9:30 a.m. At 3:00 p.m. that day, the jury recessed until March 10th.

On March 10, 2004 at 9:30 a.m., jury deliberations resumed. At 10:37 a.m. that morning, the "court reconvened in open court after receiving a note from the jury that they have

reached a verdict." The clerk thereafter pronounced the jury's penalty verdict of death.

### b. *Analysis*

On this record, we agree with the Attorney General that defendant is precluded from claiming error on appeal. Defense counsel agreed to the break in deliberations and discouraged defendant from suggesting that jurors should reach a verdict more quickly — defense counsel added, "we are not juror shopping at this point." It is clear that defense counsel considered the recess, spanning seven court days, to accommodate Juror No. 1's previously discussed vacation schedule to be in defendant's best interests. Defendant cannot now claim the trial court erred. (See, e.g., *People v. Masters* (2016) 62 Cal.4th 1019, 1069 [the defendant's failure to object forfeited his claim that the trial court erred by recessing for nine court days during the jury's guilt phase deliberations]; *People v. Bolden* (2002) 29 Cal.4th 515, 561–562 [failure to object to a 13-day interruption in jury deliberations forfeited claim of trial court error].)

Defendant relies on *People v. Santamaria* (1991) 229 Cal.App.3d 269 to argue that appellate review is necessary notwithstanding defense counsel's concession to the recess. However, in *Santamaria*, the court itself initiated the break in jury deliberations without "good cause" (*id.* at p. 277) and despite the parties' willingness to substitute in another judge to avoid suspending deliberations (*id.* at p. 278). Under these distinct circumstances, the *Santamaria* court concluded "[t]he court's abuse of discretion here was of such magnitude that whether or not appellant objected is irrelevant." (*Id.* at p. 279, fn. 7.) The circumstances here, where the prosecution and

defense counsel acceded to the break in deliberations to accommodate a juror's vacation, render *Santamaria*'s reasoning on this point inapplicable. (See *People v. Ochoa* (2001) 26 Cal.4th 398, 441 ["The timing of the delay, and the disregard for the requested alternative of a substitute judge, distinguish *Santamaria* from the instant case"].)

Nor has defendant established prejudice from the agreed-upon suspension of the jury's penalty phase deliberations. Defendant's assertions that the jurors in defendant's case were particularly vulnerable to improper influences during their break because of the media attention given to defendant's case and the small size of the community in which he was tried are speculative and unconvincing. As previously stated, we presume the jurors followed the court's instruction to avoid media accounts of the case. Moreover, the fact that the penalty verdict was returned the same day the jury reconvened does not establish prejudice. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1162 [rejecting as speculative the defendant's "claim that the jury's penalty verdict, returned on the same date court proceedings were reconvened, was the direct and prejudicial result of the recess"].)

### E. Combined Cumulative Error

Defendant contends that all alleged errors, during both the guilt and penalty phases, combined to deprive him of reliable verdicts. We disagree. We have rejected each of defendant's claims of error during the guilt and penalty phases individually, as well as his claims of cumulative prejudice therein. His attempt to aggregate all alleged errors into a single claim of cumulative error is made no more persuasive by its reframing.

### F. Challenges to California's Death Penalty Law

Defendant challenges the constitutionality of various features of California's capital sentencing scheme. He recognizes that we have "consistently rejected" such challenges, but he presents them to urge our reconsideration and preserve them for federal consideration. Defendant provides no compelling reason for us to revisit our precedents, and we reiterate the following:

Section 190.2 is not impermissibly broad. (*People v. Wilson* (2023) 14 Cal.5th 839, 865 (*Wilson*); *People v. Thomas* (2023) 14 Cal.5th 327, 408 (*Thomas*).) "California's statutory special circumstances are not so numerous or expansive that they fail to perform their constitutionally required narrowing function." (*Wilson*, at p. 865.)

" 'Section 190.3, factor (a), directs the jury to consider as evidence in aggravation the circumstances of the capital crime. This has not resulted in the wanton imposition of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments by permitting prosecutors to argue that the various features of the murder, even features that are the converse of those in other cases, are aggravating factors.' " (*Thomas, supra*, 14 Cal.5th at p. 409, quoting *Schultz, supra*, 10 Cal.5th at p. 683.)

"California's death penalty scheme does not violate the federal Constitution for failing to require written findings (*People v. Rhoades* (2019) 8 Cal.5th 393, 455 [255 Cal. Rptr. 3d 453, 453 P.3d 89] (*Rhoades*)); unanimous findings as to the existence of aggravating factors or unadjudicated criminal activity ([*People v.*] *Morales* [(2020)]10 Cal.5th [76,] 113–114); or findings beyond a reasonable doubt as to the existence of

aggravating factors (other than § 190.3, factor (b) or (c) evidence), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty (*People v. Fayed* (2020) 9 Cal.5th 147, 213 [260 Cal. Rptr. 3d 761, 460 P.3d 1149] (*Fayed*); *People v. Krebs* (2019) 8 Cal.5th 265, 350 [255 Cal. Rptr. 3d 95, 452 P.3d 609])." (*Wilson, supra*, 14 Cal.5th at p. 866.) The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296, 303–305 do not compel different conclusions. (*People v. Bracamontes* (2022) 12 Cal.5th 977, 1004).) It naturally follows that "[n]either the federal Constitution nor state law requires the jury be instructed that the prosecution bears some burden of proof as to the truth of the aggravating factors (other than [section 190.3,] factor (b) or (c) evidence) or the appropriateness of a death verdict." (*Schultz, supra*, 10 Cal.5th at p. 683.)

The standard instructions concerning a jury's determination of the appropriate penalty (CALJIC No. 8.88) are not unconstitutionally vague. The instruction provides that, "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are *so substantial* in comparison with the mitigating circumstances that it *warrants* death instead of life without parole." (Italics added.) Contrary to defendant's claim, "[i]nforming the jury that a death verdict is ' "warranted" ' if the aggravating factors are ' "so substantial" ' in comparison with the mitigating factors is not impermissibly broad or vague." (*Schultz, supra*, 10 Cal.5th at p. 683.) Nor must the jury "be instructed that it must return a verdict of life without the possibility of parole if it finds the mitigating circumstances outweigh the aggravating circumstances." (*Id.* at pp. 683–684.) Furthermore, the standard instructions are not

constitutionally infirm for failing to tell jurors that "a defendant bears no burden of proving the facts in mitigation, or that mitigating circumstances did not have to be found unanimously. [Citation.] And the death penalty law does not require the jury be instructed that there is a presumption that life without possibility of parole is the appropriate sentence." (*Id.* at p. 684.)

"An instruction reflecting section 190.3's use of adjectives such as 'extreme' and 'substantial' in factors (d) and (g) does not interfere with a defendant's right to present mitigating evidence. ([*People v.*] *Brooks* [(2017)] 3 Cal.5th [1], 115; *People v. Adcox* (1988) 47 Cal.3d 207, 270 [253 Cal. Rptr. 55, 763 P.2d 906].) Nor must a court delete from the instructions any inapplicable mitigating factors, or identify which factors are aggravating and which are mitigating." (*Schultz, supra,* 10 Cal.5th at p. 684.)

The federal Constitution does not require that our death penalty procedures provide for "[c]omparative intercase proportionality review." (*Thomas, supra,* 14 Cal.5th at p. 409, quoting *People v. Snow* (2003) 30 Cal.4th 43, 126.) Our "capital sentencing scheme does not violate equal protection by denying certain procedural protections to capital defendants that are available to noncapital defendants." (*Mataele, supra,* 13 Cal.5th at p. 436.)

Finally, we have repeatedly held that California's death penalty scheme does not violate international law or evolving standards of decency. (See, e.g., *Thomas, supra,* 14 Cal.5th at p. 409; *Wilson, supra,* 14 Cal.5th at p. 867.)

## III. DISPOSITION

We affirm the judgment in its entirety.

**GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Barrett

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S124131
**Date Filed:** June 23, 2025

_____

**Court:**  Superior
**County:**  Imperial
**Judge:**  Joseph Zimmerman

_____

**Counsel:**

Lisa M. Romo, under appointment by the Supreme Court; Michael J. Hersek and Galit Lipa, State Public Defenders, Jessie Hawk and Catherine White, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and James William Bilderback II, Assistant Attorneys General, Holly D. Wilkens, Theodore M. Cropley, Kristine A. Gutierrez and Anne Spitzberg, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Catherine White
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA 94607
(510) 267-3300

Anne Spitzberg
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9561